**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
                                                       :
In re:                                                 :    Chapter 11
                                                       :
COCOA SERVICES, L.L.C., et al.,                        :    Case No. 17-11936
                                                       :
                              Debtors.[1]              :    Joint Administration Requested
                                                       :
----------------------------------------------------------------X

**DECLARATION OF ROBERT J. FREZZA PURSUANT TO**
**LOCAL BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF CHAPTER 11**
<u>**PETITIONS AND FIRST DAY MOTIONS**</u>

I, Robert J. Frezza, declare, pursuant to section 1746 of title 28 of the United States Code,

that:

1.      I am a Managing Director with Deloite CRG ("<u>Deloitte</u>").  I have more than 30

years of experience providing financial advisory services to clients across numerous industries in

the United States and Europe.

2.      I have been engaged to serve as Chief Restructuring Officer ("<u>CRO</u>") by Cocoa

Services, L.L.C. ("<u>Cocoa Services</u>") and Morgan Drive Associates, L.L.C. ("<u>Morgan Drive</u>"),

the debtors and debtors-in-possession (each a "<u>Debtor</u>" and collectively the "<u>Debtors</u>") in the

above-captioned chapter 11 cases (the "<u>Bankruptcy Cases</u>").  My engagement as CRO for the

Debtors began shortly before the Debtors' bankruptcy filings.

3.      The Debtors are limited liability companies organized under the laws of the State

of New Jersey, with their principal place of business located at 400 Eagle Court, Swedesboro, NJ

08085.

---

[1] The last four digits of the Debtor's taxpayer identification number is as follows: Cocoa Services, L.L.C. (3769) and
Morgan Drive Associates, L.L.C. (2335).  The Debtors' principal office is located at 400 Eagle Ct., Swedesboro, NJ
08085.

4.      In performing the duties of CRO for the Debtors, I have become familiar with the Debtors' business history, their corporate and capital structures, their business operations and financial affairs, and their books and records, as well as the Debtors' recent restructuring efforts.

5.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court").  The Debtors are affiliates of and wholly-owned subsidiaries of Transmar Commodity Group, Ltd. ("TCG").  TCG is currently a debtor in its own chapter 11 bankruptcy case, styled In re Transmar Commodity Group, Ltd., Case No. 16-13625 (the "TCG Bankruptcy Case") pending in the Court, which case has been assigned to the Honorable James L. Garrity, Jr.  As a result, venue for these Debtors is proper in this Court pursuant to 28 U.S.C. § 1408(2).

6.      The Debtors intend to operate their businesses as debtors-in-possession under 11 U.S.C. §§ 1107 and 1108.

7.      To minimize the adverse effects of filing for chapter 11 protection, while at the same time maximizing value for the benefit of all stakeholders, the Debtors have filed or will file a number of pleadings requesting various "first day" relief (each a "First Day Pleading," and collectively, the "First Day Pleadings") contemporaneously with the filing of this Declaration ("Declaration").  I am familiar with the content of each First Day Pleading and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First Day Pleading: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption; (b) is critical to the Debtors' efforts to preserve value and maximize recoveries for their creditors; and (c) best serves the Debtors' estates and creditors' interests.  Further, it is my belief that the relief sought

in the First Day Pleadings is narrowly tailored and necessary to achieve the goals of these Bankruptcy Cases.

8.    I submit this Declaration in support of the Bankruptcy Cases and the First Day Pleadings.  Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by members of the Debtors' management team or the Debtors' professionals; (c) my review of relevant documents, including the Debtors' books and records; and (d) my opinion, based upon my experience and knowledge of the Debtors' operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Declaration on behalf of the Debtors.

9.    This Declaration consists of four parts.  Part I provides an overview of the Debtors' business history, current operations, organizational and capital structure and prepetition indebtedness.  Part II describes the circumstances leading up to and surrounding the commencement of the Bankruptcy Cases.  Part III sets forth relevant facts in support of First Day Pleadings.  Part IV sets forth the information required by Local Bankruptcy Rule 1007-2.

## PART I

## BUSINESS AND BACKGROUND

### A.    Overview and Nature of the Business.

10.    Cocoa Services operates a cocoa liquor and cocoa butter melting and deodorizing facility in Logan Township, Gloucester County, New Jersey (the "Facility").

11.    Morgan Drive is a real estate holding company that owns the land and building at which Cocoa Services operates.

12.    The Debtors are part of a vertically-integrated group of companies that until recently supported multi-faceted services and a supply chain for cocoa products, including

commercial activity (i.e., sales and trading of cocoa products), purchasing and importation of cocoa products, cocoa origination functions and processing for raw cocoa products (the "Cocoa Companies").

13.     As a result of, among other things, the TCG Bankruptcy Case (referenced above), many of the companies in this vertically-integrated group of Cocoa Companies have encountered financial distress and are in the process of being wound down or sold.

### B.     Current Corporate Structure.

14.     As set forth above, the Debtors are wholly-owned subsidiaries of TCG, which is a corporation organized under the laws of the State of New York.

15.     TCG is a wholly-owned subsidiary of a private limited liability company organized under the laws of England and Wales known as Transmar Group Ltd. (together with its subsidiaries and other affiliates, "Transmar Group").

16.     Transmar Holdings LLC, a Delaware limited liability company ("Transmar Holdings"), owns 85.135% of Transmar Group, while ITC Cocoa House Ltd., a private limited liability company organized under the laws of England and Wales, owns the other 14.865% of Transmar Group.  ITC Cocoa House Ltd. is a wholly-owned subsidiary of ITOCHU Corporation, a Japanese corporation whose stock is traded on the Tokyo Stock Exchange.  Transmar Holdings itself is a wholly-owned subsidiary of Morristown Group LLC, a Delaware limited liability company, which in turn is wholly owned by Peter G. Johnson, Mary Johnson, Peter B. Johnson, Timothy B. Johnson and Patricia Johnson Gasek, collectively (together, the "Johnson Family").

17.     An organizational chart illustrating the corporate structure of the Debtors and certain related entities and affiliates is annexed hereto as **Exhibit A.**

**C.**     **Ownership of Cocoa Services/Morgan Drive**

18.     In or around December 1992, Cocoa Services, L.P., a New Jersey limited partnership, was founded as a joint venture beneficially owned by members of the Johnson Family and the members of another family, the Lyons family, that also owned other businesses providing services to the cocoa industry.

19.     In 2011, Cocoa Services L.P. and its general partner, Cocoa Services, Inc., a New Jersey corporation that was also beneficially owned by members of the Johnson family and the Lyons family, merged into the debtor Cocoa Services, then a newly formed entity whose members at the time were (i) Transmar Group, L.L.C. – CS Series, a series of a Delaware limited liability company, beneficially owned by members of the Johnson family ("CS Series"), and (ii) Lyons Cocoa, LLC, a New Jersey limited liability company, beneficially owned by members of the Lyons family ("Lyons Cocoa").

20.     At around the same time, Morgan Drive, whose equity was owned directly by members of the Johnson Family, and 400 Eagle Court, LLC, a New Jersey limited liability company affiliated with the Lyons family, each obtained a fifty percent (50%) interest in the Facility from Barry Callebaut U.S.A., LLC, a Delaware limited liability company.

21.     In or around April 2014, Lyons Cocoa sold its interest in Cocoa Services to CS Series, and 400 Eagle Court, LLC sold its real estate interest in the Facility to Morgan Drive.

22.     In February 2016, a global restructuring of the Transmar Group was undertaken, which resulted in, among other things, CS Series becoming a subsidiary of Morristown Group LLC, and the Debtors becoming subsidiaries of TCG.

**D.**     **Operations**

23.     Cocoa Services' operations involve processing solid block raw cocoa butter and cocoa liquor as well as the deodorization of raw cocoa butter for the benefit of its customers.

Cocoa Services does not own any of the raw cocoa butter or cocoa liquor which it processes. Instead, Cocoa Services functions as a tolling operation,[2] wherein Cocoa Services processes the raw cocoa product owned by its customers and delivers that product back to its customers, in its refined form, via bulk stainless steel trailers or tankers.

24.     In connections with its operations, Cocoa Services has a cocoa butter melting capacity of six (6) metric tons ("MTs") per hour, a cocoa liquor melting capacity of four (4) MTs per hour and a deodorizing capacity of approximately ten (10) MTs per hour.

25.     As noted above, Cocoa Services stores cocoa butter and cocoa liquor for various third-parties in its warehouse including for FCStone Merchant Services, LLC; The Hershey Company ("Hershey"); Icestar B.V.; Olam Group and TCG.  Cocoa Services does not claim any ownership right in these goods; however, it may, in certain instances, have possessory and/or warehouseman's liens against the third-party goods in its warehouse.

26.     Cocoa Services has approximately twenty-two (22) employees (the "Permanent Employees") and also utilizes the services of approximately twelve (12) temporary employees employed by various staffing agencies (the "Temporary Employees," and together with the Permanent Employees, the "Employees").   These Employees perform a variety of duties, including technical, administrative, production, laboratory, finance and logistics operations.

27.     Morgan Drive owns the Facility at which Cocoa Services operates its processing operations and does not have any employees or any direct manufacturing functions.

### E.     Customers

28.     Cocoa Services is located near Philadelphia and is well-situated to service the needs of various customers on the East Coast and in the Mid-West.   Historically, Cocoa

---

[2] A "tolling operation" is an arrangement in which a company (which has specialized equipment) processes raw materials or semifinished goods for another company.

Services' largest customers were TCG and Hershey, with TCG being by and large Cocoa Services' largest customer. Since the filing of the TCG Bankruptcy Case, Hershey has become Cocoa Services' primary and largest customer.

### F. The Facility

29.     The Facility is designated as a Kosher and Safe Quality Foods ("SQF") Level 2 certified facility under the Global Food Safety Initative ("GFSI"). The Facility has an onsite lab and provides quality and sensory testing to comply with its customer specifications. The Facility also has a storage capacity for approximately 2,400 MTs of solid product, 800 MTs of liquid product and two (2) covered loading bays for delivery of melted cocoa butter and/or cocoa liquor. In addition, the Facility has the ability to establish connections to local railroad tracks and to expand the capacity of its warehouse space.

### G. Prepetition Indebtedness.

#### a) Secured Equipment Financing Agreement

30.     On April 8, 2014, Cocoa Services entered into a Master Equipment Financing Agreement (as amended, the "Equipment Financing Agreement") with Bank of the West ("BOW"), pursuant to which BOW loaned Cocoa Services funds, described below, to acquire, among other things, certain machinery and equipment as set forth in the schedule incorporated as part of the Equipment Financing Agreement (the "Schedule") and for working capital and other purposes.

31.     As security for repayment of this loan, Cocoa Services granted BOW a first-priority security interest in and lien upon (the "Prepetition Lien") certain of Cocoa Services' assets, as described in the Schedule, including all of Cocoa Services' equipment, machinery, tools, parts, inventory, fixtures, accounts, documents, general intangibles, contract rights, government payments, chattel paper, rents and income payment intangibles and obligations

arising now or hereafter thereunder and all proceeds of any of the foregoing and all products of, additions to, replacements of, and returns and repossession of such collateral and all accessories, accessions, parts and machinery and equipment now or hereafter affixed to such collateral, as further set forth in the Equipment Financing Documents (collectively, the "Prepetition Collateral").[3]

32.    In connection with the Equipment Financing Agreement, BOW made an original advance in the amount of $7,342,834.42, and a subsequent advance in the amount of $185,000.00 to Cocoa Services.  Prior to the Petition Date, interest on both the loans accrued at a rate of 30 day LIBOR plus 3.50%, set annually.  The current interest rate is 4.4861%.

33.    As of the Petition Date, Cocoa Services was indebted to BOW in the approximate amount of $5,308,526.09.

### b)    Unsecured Debt

34.    In connection with CS Series' acquisition of Lyons Cocoa's interest in Cocoa Services in or about April 2014, CS Series executed an unsecured promissory note dated April 14, 2014 in favor of Lyons Cocoa (the "Lyons Note") in the original principal amount of $4,000,000.

35.    In or about early 2016, as part of a restructuring of Transmar Group, Cocoa Services assumed the liabilities and obligations of CS Series under the Lyons Note.

36.    As of the Petition Date, Cocoa Services owed Lyons Cocoa the approximate sum of $2,024,661.80.

37.    As of the Petition Date, the Debtors were also indebted to various other unsecured creditors in a total approximate amount of  $508,137.09.  Certain of these unsecured creditors,

---

[3] Morgan Drive is not obligated to BOW under the Equipment Financing Documents or otherwise, and BOW does not have a lien on any of Morgan Drive's assets. Further, for the avoidance of doubt, the proposed Adequate Protection Liens will not encumber any of Morgan Drive's assets.

Cocoa Services submits, are critical to both the continued operations of Cocoa Services' business and the preservation of value of its assets.

## PART II

## EVENTS LEADING TO THE COMMENCEMENT OF THE BANKRUPTCY CASES

38.    Although historically Cocoa Services has been a healthy, profitable company, the TCG Bankruptcy Case, and TCG's subsequent wind-down, has caused Cocoa Services significant financial distress.  In particular, the loss of TCG as Cocoa Services' largest customer has created a severe liquidity crisis for Cocoa Services.

39.    Further, given the fact that, as part of its rent to Morgan Drive, Cocoa Services was obligated to pay the real estate taxes and other real estate-related obligations of Morgan Drive, Morgan Drive itself now also faces an imminent liquidity crisis.

40.    As a result of these imminent liquidity crises, the Debtors have determined that an immediate sale of substantially all of their assets is the best alternative to maximize value for creditors.

41.    Consequently, between approximately February and May 2017, the Debtors embarked on a process to actively market their assets for sale.  In connection with this marketing process, a number of third parties expressed interest in the Debtors' assets and entered into confidentiality agreements with the Debtors enabling these third parties to review documents and related due diligence materials.

42.    As a result of the foregoing, and as set forth in further detail herein, in or about May 2017, the Debtors received an offer to purchase substantially all of their assets from an entity known as JB Cocoa, Inc. ("JB Cocoa").  Shortly after the Petition Date, the Debtors will be filing is a motion pursuant to section 363 of the Bankruptcy Code to sell substantially all of

their assets, free and clear of liens, claims and encumbrances, to JB Cocoa, subject to any higher or better offers.

43.     In connection with their efforts to maximize the value of their assets for the benefit of creditors, in recent weeks, Debtors have also been involved in discussions with BOW in an effort to develop a consensual path forward in these cases to accomplish the proposed sale(s).

## PART III

## FACTS IN SUPPORT OF FIRST DAY PLEADINGS[4]

44.     Concurrent with the filing of these Bankruptcy Cases, the Debtors are filing the First Day Pleadings, wherein the Debtors are requesting various forms of relief.

45.     Generally, the Debtors narrowly tailored the First Day Pleadings to enable the Debtors to meet their goals of: (a) continuing operations in chapter 11 with as little disruption as possible; (b) maintaining the confidence and support of employees, vendors, contract counterparties and service providers during these chapter 11 proceedings pending the ultimate sale of their assets; and (c) establishing procedures for the smooth and efficient administration of these Bankruptcy Cases.

46.     Given the importance of the relief sought in the First Day Pleadings to the Debtors' ability to preserve value, and because certain of the First Day Pleadings seek emergent relief, the Debtors request that the Court conduct a hearing on the First Day Pleadings immediately after the commencement of the Bankruptcy Cases (the "First Day Hearing"), at which time the Debtors will request that the Court consider certain of the First Day Pleadings.[5]

---

[4] This section is intended only as a summary of the key provisions of the First Day Pleadings and the relief sought therein.

[5] Capitalized terms used below in the description of the First Day Pleadings and not otherwise defined have the meanings given to them in the applicable First Day Pleadings.

47.     With respect to that application in the First Day Pleadings requesting authority for Cocoa Services to pay discrete prepetition unsecured claims or to continue selected prepetition payment programs (<u>e.g.</u>, those First Day Pleadings seeking relief related to Cocoa Services' prepetition obligations to its employees, critical vendors and insurers), I submit that the relief requested is both essential to Cocoa Services' operations and necessary to avoid immediate and irreparable harm to the Debtors and their estates.

48.     For these reasons, I respectfully request that the Court grant the relief requested in the First Day Pleadings.

## I.     ADMINISTRATIVE MOTIONS

### i.     *Motion for Entry of an Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure Directing Joint Administration of the Chapter 11 Cases (the "<u>Joint Administration Motion</u>")*

49.     The Debtors request entry of an order pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 1015(b) directing joint administration of the Bankruptcy Cases for procedural purposes only. Specifically, the Debtors request that this Court maintain one file and one docket for each of Bankruptcy Cases under the lead case, Cocoa Services, L.L.C.  Further, the Debtors request that an entry be made on the docket of each of the Bankruptcy Cases to indicate the joint administration of the Bankruptcy Cases.

50.     The Debtors also seek authority to file the monthly operating reports required by the U.S. Trustee's Operating Guidelines on a consolidated basis, but intend to track and break out disbursements on a Debtor-by-Debtor basis.

51.     Given the integrated nature of the Debtors' businesses, joint administration of the Bankruptcy Cases will provide significant administrative convenience without harming the substantive rights of any party-in-interest. Many of the motions, hearings, and orders that will be filed in the Bankruptcy Cases will almost certainly affect both of the Debtors. The entry of an

order directing joint administration of the Bankruptcy Cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties-in interest to monitor the Bankruptcy Cases with greater ease and efficiency.

52.    I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully request that the Court grant the Joint Administration Motion.

**ii.    *Motion for an Order Extending the Debtors' Time to File Their Schedules of Assets and Liabilities and Statements of Financial Affairs (the "<u>Schedules and SOFA Motion</u>")***

53.    Through the Schedules and SOFA Motion, the Debtors requests entry of an order granting a thirty-one (31) day extension of the time for the Debtors to file their schedules of assets and liabilities and statements of financial affairs (collectively, the "<u>Schedules and SOFA</u>") for a total of forty-five (45) days after the Petition Date. The nature and scope of Cocoa Services' operations requires Cocoa Services to maintain fairly voluminous and complicated accounting records. Further, and importantly, the Debtors have limited staff available to perform the required internal review of their financial records and affairs, as well as critical operational matters that will need to be addressed in the early days of the Bankruptcy Cases.

54.    Allowing the Debtors' key personnel to focus their attention and energies on critical operational and sale-related issues during the early days of the Bankruptcy Cases will both allow the Debtors to make a smoother transition into chapter 11 and, therefore, ultimately maximize the value of the estates.

55.    For these reasons, I believe that the relief requested in the Schedules and SOFA Motion is in the best interests of the Debtors' estates, and will enable the Debtors to continue to

operate in Chapter 11 without disruption.  As a result, I respectfully request that the Court grant the Schedules and SOFA Motion.

      ***iii.***     ***Motion for an Order (I) Authorizing the Debtors to (a) Prepare Lists of Creditors in Lieu of Submitting a Formatted Mailing Matrix and (b) Mail Initial Notices and (II) Approving the Form and Manner of Notifying Creditors of the Commencement of the Debtors' Bankruptcy Cases (the "Creditor List Motion")***

56.     Pursuant to the Creditor List Motion, the Debtors request entry of an order: (i) allowing the Debtors to prepare an electronic list of creditors in lieu of submitting a creditor matrix and mail initial notices through its claims and noticing agent; and (ii) approving the form and manner of notifying creditors of the commencement of the Bankruptcy Cases.

57.     The Debtors have a fairly large number of creditors and parties-in-interest who will require notice of the bankruptcy.  In light of the extent of information necessary to prepare a creditor mailing matrix, I believe the relief requested in the Creditor List Motion is in the best interest of the Debtors' estates, and will enable the Debtors to continue to operate in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully request that the Court grant the Creditor Matrix Motion.

      ***iv.***     ***Debtor's Application for Entry of an Order Authorizing the Retention of Prime Clerk, LLC as Claims and Noticing Agent Effective as of the Petition Date (the "Claims Agent Application")***

58.     Pursuant to the Claims Agent Application, the Debtors seek to retain Prime Clerk, LLC ("Prime Clerk") as claims and noticing agent in the Bankruptcy Cases.  I believe that the Debtors' retention of Prime Clerk will greatly benefit the Debtors' estates.  Prime Clerk specializes in noticing, claims processing, and other administrative tasks necessary to operate chapter 11 cases effectively.  It is my understanding that Prime Clerk is fully equipped to manage claims issues and provide notices to creditors and other interested parties in the

Bankruptcy Cases.  Therefore, on behalf of the Debtors, I respectfully request that the Court grant the Claims Agent Application.

## II.    OPERATIONAL MOTIONS

> ### i.    *Motion for Interim and Final Orders Under Sections 105, 361 and 363 of the Bankruptcy Code Approving the Use of Cash Collateral, Providing Adequate Protection and Setting a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "Cash Collateral Motion")*

59.    Through the Cash Collateral Motion, the Debtors seek entry of interim and final orders under 11 U.S.C. §§ 105, 361 and 363 approving the Debtors' use of cash collateral, providing adequate protection to Bank of the West ("BOW") and setting a final hearing pursuant to Fed. R. Bankr. P. 4001.

60.    I submit that Debtors' use of cash collateral will preserve the value of the Debtors' estates for all parties-in-interest, including BOW, preserve employment for Cocoa Services' employees, and preserve the going-concern value while the Debtors pursue a sale of substantially all of their assets in these Bankruptcy Cases.

61.    Cocoa Services proposes to provide BOW with adequate protection in the form of valid, binding, enforceable, non-avoidable and automatically-perfected replacement liens on Cocoa Services' post-petition assets to the same extent, validity and priority that existed as of the Petition Date.  Moreover, to the extent that the adequate protection liens provided for fail to protect BOW against any diminution in value of its interest in its collateral, Cocoa Services' proposes to grant BOW superpriority administrative expense claims.

62.    Cocoa Services' ability to utilize cash collateral is crucial to the continuing operational needs and to allow the Debtors to pursue a sale of substantially all of their assets. Accordingly, I believe that the relief requested in the Cash Collateral Motion is in the best

interests of the Debtors' estates.  Therefore, on behalf of the Debtors, I respectfully request that

the Court grant the Cash Collateral Motion.

> ii.     **Motion for an Order (I) Authorizing the Cocoa Services, L.L.C. to (a) Satisfy and, to the Extent Applicable, Directing any Payroll Banks to Honor, Pay Pre-Petition Employee Compensation Obligations, and (b) Honor, in its Discretion, Pre-Petition Paid Time Off and Similar Themed Days; and (II) Authorizing the Debtor to Continue Paying and/or Otherwise Honoring all Other Employee Benefits (the "_Wages Motion_")**

63.     As set forth above, Cocoa Services has approximately twenty-two (22) Permanent

Employees, consisting of seven (7) full-time salaried employees and fifteen (15) hourly

employees.

64.     As noted, Morgan Drive does not have any employees or operations.

65.     The Permanent Employees perform a variety of crucial functions for Cocoa

Services, including, but not limited to, technical, administrative, production, laboratory, finance

and logistics services.  The Permanent Employees' valuable skill sets, indispensable institutional

knowledge and industry expertise and their overall understanding of the Debtors' operations

make the Permanent Employees critical to the success of these Bankruptcy Cases.

66.     By the Wages Motion, Cocoa Services seeks entry of an order: (i) authorizing it to

(A) satisfy and, to the extent applicable, directing any payroll banks to honor pre-petition gross

salaries, payroll taxes, employee expense reimbursements, and related obligations to or for the

benefit of the Permanent Employees (the "Pre-Petition Employee Compensation Obligations"),

and (B) honor, in its discretion, pre-petition paid time off and similar themed days; and (ii)

authorizing Cocoa Services to continue paying and/or otherwise honoring other ordinary

employee benefits.

67.     As an initial matter, the Debtors seek authority to pay accrued Pre-Petition

Employee Compensation Obligations in the ordinary course of business and consistent with past

practices in effect on the Petition Date, including pre-petition payroll, pre-petition payroll taxes, and employee expense reimbursement obligations.   None of the amounts to be paid to any employee for pre-petition payroll will exceed the $12,850.00 priority cap in section 507(a)(4) of the Bankruptcy Code.

68.    Further, Cocoa Services maintains an employee benefit policy pursuant to which Permanent Employees are provided with certain specific paid time off, bereavement, jury duty and holiday pay (collectively, the "Total Benefit Days"), as well as other benefits enumerated below (the "Other Employee Benefits"), and offer its Permanent Employees the opportunity to participate in various insurance and other company-sponsored programs (the "Company-Sponsored Programs" and, together with the Total Benefit Days and Other Employee Benefits, the "Employee Benefits").  The Employee Benefits provided by Cocoa Services are as follows: medical and dental insurance, a 401(k) retirement savings plan, a paid-time off policy, life insurance, accidental death & dismemberment insurance, long term disability insurance, a and workers' compensation insurance available to certain Permanent Employees.

69.    The continued, uninterrupted service of the Permanent Employees is essential to the Debtors' efforts to ensure the smooth and successful operation of the Debtors during these Bankruptcy Cases.  Any delay in paying outstanding wages, salaries or other compensation due to the Permanent Employees or the failure by Cocoa Services to continue its prepetition practices, programs and policies with respect to Employee Benefits could severely disrupt Cocoa Services' relationship with its Permanent Employees, impair morale at this critical time, and disrupt Cocoa Services' operations, all of which could irreparably harm the Debtors' estates. Accordingly, I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates and will enable Cocoa Services to continue to operate its business and pursue a

sale during the Bankruptcy Cases.  Accordingly, on behalf of the Debtors, I respectfully request
that the Court grant the Wages Motion.

> ### iii.    Motion for an Order Authorizing the Debtors (I) to Pay Amounts Due on Account of Pre-Petition Insurance Premiums (II) to Continue Pre-Petition Insurance Policies and Programs and (III) to Perform All Pre-Petition Obligations in Respect Thereof (the "Insurance Motion")

70.    Through the Insurance Motion, the Debtors seek entry of an order authorizing the
Debtors to continue to pay and perform under various prepetition insurance programs, covering a
variety of matters such as commercial liability, flood, commercial inland marine, workers'
compensation, auto, and product contamination/recall (the "Insurance Programs"), and pay all
pre-petition and post-petition obligations in respect thereof in the ordinary course of their
business consistent with past practices.

71.    In connection with the day-to-day operations of their business, the Debtors
maintain various Insurance Programs and related insurance policies (the "Insurance Policies"), as
set forth on a non-exhaustive list attached to the Insurance Motion, through several different
insurance providers (the "Insurance Providers").

72.    The Debtors are required to pay premiums under the Insurance Programs based on
a fixed amount established and billed by each Insurance Provider.

73.    It is my understanding that the Debtors are not currently aware of any insurance
payments that are past due, yet the Debtors have received invoices from insurers that are due for
payment within the coming days.  The Debtors have filed the Insurance Motion in an abundance
of caution in order to obtain authority to continue its Insurance Policies and Insurance Programs,
and pay and perform, as may be necessary, all pre-petition obligations in respect thereof.

74.    I believe that the relief requested in the Insurance Motion is in the best interests

of the Debtors' estates and will enable the Debtors to continue to operate their business and pursue a sale in Chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully request that the Court grant the Insurance Motion.

> iv.    ***Motion for Entry of an Order Authorizing, But Not Directing, Cocoa Services, L.L.C. to Pay Certain Prepetition Claims of Critical Vendors and Service Providers (the "Critical Vendor Motion")***

75.    In connection with the day-to-day operation of its business, Cocoa Services relies upon a network of vendors and essential service providers critical to the Debtors' business (the "Critical Vendors"),[6] the loss of which could immediately and irreparably harm the Debtors' business, disrupt operations, and significantly impair the Debtors' going-concern value.

76.    The Critical Vendors include companies that provide critical goods and/or services to Cocoa Services in order for it to run its operations.  In particular, the Critical Vendors include (a) food safety service providers, which include lab testing services and providers of testing supplies, required lab materials and uniforms and shipment of testing samples, as well as mandatory pest control services, (b) providers of temporary contract labor, which labor is required to fill employment needs on demand, (c) equipment maintenance providers, which are necessary to keep existing equipment operational, (d) payments for required licenses and certifications, (e) technology-related costs, necessary for the operation of the business, and (f) logistics and warehousing service providers, which perform vital roles in moving and storing product processed at the facility.

---

[6] Cocoa Services is still in the process of reviewing and revising the list of Critical Vendors. The Debtors will provide the list of Critical Vendors to their prepetition secured lender – Bank of the West, the United States Trustee, and any Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases, provided that such information is treated as confidential.

77.    Cocoa Services has identified approximately 30 service providers and suppliers that may be Critical Vendors.  Cocoa Services pays these Critical Vendors approximately $70,000 per month and estimates that approximately $82,000 is currently owed to the Critical Vendors.

78.    It is essential to the Debtors' business that Cocoa Services is able to maintain ongoing operations in the ordinary course so as to maximize the value of the Debtors' business as a going concern.  If Cocoa Services' fails to pay the claims of the Critical Vendors, (collectively, the "Critical Vendor Claims"), certain of the Critical Vendors may stop providing essential services.[7]  Even if suitable alternatives were available, the time necessary to identify these replacements and integrate them into operations likely would cause a significant disruption to the business.

79.    As a result, the Debtors seek authority in the exercise of the Debtors' sole discretion to continue to pay, in the ordinary course of business and to the extent necessary to preserve the value of its assets, the prepetition claims of certain of Cocoa Services' Critical Vendors.

80.    I believe the relief requested in the Critical Vendor Motion is in the best interest of the Debtors' estates, their creditors and all parties-in-interest and will enable the Debtors to continue to operate their business in Chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit the Critical Vendor Motion should be granted.

## PART IV

## INFORMATION REQUIRED BY LOCAL RULE 1007-2

81.    In accordance with Local Rule 1007-2, the schedules attached hereto provide certain information related to the Debtor.

---

[7] Nothing contained herein is intended or shall be construed as: (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' rights to dispute any claim on any grounds; (iii) a promise to pay any claim; or (iv) an implication or admission that any particular claim against the Debtors would constitute a Critical Vendor Claim or that any creditor is a Critical Vendor.

82.     Pursuant to Local Rule 1007-2(a)(3), and to the best of my knowledge, information and belief, no prepetition committee has been formed in anticipation of the Bankruptcy Cases.

83.     Pursuant to Local Rule 1007-2(a)(4), **Schedule 1** hereto lists the holders of the Debtors' combined top thirty (20) largest unsecured claims, excluding claims of insiders.

84.     Pursuant to Local Rule 1007-2(a)(5), **Schedule 2** hereto lists the holders of the five (5) largest secured claims against the Debtors.

85.     Pursuant to Local Rule 1007-2(a)(6), the Debtors will endeavor to file a summary of the assets and liabilities as soon as practicable but are still in the process of collecting and evaluating relevant information.

86.     Pursuant to Local Rule 1007-2(a)(8), **Schedule 3** hereto provides a list of the Debtors' property not in the Debtors' possession, including property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending.

87.     Pursuant to Local Rule 1007-2(a)(9), **Schedule 4** hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their business.

88.     Pursuant to Local Rule 1007-2(a)(10), **Schedule 5** hereto provides the location of the Debtors' substantial assets, the location of its books and records, and the value of any assets held by the Debtors outside the territorial limits of the United States.

89.     Pursuant to Local Bankruptcy Rule 1007-2(a)(11), **Schedule 6** hereto is a list of pending litigation commenced against the Debtors.

90.     Pursuant to Local Rule 1007-2(a)(12), **Schedule 7** hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

91.     Pursuant to Local Rule 1007-2(b)(1), **Schedule 8** hereto is the estimated amount of the payroll to employees of the Debtors (exclusive of officers, directors and stockholders) for the 30-day period following the commencement of the Debtors' Bankruptcy Cases.

92.     Pursuant to Local Rule 1007-2(b)(2)(A), **Schedule 9** hereto contains the amounts to be paid to the Debtors' officers, directors and stockholders for services for the 30-day period following the commencement of the Debtors' Bankruptcy Cases.

93.     Pursuant to Local Rule 1007-2(b)(3), **Schedule 10** hereto provides, for the thirty (30) day period following the filing of the Bankruptcy Cases, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations, and receivables expected to accrue that remain unpaid, other than professional fees.

## **CONCLUSION**

94.     The relief sought in each of the First Day Pleadings will minimize the adverse effects of the Bankruptcy Cases on the Debtors, allow the Debtors to continue to operate their business, allow the Debtors time to pursue a sale, and maximize value for all parties-in-interest. Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each First Day Pleading be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I hereby certify, under penalty of perjury, that the foregoing factual statements made by me are true.

Executed on July 14, 2017

*/s/ Robert J. Frezza*
Robert J. Frezza, Chief Restructuring Officer
Cocoa Services, L.L.C.
Morgan Drive Associates, L.L.C.

4850273v10

**<u>Exhibit A</u>**

Exhibit A – Corporate Structure



## **SCHEDULE 1**

**Consolidated List of 30 Largest Unsecured Creditors**

| Name of Creditor | Amount | Contingent, Unliquidated, Disputed, or Partially Secured |
|---|---|---|
| Lyons & Sons, Incorporated<br>905 Lenola Road<br>Moorestown NJ 08057-1042 | $2,024,661.80 | |
| NuTec Facilities<br>3687 Concord Road<br>York, PA 17402-8628 | $31,145.10 | Disputed |
| Atlantic City Electric<br>PO Box 13610<br>Philadelphia PA 19101 | $24,718.41 | |
| PDQ Electric Corp.<br>7 Conestoga Road<br>Laurel Springs, NJ 08021 | $20,600.15 | Disputed |
| Direct Energy Business<br>PO Box 32179<br>New York NY 10087-2179 | $20,462.25 | |
| Harleysville Insurance Company of New Jersey<br>PO Box 731178<br>Dallas TX 75373-1178 | $15,861.73 | |
| Keymar Warehouse Co., Inc.<br>5 Hanover Square<br>New York NY 10004 | $11,980.91 | |

| | | |
|---|---|---|
| South Jersey Gas Company<br>P.O. Box 6091<br>Bellmawr, NJ 08099 | $11,038.46 | |
| Phase III Trucking, Inc<br>2151 Atco Avenue<br>Atco, NJ 08004 | $10,168.40 | |
| Mobile Dredging & Pumping Co.<br>3100 Bethel Road<br>Chester, PA 19013-1488 | $9,164.17 | |
| Protocall Staffing<br>One Mall Drive, Suite 203<br>Cherry Hill NJ 08002 | $6,422.42 | |
| Express Services, Inc.<br>P.O. Box 535434<br>Atlanta, GA 30353-5434 | $6,049.66 | |
| Occupational Safety & Health<br>Administration<br>701 Route 73 South<br>Building # 2, Suite 120<br>Marlton, NJ 08053 | $5,286.75 | |
| Mettler Toledo Scales<br>PO Box 730867<br>Dallas, TX 75373-0867 | $3,904.14 | |
| Lyneer Staffing Solutions<br>Accounts Receivable/Infinity<br>1011 Whitehead Rd Extension Ewing,<br>NJ 08638 | $3,384.43 | |

| | | |
|---|---|---|
| New Jersey American Water<br>PO Box 371331<br>Pittsburgh PA 15250-7331 | $3,276.67 | |
| Apex Life Sciences<br>33035 Collections Center Drive<br>Chicago, IL 60693-0330 | $3,180.00 | |
| Excell Maintenance Services LLC<br>2250 US Route 322<br>Woolwich Twp., NJ 08085 | $3,055.86 | |
| Premium Assignment Corporation<br>P.O.Box 8000<br>Tallahassee FL 32314-8000 | $2,871.59 | |
| Aramark Uniform Services<br>PO Box 28050<br>New York NY 10087-8050 | $2,690.16 | |
| Miles Technologies<br>300 W Route 38, Suite 103<br>Moorestown, NJ 08057 | $1,846.80 | |
| Rochester Midland Corporation<br>(RMC)<br>P.O. Box 64462<br>Rochester, NY 14624-6862 | $1,835.70 | |
| F.S.Welsford<br>P.O. Box 576<br>Exton, PA 19341 | $1,830.73 | |
| Level (3) Communications, LLC<br>PO Box 910182<br>Denver, CO 80291-0182 | $1,794.50 | |

| | | |
|---|---|---|
| Lyons & Sons, Incorporated<br>905 Lenola Road<br>Moorestown NJ 08057-1042 | $1,774.08 | |
| Modern Handling Equipment<br>Company<br>P.O. Box 95000-5770<br>Philadelphia, PA 19195-5770 | $1,706.75 | |
| Hyster Capital<br>NMHG Financial Services<br>PO Box 643749<br>Pittsburgh PA 15264-3749 | $1,655.36 | |
| Amerisan LLC<br>Karen Boyt<br>1833 Columbia Ave.<br>Folcroft, PA 19032 | $1,575.25 | |
| RK Environmental Services<br>768 Carver Ave.<br>Westwood NJ 07675 | $1,528.31 | |
| Chubb & Son Insurance<br>PO Box 3820001<br>Pittsburgh, PA 15250-8001 | $1,483.00 | |

**SCHEDULE 2**

**LIST OF CREDITORS
HOLDING 5 LARGEST SECURED CLAIMS**[1]

The following is a consolidated list of creditors holding the 5 largest secured claims against the Debtors.  The list has been prepared in accordance with Local Bankruptcy Rule 1007-2(a)(5).  The information herein shall not constitute an admission of liability by, nor is it binding on, the debtor.

| Name of Creditor | Mailing Address | Description of Collateral Securing Claim | Estimate of Value of Collateral | Amount of Claim |
|---|---|---|---|---|
| Bank of the West | 12677 Alcosta Blvd Suite 200 San Ramon, CA 94583 | Equipment | To be determined | $ 5,308,526.09 |

---

[1] This list reflects the latest information available to the Debtor as of the Petition Date.

## SCHEDULE 3

## SUMMARY OF ASSETS AND LIABILITIES

1:37 PM
July 11, 2017
Accrual Basis

## Cocoa Services LLC
# Balance Sheet
### As of July 11, 2017

|  | Jul 11, 17 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| **PNC** | **150,927.63** |
| **Total Checking/Savings** | **150,927.63** |
| **Accounts Receivable** | |
| ***Accounts Receivable** | **216,069.42** |
| **Total Accounts Receivable** | **216,069.42** |
| **Other Current Assets** | |
| **Charge Back to Chemtech** | **(419.20)** |
| **Interest Due from Bank of West** | **(57,467.97)** |
| **Loan - Morgan Drive Ass LLC** | **1,766,290.53** |
| **Prepaid Expenses** | **(0.06)** |
| **Total Other Current Assets** | **1,708,403.30** |
| **Total Current Assets** | **2,075,400.35** |
| **Fixed Assets** | |
| **10 Yr Prop (Plant Eq/Off Furn)** | **13,159,299.65** |
| **15 Yr Prop (Leasehold Imp)** | **767,725.49** |
| **3 Yr Prop (Comp Hard & Soft)** | **175,339.78** |
| **39 Yr Prop (Non Res Real Prop)** | **2,519,988.19** |
| **5 Yr Prop (Office Equip & Comp)** | **183,734.02** |
| **Accumulated Depreciation** | **(4,407,712.23)** |
| **Total Fixed Assets** | **12,398,374.90** |
| **Other Assets** | |
| **Due From Morgan Drive Associate** | **69,549.78** |
| **Due from Transmar Commodity Gro** | **3,758,816.51** |

1:37 PM

**Cocoa Services LLC**

**July 11, 2017**

# Balance Sheet

**Accrual Basis**

### As of July 11, 2017

|  | Jul 11, 17 |
|---|---:|
| **Eagle Ct. Costs** | |
| Computer Expense | 24,784.97 |
| Contracted Labor | 309.12 |
| Electric Utilities | 9,638.20 |
| Fees / Permits | 2,987.00 |
| Gas Utilities | 15,449.70 |
| Group Insurance | 23,190.86 |
| Hackman | 59,308.92 |
| Insurance | 47,706.00 |
| J. Weick | 7,870.50 |
| Leased Equip | 972.08 |
| Loan Interest | 108,963.49 |
| Management Fee | 56,072.00 |
| McGuire | 74,740.55 |
| Office Expense & Postage | 4,347.95 |
| Payroll Tax | 25,204.26 |
| Pension Cost | 3,386.00 |
| Professional Fees | 45,530.49 |
| Property Tax | 61,554.45 |
| R.Scannapieco | 32,562.47 |
| Rent Expense | 130,000.00 |
| Repairs & Maintenance | 26,324.48 |
| Start Up | 60,439.66 |
| Suspense | (5,700.12) |
| Telephone Expense | 5,442.98 |
| Training Expense | 2,885.18 |
| Travel Expense | 11,156.02 |
| Walsh | 48,375.00 |
| warehouse operations | 33,485.66 |
| Warehouse Supplies | 54,480.69 |
| Water & Sewer | 8,488.49 |
| Eagle Ct. Costs - Other | (979,957.05) |
| **Total Eagle Ct. Costs** | |

1:37 PM

July 11, 2017

Accrual Basis

## Cocoa Services LLC
## Balance Sheet
### As of July 11, 2017

|  | Jul 11, 17 |
|---|---|
| **Security Deposit-Atlantic Cit e** | 850.00 |
| **Security Deposit - 2075HighHill** | 1,640.31 |
| **Security Deposit - SJ Gas CO Ea** | 39,150.00 |
| **Total Other Assets** | 3,870,006.60 |
| **TOTAL ASSETS** | 18,343,781.85 |
| **LIABILITIES & EQUITY** |  |
| **Liabilities** |  |
| **Current Liabilities** |  |
| **Accounts Payable** |  |
| **Accounts Payable** | 542,168.50 |
| **Total Accounts Payable** | 542,168.50 |
| **Other Current Liabilities** |  |
| **Accrued Expenses** | 107,643.47 |
| **Due to Tmar Group LLC-CS Series** | 1,365,648.48 |
| **FLEX Accounts** |  |
| **AFLAC post tax** | 1,892.25 |
| **AFLAC pretax** | (5,094.76) |
| **FSA pretax** | 3,161.47 |
| **Total FLEX Accounts** | (41.04) |
| **GARNISHMENTS** |  |
| **401k EMPLOYEE CONTRIBUTIONS** | (1,119.60) |
| **401k EMPLOYEE LOANS** | (276.29) |
| **Child Support** | (23.18) |
| **GARNISHMENTS - Other** | 75.00 |
| **Total GARNISHMENTS** | (1,344.07) |
| **Payroll Liabilities** |  |
| **F.I.C.A.** | 269.93 |
| **N.J.U.C.** | (2,575.42) |
| **Payroll Liabilities - Other** | (709.00) |
| **Total Payroll Liabilities** | (3,014.49) |

1:37 PM

July 11, 2017

Accrual Basis

## Cocoa Services LLC
# Balance Sheet
### As of July 11, 2017

|  | Jul 11, 17 |
|---|---|
| **Sales Tax Payable** | 92.27 |
| **Total Other Current Liabilities** | 1,468,984.62 |
| **Total Current Liabilities** | 2,011,153.12 |
| **Long Term Liabilities** | |
| Bank Of West Loan 2 (Tanks) | 92,500.00 |
| Due Bank of the West | 5,139,981.94 |
| Due MorristownGroup CAPEX | 578,750.00 |
| Due to Euromar Commodities GmbH | 70,000.00 |
| Due to Transmar CAPEX | 3,811,085.39 |
| Euromar Commodities LLC | 6,851,890.81 |
| **Total Long Term Liabilities** | 16,544,208.14 |
| **Total Liabilities** | 18,555,361.26 |
| **Equity** | |
| Capital-Patricia Johnson | 55,572.95 |
| Capital-Peter B. Johnson | 55,571.95 |
| Capital-Peter Johnson Sr. | 211,576.27 |
| Capital-Timothy Johnson | 55,572.95 |
| Capital-Tmar Group LLC-CSSeries | 578,385.24 |
| Drawing-Transmar Group LLC | (7,333.50) |
| Retained Earnings | (1,169,852.14) |
| Net Income | 8,926.87 |
| **Total Equity** | (211,579.41) |
| **TOTAL LIABILITIES & EQUITY** | 18,343,781.85 |

# **SCHEDULE 4**

## **LIST OF DEBTORS' PROPERTY NOT IN THE DEBTORS' POSSESSION**

None

**SCHEDULE 5**

**PREMISES OWNED, LEASED OR
HELD UNDER OTHER ARRANGEMENT
FROM WHICH THE DEBTORS OPERATES ITS BUSINESS**

**Real Property Owned By Morgan Drive Associates L.L.C. and Leased to Cocoa Services,
L.L.C.**

| Location | City | State | Zip Code |
|----------|------|-------|----------|
| 400 Eagle Court | Swedesboro | NJ | 08085 |

## SCHEDULE 6

## LOCATION OF DEBTORS' ASSETS, BOOKS AND RECORDS

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following lists the locations of the

Debtors' substantial assets and the location of its books and records:

| Location of Debtors' Substantial Assets |
|:---:|
| 400 Eagle Court<br>Swedesboro, NJ 08085 |

| Location of Debtors' Books and Records |
|:---:|
| 400 Eagle Court<br>Swedesboro, NJ 08085<br><br>-and-<br><br>200 South Street, 4th Floor<br>Morristown, New Jersey 07920 |

## **SCHEDULE 7**

### **SIGNIFICANT LITIGATION COMMENCED**
### **AGAINST THE DEBTORS PRIOR TO THE PETITION DATE**

| Title of Action | Court | Nature of Action | Status |
|---|---|---|---|
| Amir Hall v. Cocoa Services, LLC and Protocall-NJ, Inc. d/b/a The Protocall Group Case No. 16-03177 | United States District Court for the District of New Jersey | Employment Action involving Title VII of the Civil Rights Act of 1964 | Administratively terminated; settlement pending |

**SCHEDULE 8**

**DEBTORS' EXISTING SENIOR MANAGEMENT**

| Name/Position | Summary of Responsibilities |
|---|---|
| Peter G. Johnson, President & CEO | Provides strategic direction and decision-making, including expansions, new product lines, customers, and long term contracts. |
| Mary Johnson, Manager | Provides overall direction and guidance to the operational activities, with the objective of maximizing growth and profitability as well as day-to-day leadership and management to all operations function. Focuses on overall production, food safety, quality, and maintenance-related matters. |
| Timothy Johnson, Manager | Ensures alignment of policies and processes. |
| Edgar Bittong, Plant Manager | Responsible for managing, directing and coordinating all plant operations. In working closely with General Manager, Logistics, Quality Assurance and Production, ensures that all safety, production, product quality and financial goals are met. Leads, trains, and motivates plant employees. Establishes and maintains plant policies and procedures. |
| Robert Frezza, Chief Restructuring Officer | Retained as Chief Restructuring Officer pursuant to June 14, 2017 Amended Engagement Letter to assist with all phases of the Bankruptcy Case. Further detail will be provided in a subsequent motion regarding such retention. |
| Bernd Herrman, Head of Asset Sale Process | Responsible for the asset sale process in connection with the Bankruptcy Case. |

## SCHEDULE 9

**ESTIMATED AMOUNT OF WEEKLY PAYROLL TO
EMPLOYEES EXCLUSIVE OF OFFICERS, DIRECTORS AND
SHAREHOLDERS FOR THE 30-DAY PERIOD FOLLOWING THE PETITION DATE[2]**

| **Week Ending** | **Estimated Gross Payroll** |
|---|---|
| 7/14/2017 | $19,757.15 |
| 7/21/2017 | $19,757.15 |
| 7/28/2017 | $19,757.15 |
| 8/4/2017 | $19,757.15 |

---

[2] Estimated amounts to be paid based upon pre-petition ordinary course of business; however, actual amounts to be paid are subject to any applicable requirements imposed on the Debtors under the Interim Order Pursuant to 11 U.S.C. §§ 361, 362 and 363 and Rules 4001(b), 4001(d) and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors' Use of Cash Collateral, (II) Providing Adequate Protection Thereof and (III) Scheduling a Final Hearing (the "Interim Cash Collateral Order") and any related final order (together, the "Cash Collateral Orders"), and any such payments shall be in accordance with the Approved Budget (as defined in the Cash Collateral Orders) in effect in connection with such orders (subject to Permitted Variances, as defined in the Cash Collateral Orders).

## SCHEDULE 10

**ESTIMATED AMOUNT OF WEEKLY AMOUNTS TO BE PAID
TO OFFICERS, DIRECTORS AND SHAREHOLDERS
FOR THE 30-DAY PERIOD FOLLOWING THE PETITION DATE**

| Week Ending | Estimated Gross Amounts to be Paid |
|---|---|
| 7/14/2017 | $0 |
| 7/21/2017 | $0 |
| 7/28/2017 | $0 |
| 8/4/2017 | $0 |

## SCHEDULE 11

### DEBTORS' ESTIMATED CASH DISBURSEMENTS AND
### RECEIPTS FOR THE 30-DAY PERIOD FOLLOWING THE PETITION DATE

| | |
|---|---|
| **Cash Receipts** | $350,000 |
| **Cash Disbursements** | $530,000 |
| **Net Cash Gain (Loss)** | $180,000 |
| **Unpaid Obligations** | $130,000 |
| **Unpaid Receivables** | $380,000 |

4854036v3