<u>**Hearing Date:**</u> **August 10, 2017 at 2:00 p.m.**
<u>**Objection Deadline:**</u> **August 3, 2017 at 4:00 p.m.**

KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP
Tracy L. Klestadt
Joseph C. Corneau
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245

-and-

RIKER DANZIG SCHERER HYLAND & PERRETTI LLP
Joseph L. Schwartz (*pro hac vice* admission pending)
Tara J. Schellhorn
Rachel F. Gillen (*pro hac vice* admission pending)
Headquarters Plaza, One Speedwell Avenue
Morristown, New Jersey 07960
Telephone: (973) 538-0800
Facsimile: (973) 538-1984

Attorneys for the Debtors and Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ------------------------------------------------------------ x | |
| : | |
| In re | Chapter 11 |
| : | |
| COCOA SERVICES, L.L.C., <u>et al.</u>,[1] | : |
| : | Case No. 17-11936 |
| Debtors. | : |
| : | Jointly Administered |
| : | |
| ------------------------------------------------------------ x | |

**NOTICE OF HEARING ON DEBTORS' MOTION FOR ORDERS PURSUANT TO 11
U.S.C. §§ 105, 363 AND 365, AND BANKRUPTCY RULES 2002, 6004 AND 6006: (A)
FIXING THE TIME, DATE AND PLACE FOR HEARING TO CONSIDER BIDDING
PROCEDURES IN CONNECTION WITH THE DEBTORS' SALE OF**

---

[1] Debtors in these Bankruptcy Cases and the last four digits of their respective taxpayer identification number are as follows: Cocoa Services, L.L.C. (3769); Morgan Drive Associates, L.L.C. (2335). Debtors' principal office is located at 400 Eagle Court, Swedesboro, New Jersey 08085.

**SUBSTANTIALLY ALL OF THEIR ASSETS; (B)(i) ESTABLISHING BIDDING PROCEDURES AND BID PROTECTIONS; (ii) APPROVING THE FORM AND MANNER OF NOTICES; (iii) ESTABLISHING JB COCOA HOLDING, INC. AS STALKING HORSE; (iv) APPROVING ASSET PURCHASE AGREEMENT FOR STALKING HORSE TRANSACTION; (v) SETTING HEARING DATE FOR THE HEARING ON SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; AND (C)(i) APPROVING THE SALE AND ASSIGNMENT OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES AND (ii) GRANTING RELATED RELIEF**

      **PLEASE TAKE NOTICE** that a hearing (the "Hearing") the *Debtors' Motion for Orders Pursuant to 11 U.S.C. §§ 105, 363 and 365, and Bankruptcy Rules 2002, 6004 and 6006: (A) Fixing the Time, Date and Place for Hearing to Consider Bidding Procedures in Connection with the Debtors' Sale of Substantially All of Their Assets; (B)(i) Establishing Bidding Procedures and Bid Protections; (ii) Approving the Form and Manner of Notices; (iii) Establishing JB Cocoa Holding, Inc. as Stalking Horse; (iv) Approving Asset Purchase Agreement for Stalking Horse Transaction; (v) Setting Hearing Date for the Hearing on Sale of Substantially All of the Debtors' Assets; and (C)(i) Approving the Sale and Assignment of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (ii) Granting Related Relief (the "Motion")* shall be held on **August 10, 2017, at 2:00 p.m. (EST)** before the Honorable James L. Garrity, Jr., United States Bankruptcy Judge, in Courtroom 601 at the United States Bankruptcy Court, Southern District of New York, Alexander Hamilton Customs House, One Bowling Green, New York, New York 10004-1408.

      **PLEASE TAKE FURTHER NOTICE** that responses or objections to the Motion and the relief requested therein, if any, shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall set forth the basis for the response or objection and the specific grounds therefore, and shall be filed with the Court electronically in accordance with the General Order M-399 by registered users of the Court's case filing system (the User's Manual for the Electronic Case Filing System can be found at http://www.nysb.uscourts.gov, the official website for the Court), with two hard copies delivered directly to Chambers pursuant to Local Bankruptcy Rule 9028-1 and served so as to be actually received no later than **August 3, 2017 at 4:00 p.m.** (prevailing Eastern Time) (the "Objection Deadline"), by (a) counsel for the Debtors, Riker Danzig Scherer Hyland & Perretti LLP, Headquarters Plaza, One Speedwell Avenue, Morristown, New Jersey 07960 (Attn: Joseph L. Schwartz, Esq.,), (b) the Office of the U.S. Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014 (Attn: Serene Nakano, Esq.); (c) Baker, Manock & Jenson, PC, 5260 N. Palm Ave., Suite 421, Fresno, CA 93704-2209 (Attn: Carl R. Refuerzo, Esq. and Courtney R. McKeever, Esq.) and Trenk, DiPasquale, Della Fera & Sodono, P.C., 347 Mount Pleasant Avenue, Suite 300, West Orange, NJ 07052 (Attn: Adam D. Wolper, Esq. and Ross J. Switkes, Esq.), as counsel to JB Cocoa; and (d) Thompson & Knight, LLP, 333 Clay Street, Suite 330, Houston, TX 77002 (Attn: Anthony Pirraglia, Esq.), as counsel to Bank of the West; and (e) all parties filing a notice of appearance herein.

**PLEASE TAKE FURTHER NOTICE** that copies of the above-referenced Motion are available on the Bankruptcy Court's official website (http://www.nysb.uscourts.gov/) for registered users of the Bankruptcy Court's case filing system, or free-of charge from the Debtors' bankruptcy website, (https://cases.primeclerk.com/cocoaservices/).

Dated: July 21, 2017

New York, New York

Respectfully submitted,

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP


By: */s/ Tracy Klestadt*
        Tracy Klestadt

Tracy L. Klestadt
Joseph C. Corneau
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Fax: (212) 972-2245
Email: tklestadt@klestadt.com
          jcorneau@klestadt.com

        - and -

RIKER DANZIG SCHERER HYLAND &
PERRETTI LLP
Joseph L. Schwartz (*pro hac vice* admission pending)
Tara J. Schellhorn
Rachel F. Gillen (*pro hac vice* admission pending)
Headquarters Plaza, One Speedwell Avenue
Morristown, New Jersey 07960
Telephone: (973) 538-0800
Facsimile: (973) 538-1984
Email:  jschwartz@riker.com
          tschellhorn@riker.com
          rgillen@riker.com
Attorneys for the Debtors and
Debtors-in-Possession

4865678v1

KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP
Tracy L. Klestadt
Joseph C. Corneau
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245

-and-

RIKER DANZIG SCHERER HYLAND & PERRETTI LLP
Joseph L. Schwartz (*pro hac vice* admission pending)
Tara J. Schellhorn
Rachel F. Gillen (*pro hac vice* admission pending)
Headquarters Plaza, One Speedwell Avenue
Morristown, New Jersey 07960
Telephone: (973) 538-0800
Facsimile: (973) 538-1984

Proposed Attorneys for the Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------X
                                                                :
In re:                                                          :    Chapter 11
                                                                :
COCOA SERVICES, L.L.C., et al.,[1]                              :    Case No. 17-11936
                                                                :
                                        Debtors.                :    Jointly Administered
                                                                :
----------------------------------------------------------- x


**DEBTORS' MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365,**
**AND BANKRUPTCY RULES 2002, 6004 AND 6006: (A) FIXING THE TIME, DATE**
**AND PLACE FOR HEARING TO CONSIDER BIDDING PROCEDURES IN**
**CONNECTION WITH THE DEBTORS' SALE OF SUBSTANTIALLY ALL OF THEIR**
**ASSETS; (B)(i) ESTABLISHING BIDDING PROCEDURES AND BID PROTECTIONS;**
**(ii) APPROVING THE FORM AND MANNER OF NOTICES; (iii) ESTABLISHING**
**JB COCOA HOLDING, INC. AS STALKING HORSE; (iv) APPROVING**

---

[1] Debtors in these Bankruptcy Cases and the last four digits of their respective taxpayer identification number are as follows: Cocoa Services, L.L.C. (3769); Morgan Drive Associates, L.L.C. (2335). Debtors' principal office is located at 400 Eagle Court, Swedesboro, New Jersey 08085.

**ASSET PURCHASE AGREEMENT FOR STALKING HORSE TRANSACTION; (v)
SETTING HEARING DATE FOR THE HEARING ON SALE OF SUBSTANTIALLY
ALL OF THE DEBTORS' ASSETS; AND (C)(i) APPROVING THE SALE AND
ASSIGNMENT OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS,
CLAIMS, INTERESTS, AND ENCUMBRANCES AND
(ii) GRANTING RELATED RELIEF**

Cocoa Services, L.L.C. ("Cocoa Services") and Morgan Drive Associates, L.L.C.

("Morgan Drive"), the debtors and debtors-in-possession (each a "Debtor" and collectively, the

"Debtors"), by and through their undersigned proposed counsel, hereby submit this Motion (the

"Sale Motion") seeking the following relief:

    a.    Entry of an order, substantially in the form attached hereto as **Exhibit B**
(the "Bidding Procedures Order"): (a) establishing bidding procedures and
bid protections, including an auction, as set forth herein (the "Bidding
Procedures"), with respect to the Debtors' sale of substantially all of their
assets (as defined herein), (b) approving the form and manner of notices
thereof (the "Bidding Procedures Notice," attached hereto as **Exhibit D**),
(c) establishing JB Cocoa Holding, Inc. ("JB Cocoa") as the stalking horse
bidder for substantially all of the Debtors' assets, (d) approving the form
of Asset Purchase Agreement by and among the Debtors and JB Cocoa
(the "Stalking Horse APA"), pursuant to which the Debtors propose to sell
substantially all of their assets to JB Cocoa, or a third party that makes a
higher and/or better offer for those assets (the "Proposed Sale"), and (e)
setting a hearing to consider approval of the Proposed Sale (the "Sale
Hearing"); and

    b.    Entry of an order pursuant to sections 105(a), 363 and 365 of the
Bankruptcy Code, substantially in the form attached hereto as **Exhibit C**
(the "Sale Order"), (i) approving the sale of substantially all of the
Debtors' assets free and clear of liens, claims, interests and encumbrances,
and (ii) granting related relief.

In support of the Sale Motion, the Debtors submit the *Declaration of Robert J. Frezza in Support

of Debtors' Motion for Orders Pursuant to 11 U.S.C. §§ 105, 363 and 365, and Rules 2002,

6004 and 6006: (A) Fixing the Time, Date and Place for Hearing to Consider Bidding

Procedures in Connection with the Debtors' Sale of Substantially All of Their Assets; (B)(i)

Establishing Bidding Procedures and Bid Protections, (ii) Approving the Form and Manner of

Notices, (iii) Establishing JB Cocoa Holding, Inc. as Stalking Horse, (iv) Approving Asset*

Purchase Agreement for Stalking Horse Transaction, (v) Setting Hearing Date for the Hearing on Proposed Sale; and (C)(i) Approving the Proposed Sale and (ii) Granting Related Relief (the "Frezza Declaration"), attached hereto as **Exhibit E**, submitted contemporaneously herewith, and respectfully states as follows:

## PRELIMINARY STATEMENT[2]

The Debtors filed these Bankruptcy Cases for purpose of preserving value, preserving jobs and selling substantially all their assets.  To that end, immediately prior to their bankruptcy filings, the Debtors secured a stalking horse agreement with JB Cocoa for the sale of substantially all of their assets for a purchase price of $8,000,000, less the Cure Amount and certain other adjustments, and subject to higher or otherwise better offers (the "Stalking Horse Bid").  The Stalking Horse Bid is the result of extensive prepetition marketing efforts.  Given the Debtors' precarious financial condition, the Debtors' sale of substantially all of their assets is the only viable option and is the best alternative to avoid a potentially interruption of the Debtors' business operations, which could reduce value and negatively affect employees.

For these reasons, in consultation with its secured lender, Bank of the West ("BOW"), the Debtors and their advisors developed bidding and auction procedures for the sale of substantially all of the Debtors' assets.  By the Sale Motion, the Debtors seek, among other things, approval of the Bidding Procedures Order and Sale Order approving the sale to JB Cocoa and/or the bidder(s) who submit the highest or otherwise best offers.

For the reasons contained herein, the Debtors request that the Court approve the Motion.

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Sale Motion.

## JURISDICTION, VENUE AND STATUTORY PREDICATE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief sought herein are sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, et. seq. (the "Bankruptcy Code"), and Rule 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

4.      On July 14, 2017 (the "Petition Date"), the Debtors each filed voluntary petitions for relief pursuant to Chapter 11 of the Bankruptcy Code, commencing the above-referenced chapter 11 cases (the "Bankruptcy Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Court").

5.      Since the Petition Date, the Debtors have remained in possession of their assets and have continued management of their business as a debtors-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6.      No committee, trustee or examiner has been appointed in the Bankruptcy Cases.

7.      A detailed description of the Debtors' business and the facts precipitating the filing of the Debtors' Bankruptcy Cases are set forth in the Declaration of Robert J. Frezza in Support of Debtors' Chapter 11 Petitions and First Day Motions [Docket No. 12].

## THE DEBTORS' BUSINESS AND ASSETS

8.      Cocoa Services operates a cocoa liquor and cocoa butter melting and deodorizing facility in Logan Township, Gloucester County, New Jersey (the "Facility").

9.      Morgan Drive is a real estate holding company that owns the land and building at which Cocoa Services operates.

10.     Cocoa Services' operations involve processing solid block raw cocoa butter and cocoa liquor as well as the deodorization of raw cocoa butter for the benefit of its customers. Cocoa Services functions as a tolling operation,[3] wherein Cocoa Services processes the raw cocoa product owned by its customers and delivers that product back to its customers, in its refined form, via bulk stainless steel trailers or tankers.   In connections with its operations, Cocoa Services has a cocoa butter melting capacity of six (6) metric tons ("MTs") per hour, a cocoa liquor melting capacity of four (4) MTs per hour and a deodorizing capacity of approximately ten (10) MTs per hour.

11.     The Facility is designated as a Kosher and Safe Quality Foods Level 2 certified facility under the Global Food Safety Initative.   The Facility has an onsite lab and provides quality and sensory testing to comply with its customer specifications.   The Facility also has a storage capacity for approximately 2,400 MTs of solid product, 800 MTs of liquid product and two (2) covered loading bays for delivery of melted cocoa butter and/or cocoa liquor.   In addition, the Facility has the ability to establish connections to local railroad tracks and to expand the capacity of its warehouse space.

## THE SECURED DEBT

12.     On April 8, 2014, Cocoa Services entered into a Master Equipment Financing Agreement with BOW (as amended, restated, supplemented and/or otherwise modified from time to time, the "Equipment Financing Agreement," and together with all related loan and security documents, the "Prepetition Financing Documents"). Pursuant to the Prepetition Financing Documents, BOW loaned Cocoa Services funds to acquire, among other things,

---

[3] A "tolling operation" is an arrangement in which a company (which has specialized equipment) processes raw materials or semifinished goods for another company.

certain machinery and equipment as set forth in the schedule incorporated as part of the Equipment Financing Agreement (the "Schedule") and for working capital and other purposes.

13.    As security for repayment of this loan, Cocoa Services granted BOW a first-priority security interest in and lien upon (the "Prepetition Lien") certain of Cocoa Services' assets, as described in the Schedule, including all of Cocoa Services' equipment, machinery, tools, parts, inventory, fixtures, accounts, documents, general intangibles, contract rights, government payments, chattel paper, rents and income payment intangibles and obligations arising now or hereafter thereunder and all proceeds of any of the foregoing and all products of, additions to, replacements of, and returns and repossession of such collateral and all accessories, accessions, parts and machinery and equipment now or hereafter affixed to such collateral, as further set forth in the Equipment Financing Documents (collectively, the "Prepetition Collateral").[4]

14.    In connection with the Equipment Financing Agreement, BOW made an original loan advance in the amount of $7,342,834.42, and a subsequent loan advance in the amount of $185,000.00 to Cocoa Services.

15.    As of the Petition Date, Cocoa Services owes BOW the approximate sum of $5,308,526.09 under the Equipment Financing Agreement and related loan documents.

## THE PRE-PETITION MARKETING OF THE ASSETS

16.    Between February and May 2017, the Debtors embarked on a process to actively market substantially all of their assets for sale (collectively, the "Assets").[5]  In connection with this marketing process, in February 2017, the Debtors established a due diligence data room for

---

[4] Morgan Drive is not obligated to BOW under the Equipment Financing Documents or otherwise, and BOW does not have a lien on any of Morgan Drive's assets.

[5] As further discussed herein, the Debtors and JB Cocoa recently executed the Stalking Horse APA for JB Cocoa's potential purchase of the "Purchased Assets," which are more specifically identified in Section 2.01 of the Stalking Horse APA.

potential bidders, all of which were required to execute confidentiality agreements in order to participate. In connection with this process, the Debtors initially contacted at least 14 separate potential strategic and/or financial bidders, and to date have provided detailed information regarding the Assets to at least 11 different potential bidders, each of which has executed a confidentiality agreement, and which were provided access to the Debtors' electronic data room.

17.     As a result of these marketing efforts, in May 2017, the Debtors received two (2) bids for the Assets.

18.     The Debtors, after due consideration, in their business judgement determined that the bid presented by one of those two (2) bidders, JB Cocoa, was the superior bid of the two and determined in their business judgment to designate JB Cocoa's bid as the stalking horse bid for the Purchased Assets.  The Purchased Assets include, without limitation, the real property known as Block 1602, Lot 11, on the Tax Map of the Township of Logan, County of Gloucester, State of New Jersey.

## NEED FOR A TIMELY SALE PROCESS

19.     The need for a prompt sale process is driven by the liquidity crisis facing the Debtors, which resulted, in large part, from Cocoa Services' loss of its largest customer, Transmar Commodity Group Ltd. (the Debtors' parent company), earlier this year.

20.     As part of the Stalking Horse APA, JB Cocoa has required that the Proposed Sale shall be consummated by no later than September 30, 2017 (the "Drop Dead Date").

21.     Cognizant of their precarious financial condition and the tight timeline that would govern upon the commencement of the Bankruptcy Cases, the Debtors accomplished as much as possible with respect to the sale process prior to the Petition Date.

22.     Absent the Proposed Sale contemplated by this Sale Motion, the Debtors believe they will be unable to realize the maximum value of their Assets for the benefit of all

stakeholders.   The Debtors' declining revenues are insufficient to support the continued

operation of the business in light of the unsustainable and insurmountable costs of the Debtors'

business as a whole.   Thus, a prompt sale is necessary to ensure that such assets are sold at their

going concern values.

## THE SALE TRANSACTION WITH JB COCOA

23.     The following is a summary of the principal terms of the Stalking Horse APA,[6]

attached hereto as **Exhibit A**:

(a)     Purchase Price.   In consideration for the Purchased Assets,
the purchase price shall be $8,000,000, less the Cure Amount, plus the assumption
of the Assumed Liabilities, including the payment of the Cure Amount relating to
the Assigned Contracts.   (See Stalking Horse APA at Section 2.05.)   The Purchase
Price shall be allocated (i) $6 million to Cocoa Services' assets and (ii) $2 million
to Morgan Drive's assets.   (See Stalking Horse APA at Section 2.06 and Ex. A.)
JB Cocoa has delivered to the Debtors a deposit of $800,000 (10% of the
Purchase Price), which is being held by Foundation Title (the "Deposit").   (See
Stalking Horse APA Section 2.05.)

(b)     Purchased Assets.   Subject to terms and conditions set
forth in the Stalking Horse APA, the Debtors will transfer to JB Cocoa all of their
right, title and interest in and to all of the Purchased Assets identified in Section
2.01 of the Stalking Horse APA, including certain contracts set forth on Section
2.01(c) of the Disclosure Schedules to the Stalking Horse APA.   (See Stalking
Horse APA at Section 2.01.)   In order to facilitate the sale of  the Purchased
Assets, JB Cocoa and the Debtors shall execute and deliver at or before the
Closing the Bill of Sale and the Assignment and Assumption Agreement. (See
Stalking Horse APA at Exhibit B and Exhibit C.)   For the avoidance of doubt, the
Debtors' cash, accounts receivable, and books and records are not part of the
Purchased Assets and are specifically excluded from the Sale Transaction.   (See
Stalking Horse APA at 2.02.)

(c)     Assumed Liabilities.   Subject to terms and conditions set
forth in the Stalking Horse APA, JB Cocoa shall assume and agree to pay,
perform and discharge when due: (i) all liabilities arising under or relating to the
Assigned Contracts (but only to the extent that such liabilities arise out of or result
from events occurring subsequent to the Closing); (ii) all liabilities of JB Cocoa
relating to employee benefits, compensation or other arrangements with respect to

---

[6] To the extent that there are any discrepancies between this summary and the Stalking Horse APA, the terms and
language of the Stalking Horse APA shall govern.  Unless defined herein, capitalized terms used in this summary
shall have the meanings ascribed to them in the Stalking Horse APA.

any Hired Employee arising on or after the Closing; (iii) liabilities related to post-Closing taxes; (iv) the Cure Amount; and (v) all other liabilities arising out of or relating to JB Cocoa's ownership or operation of the Business and the Purchased Assets on or after the Closing.  (See Stalking Horse APA at Section 2.03.)  In order to facilitate the assumption of the Assumed Liabilities, JB Cocoa and the Debtors shall execute and deliver at or before the Closing the Assignment and Assumption Agreement. (See Stalking Horse APA at Exhibit C.)

## PROPOSED BIDDING PROCEDURES, BID PROTECTIONS, AUCTION AND OVERBID PROCEDURES

### A.    Overview

24.    In connection with the Proposed Sale, the Debtors seek approval of the Bidding

Procedures, which the Debtors submit are designed to maximize the value of the Assets.

25.    The Debtors propose that third party offers received for some or all of the Assets

(each, an "Offer") be governed by the following Bidding Procedures:[7]

> (1)    Offer Deadline: Any person or entity interested in participating in the Auction (defined below) (each, a "Prospective Bidder") shall make an Offer in writing and serve the Offer upon the Debtors (Attn: Joseph L. Schwartz, Esq. and Jason D. Navarino, Esq. of Riker Danzig Scherer Hyland & Perretti, LLP, Headquarters Plaza, One Speedwell Avenue, Morristown, NJ 07962); counsel to Bank of the West (Attn: Anthony F. Pirraglia, Esq., of Thompson & Knight LLP, 333 Clay St., Suite 3300, Houston, TX 77002); and counsel to any Official Committee of Unsecured Creditors appointed in the Bankruptcy Cases (the "Committee"), if any is appointed, by no later than **August 25, 2017 at 5:00 p.m.** prevailing Eastern Time (the "Offer Deadline").  The Debtors shall promptly provide copies of all Offers received to the Consultation Parties;[8] provided that the Debtors shall not be required to provide to any Consultation Party any material, nonpublic information regarding bids for the Assets if such Consultation Party or any related entity to that Consultation Party submits a bid to purchase all or any portion of

---

[7] To the extent that there are any discrepancies between this summary and the Bidding Procedures Order, the terms of the Bidding Procedures Order shall govern.  Further, unless otherwise defined herein, capitalized terms defined in the Bidding Procedures shall have the meaning ascribed to them either in the Bidding Procedures Order or the Stalking Horse APA.

[8] Throughout the sale process, as necessary or appropriate, the Debtors will consult with counsel to BOW and counsel to the Committee, if any is appointed (together, the "Consultation Parties").

the Assets.  Further, the Debtors shall not be required to consult with any Consultation Party regarding a particular Offer if that Consultation Party is an active bidder for the Assets at the applicable time.

(2)   <u>Diligence</u>:  To be eligible to participate in the Auction, each Prospective Bidder must execute a confidentiality agreement in form and on terms satisfactory to the Debtors.  Any Prospective Bidder identified by the Debtors as reasonably likely to be a Qualified Party that wishes to conduct due diligence on the Assets may be granted access to all material information regarding them.

(3)   <u>Qualified Bid Requirements</u>: To qualify as a "<u>Qualified Bid</u>," a Prospective Bidder must submit a written Offer by the Offer Deadline, and the Debtors, in consultation with the Consultation Parties, must determine that the Offer satisfies the following requirements:

(a)   <u>Allocation Schedule</u>.  Each Offer must include an allocation schedule of the proposed purchase price for the Assets to be assumed, assigned and sold to it in connection with the proposed transaction as Exhibit A to the Modified APA (defined below).

(b)   <u>Modified APA</u>. Each written offer must include: (i) an executed copy of an asset purchase agreement which is not materially more burdensome than the Stalking Horse APA or inconsistent with these Bidding Procedures (the "<u>Modified APA</u>"); and (ii) a marked-up copy of the Modified APA reflecting the difference between the Modified APA and the Stalking Horse APA. The Debtors, in consultation with the Consultation Parties, shall determine whether any Modified APA that modifies the Stalking Horse APA in any respect beyond the identity of the purchaser, the purchase price under the agreement and the allocation of the Purchase Price is a Qualified Bid.

(c)   <u>Bidding Requirements</u>. Any Offer by a Prospective Bidder for all of the Purchased Assets shall not be less than $8,390,000 ($8,000,000 plus Transaction Expenses (defined herein) plus $50,000 initial overbid).  If an Offer is only for the assets of Cocoa Services, such Offer shall not be less than $6,390,000 ($6,000,000 plus Transaction Expenses (defined herein) plus $50,000 initial overbid).  If an Offer is only for the assets of Morgan Drive, such Offer shall not be less than $2,390,000 ($2,000,000 plus Transaction Expenses (defined herein) plus $50,000 initial overbid).

(d)    <u>Identification of Bidder</u>. A Qualified Bid must fully disclose the legal identity of each entity that will be bidding for the Assets otherwise participating in connection with such bid (including but not limited to any equity holder or other financial backer if the Prospective Bidder is an entity specifically formed for purposes of effectuating the Proposed Sale, and the complete terms of any such participation) and must also disclose any connections or agreements with the Debtors, any other known Prospective Bidder or Qualified Party, and/or any officer or director of the foregoing.

(e)    <u>Financial Information</u>. Any Prospective Bidder that wishes to make an Offer for the Assets must provide the Debtors with sufficient and adequate information to demonstrate, to the satisfaction of the Debtors, in consultation with the Consultation Parties, that its Offer: (i) is being made by an entity that has the financial wherewithal and ability to consummate the transaction, including evidence of adequate financing; and (ii) provides information to demonstrate that it is able to fulfill all obligations in connection with all Assigned Contracts (as defined below) so as to satisfy the requirement of providing adequate assurance of future performance, as contemplated by section 365 of the Bankruptcy Code (the "<u>Adequate Assurance Information</u>").

(f)    <u>Other Requirements</u>. Each Offer shall: (i) state that the bid is formal, binding and unconditional, is not subject to further due diligence, and is irrevocable until the earlier to occur of: (x) the first business day following the closing of the Proposed Sale or (y) thirty (30) days following the last date of the Auction (as may be adjourned); (ii) not contain any financing contingencies of any kind; (iii) not contain any condition to closing the Proposed Sale on the receipt of any third party approvals that were not required by the Stalking Horse APA; (iv) state that the Prospective Bidder is ready, willing and able to perform its obligations under the Modified APA submitted with such Offer; (v) expressly state that the Prospective Bidder agrees to serve as a backup bidder (a "<u>Backup Bidder</u>") if such bidder's Qualified Bid is selected as the next highest or next best bid after the Winning Bid for the implicated Assets; (vi) include contact information for the person(s) the Debtors should contact with questions about the Prospective Bidder's bid; and (vii) be received by the Debtors and Consultation Parties by the Offer Deadline.

(g)     <u>Good Faith Deposit</u>.  All Qualified Bids must be accompanied by a good faith deposit in the amount of 10% of the Offer (a "<u>Good Faith Deposit</u>"), in the form of a certified or cashier's check, payable to "RIKER DANZIG SCHERER HYLAND & PERRETTI LLP TRUST ACCOUNT."  All such deposits shall be retained by the Debtors pending the hearing to consider the Sale Motion and shall be returned within ten (10) days after entry of a Sale Order, except that the Debtors shall transfer  the deposit of the Winning Bidder (defined below) to Foundation Title, and apply such deposit(s) to the Purchase Price at closing, and hold the deposit of the Backup Bidder, until the first business day following the closing of the Proposed Sale with the Winning Bidder.

(h)     For the avoidance of doubt, the bid of JB Cocoa has automatically been deemed to be a Qualified Bid.

(4)     <u>Selecting Qualified Parties</u>.  The Debtors shall, in consultation with the Consultation Parties, make a determination whether an Offer is a Qualified Bid and shall notify Prospective Bidders whether their Offers have qualified as Qualified Bids by not later than **August 29, 2017 at 5:00 p.m.** (prevailing Eastern Time); <u>provided that</u>, if an Offer is made by the Offer Deadline that is not determined to be a Qualified Bid, the Debtors will promptly advise the Prospective Bidder of the deficiencies, if any, and allow such Prospective Bidder one (1) day to submit a revised offer.  In addition, if the Debtors, after consulting with the Consultation Parties and after providing notice to the Notice Parties, determine to extend the Offer Deadline, the Debtors shall be required to notify Prospective Bidders whether their bids have qualified as Qualified Bids by no later than two (2) days after the newly-scheduled Offer Deadline. Any Prospective Bidder whose Offer that is deemed a Qualified Bid shall be Assigned  as a "<u>Qualified Party</u>."

JB Cocoa shall automatically be deemed a Qualified Party, and JB Cocoa's bid, as reflected in the Stalking Horse APA, shall be deemed a Qualified Bid.

(5)     <u>Bid Protections</u>: In the event that the Stalking Horse APA is terminated because the Court approves a sale of any of the Assets to a party or parties other than JB Cocoa, or if JB Cocoa is determined to be the Winning Bidder, and the Proposed Sale failed to close for any reason, the Debtors shall pay JB Cocoa a fee of $240,000 (the "<u>Break-Up Fee</u>"), plus reimbursement of expenses, including professional fees and expenses incurred in pursuit of its bid and preparation of the Stalking Horse APA and related documents, not to exceed $100,000 ("<u>Expense

Reimbursement," and together with the Break-Up Fee, the "Transaction Expenses"), to compensate JB Cocoa for its efforts in connection with it being the "stalking horse" bidder for the Assets, including the costs of the JB Cocoa incurred in performing due diligence, negotiating and documenting the terms of the Stalking Horse APA and representing its interests with respect to the Proposed Sale.  The Transaction Expenses shall also be payable to JB Cocoa in the event that it terminates the Stalking Horse APA pursuant to Section 10.01(b)(i), Section 10.01(b)(iii), or Section 10.01(b)(iv) thereof.  The Transaction Expenses shall constitute allowed superpriority administrative expenses of the Debtors pursuant to Section 503(b) and shall be paid upon closing in connection with the Assets and without further order or application to the Court.

(6)    The Auction:  If the Debtors receive at least two (2) Qualified Bids, the Debtors shall conduct an Auction (the "Auction").[9]  The Auction, if required, shall be held at the offices of Riker Danzig Scherer Hyland & Perretti LLP, Headquarters Plaza, One Speedwell Avenue, Morristown, NJ 07962, or at such alternative location as the Debtors may determine, after consultation with the Consultation Parties, and after providing notice to the Notice Parties.  The Auction shall commence on **September 6, 2017 at 10:00 a.m. (EST)**.   The Consultation Parties and/or their representatives will be permitted to attend the Auction.

(a)    Each Qualified Party shall appear in person at the Auction or through a duly authorized representative. Only Qualified Parties shall be entitled to make any subsequent bids at the Auction. Each Qualified Party shall be required to confirm that (i) it has not engaged in any collusion with respect to the bidding or the Proposed Sale; and (ii) its Qualified Bid represents a binding, good faith, and bona fide offer to purchase the Assets identified if such bid if selected as the Winning Bidder.

The Debtors, in consultation with the Consultation Parties, shall, after the Offer Deadline and prior to the Auction, evaluate all Qualified Bids or combination of Qualified Bids received, and, in consultation with the Consultation Parties, determine which Qualified Bids or combination of Qualified Bids, as the case may be, reflect the highest or best offers for some or all of the Assets, whether in whole or in lots, at that time (the "Baseline Bid(s)").  The Debtors

---

[9] In the event the Debtors fail to receive at least two (2) Qualified Bids, the Debtors shall file with the Court and docket on the Court's ECF system a notice of cancellation of the Auction by no later two (2) business days prior to the Auction.

shall announce such determination at the commencement of the Auction.

(b)    <u>Minimum Overbid Procedures</u>.  Any further bids made at the Auction for the Assets shall be in increments of at least $50,000 (the "<u>Overbid Procedures</u>").

(c)    <u>Highest or Best Offer</u>. After the first round of bidding and between each subsequent round of bidding, the Debtors, after consulting with the Consultation Parties, shall announce the bid that it determines in its business judgment to be the highest or otherwise best offer for the relevant Assets (the "<u>Leading Bid</u>"). Each round of bidding will conclude after each participating Qualified Party has had the opportunity to submit a subsequent bid with full knowledge of the Leading Bid.

(d)    <u>Winning Bid</u>. Immediately prior to the conclusion of the Auction, the Debtors shall, in consultation with the Consultation Parties, (i) determine, consistent with these Bidding Procedures, which bid constitutes the Winning Bid for the implicated Assets; and (ii) notify all Qualified Parties at the Auction for the implicated Assets of the identity of the bidder that submitted the Winning Bid (each such bidder, the "<u>Winning Bidder</u>") and the amount of the purchase price and other material terms of the Winning Bid.

The Auction may include open bidding in the presence of all other Qualified Parties. All Qualified Parties shall have the right to submit additional bids at the Auction to improve their bids. The Debtors may, in their reasonable business judgment, negotiate with any and all Qualified Parties participating in the Auction.

The Debtors shall have the right, after consulting with the Consultation Parties, to determine, in its reasonable business judgment, without liability, which bid is the highest or otherwise best bid and reject at any time, any bid that the Debtors deems to be inadequate or insufficient, not in conformity with the requirements of the Bankruptcy Code, Bankruptcy Rules, or the Local Rules, these Bidding Procedures, any order of the Bankruptcy Court, or the best interests of the Debtors and their estates.

At least one (1) day prior to the Sale Hearing, the Winning Bidder shall be required to supplement its Good Faith Deposit by the difference between its Qualified Bid and the Winning Bid.

14

(e)     Backup Bid. Immediately prior to the conclusion of the Auction, the Debtors shall, in consultation with the Consultation Parties, (i) determine, consistent with these Bidding Procedures, which Qualified Bid is the next highest or otherwise best Qualified Bid for the relevant Assets after the Winning Bid (each such Qualified Bid, a "Backup Bid"); and (ii) notify all Qualified Parties at the Auction for the implicated Assets of the identity of the Backup Bidder and the amount of the purchase price and other material terms of the Backup Bid. Backup Bids shall be open and irrevocable until the earlier of (x) the first business day following closing of the Proposed Sale or (y) thirty (30) days following the last date of the Auction (as may be adjourned). If the Winning Bidder for the implicated Forward Contract fails to consummate a Proposed Sale, the Backup Bidder shall be deemed the new Winning Bidder, and the Debtors will be authorized, but not required, to consummate a Proposed Sale for the applicable Assets with the Backup Bidder.

Subject to the terms and conditions set forth in the Stalking Horse APA or Modified APA, in the event that a Winning Bidder fails to consummate the proposed transaction by the Closing Date, such bidder's deposit shall be forfeited to the Debtors (but not as liquidated damages, the Debtors reserving the right to pursue all remedies that may be available to it) and the Debtors shall be free to consummate the proposed transaction with the Backup Bidder at the final price bid by such bidder at the Auction (or, if that bidder is unable to consummate the transaction at that price, the Debtors may consummate the transaction with the next higher bidder, and so forth) without the need for an additional hearing or order of the Court.

If JB Cocoa is not the Winning Bidder, it shall be the Backup Bidder if it has made the second best offer, but shall nonetheless be entitled to receive the Transaction Expenses if the Purchased Assets are sold to the Winning Bidder.

(f)     Modification of Procedure. The Debtors may, after consulting with the Consultation Parties, announce at the Auction modified or additional procedures for conducting the Auction.

(g)     Auction Results: Within one (1) business day following the Auction, the Debtors will cause the results of the Auction to be filed with the Court, docketed on the Court's electronic case filing ("ECF") system, and published on the

website of the Debtors' Court-approved claims agent, Prime Clerk, LLC at (http://cases.primeclerk.com/cocoaservices) (the "Prime Clerk Website"), which filing will include a list of the Cocoa Services' Contracts to be sold and assigned to the Winning Bidder(s), subject to revision prior to Closing, as further set forth below.

(7)    <u>Bankruptcy Court Approval</u>: All bids for the purchase of some or all of the Assets shall be subject to approval of the Court and conditioned upon entry of a Sale Order.

(8)    <u>Sale Objection</u>: Objections to the Proposed Sale (each, a "<u>Sale Objection</u>"), including any objection to the sale of the Assets free and clear of liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code and entry of any Sale Order (other than Adequate Assurance Objections and Cure Objections (as hereinafter defined)), must (i) be in writing and specify the nature of such objection; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules; and (iii) be filed with the Court and served on: (a) counsel for the Debtors (Attn: Joseph L. Schwartz, Esq.,), (b) the Office of the U.S. Trustee (Attn: Serene Nakano, Esq.); (c) Baker, Manock & Jenson, PC (Attn: Carl R. Refuerzo, Esq. and Courtney R. McKeever, Esq.) and Trenk, DiPasquale, Della Fera & Sodono, P.C. (Attn: Adam D. Wolper, Esq. and Ross J. Switkes, Esq.), as counsel to JB Cocoa; (d) the attorneys (if applicable) of any Winning Bidder(s); (e) the attorneys (if applicable) of any applicable Backup Bidder(s); (f) Thompson & Knight, LLP, as counsel to Bank of the West (Attn: Anthony Pirraglia, Esq.) and (e) as counsel to the Committee, if any is appointed) (the foregoing parties, the "<u>Objection Recipients</u>") by **September 12, 2017, at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Sale Objection Deadline</u>"). Any reply by the Debtors or the Other Objection Recipients shall be filed and served by no later than **September 15, 2017 at 6:00 p.m.**

All Sale Objections not otherwise resolved by the parties prior thereto shall be heard at the Sale Hearing. The failure of any party to timely file with the Court and serve on the Objection Recipients a Sale Objection by the Sale Objection Deadline forever shall be barred from asserting, at the Sale Hearing or thereafter, any objection to the relief requested in the Sale Motion, or to the consummation and performance of the applicable Proposed Sale(s) contemplated by an applicable asset purchase agreement with a Winning Bidder, including the transfer of the Assets to the applicable Winning Bidder(s), free

16

and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code.

26.    The Debtors submit that the Bidding Procedures are fair and reasonable.

**B.    Key Dates and Deadlines**

27.    Consistent with the Guidelines for the Conduct of Asset Sales established by the Bankruptcy Court for the Southern District of New York, the Debtors propose the following key dates and deadlines for the Proposed Sale:

| | |
|---|---|
| August 10, 2017 at 2:00 p.m. | Hearing on Bidding Procedures Motion |
| August 14, 2017 | Deadline to Mail Bidding Procedures Notice and Sale Motion |
| August 25, 2017 | Offer Deadline |
| August 29, 2017 | Deadline for Debtors to notify Prospective Bidders of their status as Qualified Parties |
| September 6, 2017 | Auction |
| September 12, 2017 at 4:00 p.m. | Sale Objection Deadline, Cure Objection Deadline, and Adequate Assurance Objections Deadline |
| September 15, 2017 at 6:00 p.m. | Deadline for Debtors to file Replies to Sale Objections, Cure Objections, and Adequate Assurance Objections |
| September 19, 2017 at __:00 _.m. | Sale Hearing |

**C.    Extraordinary Provisions in Connection with Proposed Sale**

28.    Agreement with Employees.  As part of the Proposed Sale, JB Cocoa may make offers to current employees of the Cocoa Services for future employment in order to facilitate the successful continuation of certain of the business.

29.    Use of Proceeds.  Pursuant to the Stalking Horse APA, JB Cocoa has allocated the Purchase Price as follows: (i) $6 million for the assets of Cocoa Services, and (ii) $2 million for the assets of Morgan Drive.  (See Stalking Horse APA at Exhibit A.)  Based upon the value apportioned by JB Cocoa in the Stalking Horse APA's allocation schedule, the Debtors intend to

apply the same allocation to the disposition of the sale proceeds. The Debtors will use the sale proceeds to pay BOW the approximate sum of $5,308,526.09[10], which amount is owed by Coca Services to BOW under the Equipment Financing Agreement and related loan documents.

**D.    Notice**

30.    The Debtors propose that, within three (3) days filing of this Sale Motion, the Debtors shall serve a copy of this Sale Motion, the proposed Bidding Procedures Order, the proposed Bidding Procedures Notice, the proposed Sale Order, and all exhibits to such orders upon the following persons by first-class mail, postage prepaid: (i) the Office of the U.S. Trustee (Attn: Serene Nakano, Esq.); (ii) Baker Manock & Jensen, PC (Attn:  Carl R. Refuerzo, Esq. and Courtney R. McKeever, Esq.) and Trenk, DiPasquale, Della Fera & Sodono, P.C. (Attn: Adam D. Wolper, Esq. and Ross J. Switkes, Esq.), as counsel to JB Cocoa; (iii) all Counterparties to the Cocoa Services Contracts; (iv) all parties who have made an offer on the Assets or expressed an interest in making an offer on the Assets; (v) Thompson & Knight, LLP, as counsel to Bank of the West (Attn: Anthony Pirraglia, Esq.); (vi) counsel to any Committee; (vii) all taxing authorities that have jurisdiction over the Assets; (viii) all known persons holding a lien on any of the Assets; and (ix) all entities who have requested notice under Bankruptcy Rule 2002 (collectively, the "Notice Parties").

31.    Further, within two (2) days after entry of the Bidding Procedures Order, the Debtors shall serve the Bidding Procedures Order and the Bidding Procedures Notice on the Notice Parties via first class mail.

32.    The Debtors submit that the foregoing notice is sufficient to provide effective notice of the Bidding Procedures, the Auction and the Proposed Sale to potentially-interested

---

[10] To the extent BOW asserts that Cocoa Services owes BOW more than $5,308,526.09, BOW shall file an appropriate application to the Court.  The Debtors reserve all rights with respect to such an application.

parties in a manner designed to maximize the chance of obtaining the broadest possible participation in the Auction, while minimizing the costs to the estate.

## ASSUMPTION AND ASSIGNMENT
## OF COCOA SERVICES' CONTRACTS

33.    In connection with the Proposed Sale, the Debtors seek authority under section 365 of the Bankruptcy Code to (a) assume and assign certain contracts of the Debtors as further set further on Section 2.01(c) of the Disclosure Schedules to the Stalking Horse APA (the "Assigned Contracts") and any other contracts of Cocoa Services that may be assumed and assigned to a Winning Bidder (the "Additional Contracts," and together with the Assigned Contracts, the "Cocoa Services' Contracts"), and (b) execute and deliver to JB Cocoa (and/or any other Winning Bidder, as the case may be) such documents or other instruments as may be necessary to assign and transfer the applicable Cocoa Services' Contracts.

34.    The Debtors believe that there will be no material cure amounts associated with the Cocoa Services' Contracts; however, the Debtors seeks to implement the following Assumption and Assignment Procedures (the "Assumption and Assignment Procedures") in order to facilitate a smooth process:

    a.    Notice of Potential Assumption and Assignment. Within two (2) days after the entry of the Bidding Procedures Order, the Debtors shall file with the Court, serve on the Notice Parties, including each Counterparty to the Cocoa Services' Contracts, and cause to be published on the Prime Clerk Website, the Assumption and Assignment Notice, substantially in the form attached hereto as **Exhibit F**, which shall (i) identify all of the Cocoa Services' Contracts; (ii) list the Debtors' good faith calculation of the cure costs with respect to each Cocoa Services' Contract; (iii) expressly state that assumption or assignment of the Cocoa Services' Contract is subject to Court approval; and (iv) prominently display the deadline to file objections to the assumption, assignment, and sale of the cocoa Services' Contracts (the "Proposed Assumed Contracts Notice").

    b.    Cure Objections.

(1)    <u>Cure Objection Deadline</u>. Any Counterparty to a Cocoa Services' Contract that wishes to object to the proposed assumption, assignment, and sale of the Cocoa Services' Contract, the subject of which objection is the Debtors' proposed costs to cure any outstanding monetary defaults then existing ("<u>Cure Costs</u>") under such contract (each, a "<u>Cure Objection</u>"), shall file with the Court and serve on the Objection Recipients its Cure Objection, which must state, with specificity, the legal and factual bases thereof, including any appropriate documentation in support thereof, by no later than **September 12, 2017 at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Cure Objection Deadline</u>"). Replies, if any, to Cure Objection shall be filed by **September 15, 2017 at 6:00 p.m. (prevailing Eastern Time).**

(2)    <u>Resolution of Cure Objections</u>. The Debtors and a Counterparty that has filed a Cure Objection shall first confer in good faith to attempt to resolve the Cure Objection without Court intervention. If the parties are unable to consensually resolve the Cure Objection prior to the commencement of the Sale Hearing, the amount to be paid or reserved with respect to such objection shall be determined by the Court at the Sale Hearing. The Court shall make all necessary determinations relating to the applicable Cure Costs and Cure Objection at a hearing scheduled pursuant to the following paragraph.

(3)    <u>Adjourned Cure Objections</u>. If a timely Cure Objection cannot otherwise be resolved by the parties, such objection shall be heard at the Sale Hearing; provided that, a Cure Objection (and only a Cure Objection) may, at the Debtors' discretion, after consulting with the Consultation Parties and the applicable Winning Bidder, be adjourned with the Court's consent (an "<u>Adjourned Cure Objection</u>") to a subsequent hearing. An Adjourned Cure Objection may be resolved after the closing date of the applicable Proposed Sale (and therefore the contract of the Counterparty in question may be assumed and assigned at Closing); provided that, the Debtors maintain a cash reserve equal to the Cure Costs the objecting Counterparty believes is required to cure the asserted monetary default under the implicated Cocoa Services' Contracts.

(4)    <u>Failure to File Timely Cure Objection</u>. If a Counterparty fails to timely file with the Court and serve on the Objection Recipients a Cure Objection, the Counterparty shall be deemed to have consented to the assumption, assignment, and sale of the Cocoa Services' Contract (unless such Counterparty has timely filed an Adequate Assurance Objection with respect to the Cocoa Services' Contract) to the applicable Winning Bidder and shall be forever barred from asserting any objection with regard to

such assumption, assignment, and sale. Further, in the event no objections are timely filed and served, the Cure Costs set forth in the Assumption and Assignment Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the Cocoa Services' Contract under Bankruptcy Code section 365(b), notwithstanding anything to the contrary in any Cocoa Services' Contract, or any other document, and the Counterparty to the Cocoa Services' Contract shall be deemed to have consented to the Cure Costs and shall be forever barred from asserting any other claims related to such Cocoa Services' Contract against the Debtors or any Winning Bidder(s), or the property of any of them.

c.    Adequate Assurance Objections.

(1)    Adequate Assurance Information. The Debtors shall provide, with respect to JB Cocoa and each Qualified Party, the Adequate Assurance Information. The Debtors shall: (a) within 24 hours of receipt of an Offer from a Potential Bidder (other than JB Cocoa) and (b) with respect to JB Cocoa, by no later than twenty (20) days before the Sale Hearing, or by **August 30, 2017 at 5:00 p.m.** (the later of (a) and (b), the "Adequate Assurance Deadline"), provide a copy of the Adequate Assurance Information to those Counterparties (or their counsel) who have (x) submitted a written request (e-mail to Debtors' counsel is acceptable) for Adequate Assurance Information and (y) confirmed in writing to the Debtors' counsel (e-mail is acceptable) their agreement to keep such Adequate Assurance Information strictly confidential and use it solely for the purpose of evaluating whether a Potential Bidder, including JB Cocoa, has provided adequate assurance of future performance under the implicated Cocoa Services' Contracts.

(2)    Adequate Assurance Objection Deadline. Any Counterparty to a Cocoa Services' Contract that wishes to object to the proposed assumption, assignment, and sale of the Cocoa Services' Contract, the subject of which objection is a Winning Bidder's proposed form of adequate assurance of future performance with respect to such contract (each, an "Adequate Assurance Objection") shall file with the Court and serve on the Objection Recipients an Adequate Assurance Objection, which must state, with specificity, the legal and factual bases thereof, including submitting any appropriate documentation in support thereof, by **September 12, 2017 at 4:00 p.m. (prevailing Eastern Time)** (the "Adequate Assurance Objection Deadline"). Replies, if any, to Adequate Assurance Objections shall be filed by **September 15, 2017 at 6:00 p.m. (prevailing Eastern Time)**.

(3)     Resolution of Adequate Assurance Objections. The Debtors and a Counterparty that has filed an Adequate Assurance Objection shall first confer in a good faith to attempt to resolve the Adequate Assurance Objection without Court intervention. If the parties are unable to consensually resolve the Adequate Assurance Objection prior to the commencement of the Sale Hearing, such objection and all issues of adequate assurance of future performance by the applicable Winning Bidder shall be determined by the Court at the Sale Hearing.

(4)     Failure to File Timely Adequate Assurance Objection. If a Counterparty fails to timely file with the Court and serve on the Objection Recipients an Adequate Assurance Objection, the Counterparty shall be deemed to have consented to the assumption, assignment, and sale of the Cocoa Services' Contract (unless the Counterparty has filed a timely Cure Objection with respect to the Cocoa Services' Contract) to the applicable Winning Bidder and shall be forever barred from asserting any objection with regard to such assumption, assignment, and sale. Further, in the event no objections are filed and served, the applicable Winning Bidder shall be deemed to have provided adequate assurance of future performance with respect to the implicated Forward Contract in accordance with section 365(f)(2)(B) of the Bankruptcy Code, notwithstanding anything to the contrary in the Forward Contract, or any other document.

d.     Other Sale Objections by Counterparties.

(1)     Objection Deadline. Any Counterparty to a Cocoa Services' Contract that wishes to file a Sale Objection (other than a Cure Objection or an Adequate Assurance Objection) to the proposed assumption, assignment and sale of the Cocoa Services' Contract shall file with the Court and serve on the Objection Recipients its Sale Objection, which must state, with specificity, the legal and factual bases thereof, including any appropriate documentation in support thereof, by no later than the Sale Objection Deadline of **September 12, 2017 at 4:00 p.m. (prevailing Eastern Time)**. Replies, if any, to Sale Objections shall be filed by **September 15, 2017 at 6:00 p.m. (prevailing Eastern Time)**

(2)     Failure of Counterparties to File Timely Sale Objection. If a Counterparty fails to timely file with the Court and serve on the Objection Recipients a Sale Objection, the Counterparty shall be deemed to have consented to the assumption, assignment, and sale of the Cocoa Services' Contract (unless the Counterparty has filed a timely Cure Objection or Adequate Assurance Objection with respect to the Cocoa Services' Contract) to the applicable

22

Winning Bidder and shall be forever barred from asserting any objection with regard to such assumption, assignment, and sale.

e.    Reservation of Rights. The inclusion of a Cocoa Services' Contract or Cure Costs on the Proposed Assumed Contracts Notice shall not constitute or be deemed a determination or admission by the Debtors, the applicable Winning Bidder(s), or any other party in interest that such contract or other document is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code or that the stated Cure Costs are due (all rights with respect thereto being expressly reserved). The Debtors and JB Cocoa reserve all of their rights, claims, and causes of action with respect to each Cocoa Services' Contract or other document listed on the Proposed Assumed Contracts Notice.    The Debtors' inclusion of any Cocoa Services' Contract on the Proposed Assumed Contract Notice shall not be a covenant, promise, or guarantee that such contract ultimately will be assumed and assigned and sold.    The Proposed Assumed Contract Notice shall be without prejudice to each Winning Bidder's rights, if any, under the applicable asset purchase agreement, to subsequently exclude any Cocoa Services' Contracts from the assumption or assignment prior to the closing of an applicable Proposed Sale, pursuant to the terms of the Stalking Horse APA or Modified APA.

35.    The Debtors submit that the foregoing Assumption and Assignment Procedures and deadlines are fair and reasonable, and will provide sufficient notice to the non-Debtors Counterparties to the Cocoa Services' Contracts.

**RELIEF REQUESTED AND BASIS THEREOF**

A.    **The Proposed Sale is Within the Debtors' Sound Business Judgment/Notice is Good and Sufficient**

36.    The Debtors submit that ample authority exists for approval of the Proposed Sale. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

37.    In applying this provision, courts in this and other districts have required that the sale of a Debtors' assets be based upon the sound business judgment of the Debtors.  See, e.g.,

Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143-145 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same).

38.     In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983), one of the seminal and most widely followed cases dealing with asset sales, the Second Circuit held that the factors to be considered in determining whether a sound business reason exists include the following:

> the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, *most importantly perhaps, whether the asset is increasing or decreasing in value.*

Id. at 1071 (emphasis supplied).

39.     The Lionel decision has been widely accepted and applied by various courts considering a Debtors' request to sell assets, including requests to approve a sale of certain of the assets of a Debtors' estate.  See, e.g., In re the Delaware & Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991); In re Eng'g Prod. Co., 121 B.R. 246 (Bankr. E.D. Wis. 1990); In re Thomson McKinnon Sec., Inc., 120 B.R. 301 (Bankr. S.D.N.Y. 1990); In re Channel One Communications, Inc., 117 B.R. 493 (Bankr. E.D. Mo. 1990); In re Brethren Care, 98 B.R. 927 (Bankr. N.D. Ind. 1989).  As will be demonstrated below, application of the above-listed factors demonstrates that approval of the Stalking Horse APA is warranted at this time.

40.     Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether: (i) the Debtors have provided the interested parties

with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith.  <u>See</u> <u>Polvay v. B.O. Acquisitions, Inc. (In re Betty Owens Sch., Inc.),</u> No. 96 Civ. 3576 (PKL), 1997 WL 188127, at *4 (S.D.N.Y. Apr. 17, 1997); <u>In re Del. & Hudson Ry. Co.</u>, 124 B.R. 169, 176 (D. Del. 1991); <u>In re Decora Indus., Inc.</u>, No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002).

41.     Fair and accurate notice should inform all interested parties of the liquidation of the Debtors' business; disclose accurately the terms of the sale; explain the effect of the sale upon the Debtors' business; and explain why the sale is in the best interests of the Debtors' estate.  <u>In re Delaware & Hudson Ry.</u>, 124 B.R. at 180; <u>Naron & Wagner, Chartered</u>, 88 B.R. 85, 88 (Bankr. D.Md. 1988).

42.     The Proposed Sale provides the Debtors with an opportunity to maximize the value of the Assets.  The purchase price for the Purchased Assets is $8,000,000, subject to adjustment, as set forth in Section 2.05 of the Stalking Horse APA.  The Debtors believe that the Purchase Price for the Purchased Assets, which sets a floor for the Assets, represents the highest and/or best value available for the Assets, particularly in light of the limited market for this specialized asset and the marketing efforts by the Debtors.  Further, the Stalking Horse APA is subject to higher and better offers, thereby ensuring that the best possible offer has been or will be received.

43.     Moreover, the Debtors submit that the notice provisions previously described herein to the Notice Parties will ensure that full and fair disclosure, as well as the opportunity to object, will be afforded to all creditors and parties in interest.

44.     For these reasons, the Debtors submit that the Proposed Sale meets the requirements of Section 363(b) of the Bankruptcy Code.

**B.**      **Sale Free and Clear of Liens, Claims, Encumbrances and Interests**

45.      Pursuant to section 363(f) of the Bankruptcy Code, a debtor-in-possession may

sell property of the estate:

> free and clear of any interest in such property of an entity other
> than the estate if (1) applicable nonbankruptcy law permits the sale
> of such property free and clear of such interest, (2) such entity
> consents, (3) such interest is a lien and the price at which such
> property is to be sold is greater than the aggregate value of all liens
> on such property, (4) such interest is in bona fide dispute, or (5)
> such entity could be compelled, in a legal or equitable proceeding,
> to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

46.      The Debtors submit that the Proposed Sale, along with the Bidding Procedures

related thereto, meets the test set forth in section 363(f)(2), in that BOW, which holds liens

against certain of the Assets, has or will consent to the Proposed Sale.  In addition, BOW's lien

against certain of the Assets will attach to the net proceeds from the Proposed Sale with the same

validity, enforceability, priority, force and effect that they now have as against the Assets.

47.      Accordingly, the Debtors submit that the Proposed Sale, free and clear of all liens,

claims, encumbrances and interests, meets the requirements of Section 363(f) of the Bankruptcy

Code.

**C.**      **Protections as a Good Faith Purchaser**

48.      Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest

in property purchased from a debtor in the event that the sale conducted under section 363(b) of

the Bankruptcy Code is later reversed or modified on appeal. Specifically, section 363(m)

provides:

> The reversal or modification on appeal of an authorization under
> [section 363(b)] ... does not affect the validity of a sale ... to an
> entity that purchased ... such property in good faith, whether or not

> such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. § 363(m).

49.    Section 363(m) of the Bankruptcy Code "affords 'finality to judgment by protecting good faith purchasers, the innocent third parties who rely on the finality of bankruptcy judgments in making their offers and bids.'" Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.), No. 92 Civ. 7054 (PKL), 1993 WL 159969, at *3 (S.D.N.Y. May 10, 1993) (quoting Anheuser-Busch, Inc. v. Miller (In re Stadium Mgmt. Corp.), 895 F.2d 845, 847 (1st Cir. 1990)); see also Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal."); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("[P]ursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal.")

50.    The Second Circuit has indicated that, generally, a party would have to show fraud or collusion between the buyer and the debtors-in-possession or trustee or other bidders in order to demonstrate a lack of good faith. See Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); see also In re Angelika Films 57th, Inc., Nos. 97 Civ. 2239 (MBM), 97 Civ. 2241 (MBM), 1997 WL 283412, at *7 (S.D.N.Y. 1997) (same; holding that purchaser's status as an insider was not *per se* bad faith).

51.    Here, the Debtors submit that JB Cocoa has engaged in the sale process in good faith as part of an arm's length transaction negotiated over the course of several weeks.  JB Cocoa is an independent entity, unaffiliated with the Debtors, its officers, directors or shareholders, and the resulting Stalking Horse APA is the product of the parties' arm's length, good-faith negotiations.

52.    Further, the managers of the Debtors and the managers of JB Cocoa have no existing or former business or commercial relationship related to Cocoa Services.[11]  However, as noted, JB Cocoa may hire certain employees of Cocoa Services in order to facilitate the successful continuation of certain of the business.

53.    Moreover, by exposing the Assets to the market through the Auction, the Debtors submit that the consideration to be received for the Assets is fair and reasonable.

54.     For these reasons, the Debtors request a finding that JB Cocoa is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**D.    The Bidding Procedures are Fair and Reasonable and are in the Best Interests of the Debtors' Estates and Creditors**

55.    In order to maximize the value of the Assets for the benefit of the Debtors, their creditors and the chapter 11 estates, the Debtors seek to implement a competitive bidding process for the Assets that is designed to generate a maximum recovery.  The Debtors believe that the Auction and proposed Bidding Procedures will encourage participation by financially-capable bidders.  Furthermore, the Bidding Procedures are consistent with other procedures previously approved by this and other courts, and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  See e.g., In re Kmart,

---

[11] JB Cocoa had a business relationship with the Debtors' parent company, Transmar Commodity Group Ltd. ("TCG").  TCG is currently a debtor in its own chapter 11 bankruptcy case, styled In re Transmar Commodity Group, Ltd., Case No. 16-13625 (the "TCG Bankruptcy Case").  TCG is no longer actively operating, and the TCG Bankruptcy Case will be converted to a chapter 7 bankruptcy case in the very near future.

Case No. 02-B02474 (SPS) (Bankr. N.D. 111 May 10, 2002); In re Global Crossing, Case No. 02-40188 (S.D.N.Y. March 25, 2002) (REG); In re Randall's Island Family Golf Ctrs., Inc., 261 B.R. 96 (S.D.N.Y. 2001); In re Integrated Resources, Inc., 147 B.R. 650 (S.D.N.Y. 1992).

56.     Further, bidding incentives, such as the Break-Up Fee and Expense Reimbursement, encourage a potential purchaser to invest the requisite time, money and effort to conduct due diligence and sale negotiations with a Debtors despite the inherent risks and uncertainties of the chapter 11 process. See e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding bidding incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); In re Marrose Corp., 89 B 12171-12179 (CB), 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "[a]greements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers").

57.     Further, the Debtors submit that the Bidding Procedures are a normal and necessary component of sales outside the ordinary course of business under section 363 of the Bankruptcy Code. See e.g., In re Kmart, Case No. 02 B02474 (SPS) (Bankr. N.D. Ill. May 10, 2002) (authorizing a termination fee and bid protections for potential bidders); In re Comdisco, Inc., Case No. 01 24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, inter alia, an actual and necessary cost and expense of preserving the Debtors' estate, of substantial benefit to the Debtors' estate, and a necessary inducement for, and a condition to, the proposed purchaser's entry into the Asset Purchase Agreement); In re Integrated Resources, Inc., 147 B.R. at 660 (noting that break up fees may be legitimately necessary to convince a "white knight" to offer an initial bid by providing some form of compensation for the expenses such

bidder incurs, and the risks such bidder faces by having its offer held open, subject to higher and better offers); In re Crowthers McCall Pattern, Inc., 114 B.R. 877 (Bankr. S.D.N.Y. 1990) (approving an overbid requirement in an amount equal to the approved break up fee); In re Kupp Acquisition Corp., Case No. 96 1223 (PJW) (Bankr. D. Del. March 3, 1997).

58.     Here, the proposed Break-up Fee is 3.0% of the proposed purchase price, or $240,000, plus JB Cocoa's additional expenses for performing its due diligence, negotiating and documenting the terms of the Stalking Horse APA, not to exceed $100,000.   As a result, the Transaction Expenses are within the range of fees typically paid in other significant sales transactions that have been consummated in a bankruptcy setting. See e.g., Consumer News & Bus. Channel P'ship v. Financial News Network, Inc. (In re Financial News Network, Inc.), 980 F.2d 165, 167 (2d Cir. 1992) (noting that transaction at issue provided for a $8.2 million breakup fee on a $149.3 million transaction (5.5%)); Doehring v. Crown Corp. (In re Crown Corp.), 679 F.2d 774 (9th Cir. 1982) (bid protection of 4.9% approved).

59.     Further, the amount of the Transaction Expenses is reasonably calculated to compensate JB Cocoa (a) for committing the time to perform due diligence, (b) for lost opportunity in being bound to a transaction that could be topped in a competitive auction process and (c) for serving as a "stalking horse" to encourage the submission of other bids.

60.     For these reasons, the Debtors submit that the Bidding Procedures, which include the Transaction Expenses, should be approved.

### E.     Assumption and Assignment of Assigned  Contracts

61.     Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the Debtors." 11 U.S.C. § 365(a).   A debtors' decision to assume an executory contract or unexpired lease must be an exercise of its sound business judgment for the court to approve the

assumption under section 365(a) of the Bankruptcy Code. See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.), 78 F.3d 18, 25 (2d Cir. 1996); Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

62.    Further, section 365(k) of the Bankruptcy Code provides that assignment by a debtors to a third party assignee of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k). Therefore, upon the closing of the Proposed Sale, the Debtors will be relieved of their obligations under the Assigned Contracts, thereby further decreasing the obligations of the estate and creating value for creditors.

63.    Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under executory contracts that will be assumed must be cured or that adequate assurance be provided to the counterparties that such defaults will be promptly cured.

64.    In addition, pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2)(B). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr D.N.J. 1988) (internal citations omitted); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (holding that adequate assurance of future performance does not mean absolute assurance that debtors will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance when prospective assignee of lease had financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; in the leasing context, chief consideration with respect to adequate assurance is whether rent will be paid).

65.     To the extent that defaults exist under the Assigned  Contracts, the Debtors will ensure that the Winning Bidder will cure or provide adequate assurance of cure of such defaults within the meaning of section 365(b)(1)(A) of the Bankruptcy Code.

66.     Further, the Debtors will be prepared to proffer testimony or present evidence to demonstrate JB Cocoa's (and/or the Winning Bidder's, as the case may be) financial credibility, experience in the industry and willingness and ability to perform under the Assigned Contracts and any addition contracts, as applicable.  Therefore, the Sale Hearing will provide the Court and other interested parties with an opportunity to evaluate and if necessary, challenge the ability of JB Cocoa (and/or the Winning Bidder, as the case may be) to provide adequate assurance of future performance under the Assigned  Contracts.

67.     For these reasons, the Debtors submit that they meet all of the requirements of section 365 of the Bankruptcy Code necessary to assume and assign the Assigned  Contracts.

F.     **Request for Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d)**

68.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under §

365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

69.    To preserve the value of the Assets and limit the costs of administering and preserving the Assets, it is very important that the Debtors close on the Proposed Sale as soon as possible after all closing conditions have been met or waived.  Accordingly, the Debtors request that the Court waive the stay periods under Bankruptcy Rules 6004(g) and 6006(d).

## **NOTICE**

70.    Notice of this Motion will be given to in accordance with the notice procedures set forth herein.  The Debtors submit that such notice is sufficient and requests that this Court find that no other or further notice is necessary.

## **NO PRIOR REQUEST**

71.    No previous request of the relief sought herein has been made by the Debtors to this or any other court.

## CONCLUSION

**WHEREFORE**, for all the foregoing reasons, the Debtors respectfully request that this Court enter orders, substantially in the form annexed hereto, granting the Motion and such other further relief as the Court deems just and equitable.

Dated: July 21, 2017                    Respectfully submitted,

New York, New York

                                        KLESTADT WINTERS JURELLER
                                        SOUTHARD & STEVENS, LLP


                                        By: /s/ Tracy Klestadt
                                              Tracy Klestadt

                                        Tracy L. Klestadt
                                        Joseph C. Corneau
                                        200 West 41st Street, 17th Floor
                                        New York, New York 10036
                                        Tel: (212) 972-3000
                                        Fax: (212) 972-2245
                                        Email: tklestadt@klestadt.com
                                                jcorneau@klestadt.com

                                              - and -

                                        RIKER DANZIG SCHERER HYLAND &
                                        PERRETTI LLP
                                        Joseph L. Schwartz (*pro hac vice* admission pending)
                                        Tara J. Schellhorn
                                        Rachel F. Gillen (*pro hac vice* admission pending)
                                        Headquarters Plaza, One Speedwell Avenue
                                        Morristown, New Jersey 07960
                                        Telephone: (973) 538-0800
                                        Facsimile: (973) 538-1984
                                        Email:  jschwartz@riker.com
                                                tschellhorn@riker.com
                                                rgillen@riker.com

                                        Attorneys for the Debtors and
                                        Debtors-in-Possession

4860879v4

34

**Exhibit A**

**ASSET PURCHASE AGREEMENT**

among

**COCOA SERVICES, L.L.C.,**

**MORGAN DRIVE ASSOCIATES, L.L.C.**

and

**JB COCOA HOLDING, INC.**

dated as of

July 12, 2017

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ................................................................6

ARTICLE II PURCHASE AND SALE ...........................................................13

 **Section 2.01 Purchase and Sale of Assets.**.......................................13

 **Section 2.02 Excluded Assets.** ..................................................14

 **Section 2.03 Assumed Liabilities.** ..............................................15

 **Section 2.04 Excluded Liabilities.** .............................................15

 **Section 2.05 Purchase Price.** ...................................................16

 **Section 2.06 Allocation of Purchase Price.**.....................................16

 **Section 2.07 Non-assignable Assets.** ...........................................17

 **Section 2.08 Cure Payments.** ...................................................17

ARTICLE III CLOSING ......................................................................17

 **Section 3.01 Closing.** .........................................................17

 **Section 3.02 Closing Adjustment.** ..............................................17

 **Section 3.03 Closing Deliverables.** ............................................17

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS ............................18

 **Section 4.01 Organization and Qualification of Sellers.**........................19

 **Section 4.02 Authority of Sellers.**.............................................19

 **Section 4.03 No Conflicts; Consents.** ..........................................19

 **Section 4.04 Financial Statements.** ............................................19

 **Section 4.05 Absence of Certain Changes, Events and Conditions.**................20

 **Section 4.06 Assigned Contracts.**...............................................21

 **Section 4.07 Title to Tangible Personal Property.** .............................21

 **Section 4.08 Sufficiency of Assets.** ...........................................21

 **Section 4.09 Real Property.** ...................................................21

2

**Section 4.10 Intellectual Property.** ...................................................................22

**Section 4.11 Legal Proceedings; Governmental Orders.** .................................22

**Section 4.12 Compliance With Laws; Permits.** .................................................22

**Section 4.13 Environmental Matters.** ................................................................23

**Section 4.14 Employee Benefit Matters.** ..........................................................23

**Section 4.15 Employment Matters.** ...................................................................25

**Section 4.16 Taxes.** ............................................................................................25

**Section 4.17 Brokers.** .........................................................................................26

**Section 4.18 No Other Representations and Warranties.** ................................26

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER .................................26

**Section 5.01 Organization and Authority of Buyer.** .......................................26

**Section 5.02 Authority of Buyer** ......................................................................26

**Section 5.03 No Conflicts; Consents.** ...............................................................27

**Section 5.04 Brokers.** .........................................................................................27

**Section 5.05 Sufficiency of Funds.** ...................................................................27

**Section 5.07 Legal Proceedings.** .......................................................................27

**Section 5.08 Independent Investigation.** ..........................................................28

ARTICLE VI COVENANTS ...................................................................................................28

**Section 6.01 Conduct of Business Prior to the Closing.** .................................28

**Section 6.02 Access to Information.** ..................................................................28

**Section 6.03 Supplement to Disclosure Schedules.** .........................................29

**Section 6.04 Employees and Employee Benefits.** ............................................29

**Section 6.05 Confidentiality.** ............................................................................30

**Section 6.06 Governmental Approvals and Consents.** ....................................30

**Section 6.07 Closing Conditions.** .....................................................................31

**Section 6.08 Public Announcements.**..............................................................31

**Section 6.09 Bulk Sales Laws.**.......................................................................31

**Section 6.10 Transfer Taxes.**..........................................................................32

**Section 6.11 Further Assurances.**....................................................................32

ARTICLE VII CONDITIONS TO CLOSING ..................................................32

**Section 7.01 Conditions to Obligations of All Parties.**...................................32

**Section 7.02 Conditions to Obligations of Buyer.**..........................................32

**Section 7.03 Conditions to Obligations of Sellers.**.........................................33

ARTICLE VIII SURVIVAL..............................................................................34

**Section 8.01 Survival.**.....................................................................................34

ARTICLE IX BANKRUPTCY COURT MATTERS ........................................35

**Section 9.01 Submission to Bankruptcy Court of Bid Protections and the Sale Order**...................................................................................................35

**Section 9.02 Competing Transaction**..............................................................38

**Section 9.03 Notice of Sale.**...........................................................................38

ARTICLE X TERMINATION ...........................................................................38

**Section 10.01 Termination.**.............................................................................38

**Section 10.02 Effect of Termination.**.............................................................40

ARTICLE XI MISCELLANEOUS ....................................................................40

**Section 11.01 Expenses.**.................................................................................40

**Section 11.02 Notices.**....................................................................................40

**Section 11.03 Interpretation.**..........................................................................41

**Section 11.04 Headings.**.................................................................................42

**Section 11.05 Severability.**.............................................................................42

**Section 11.06 Entire Agreement.**....................................................................42

**Section 11.07 Successors and Assigns.**..........................................................42

**Section 11.08 No Third Party Beneficiaries.**...................................................................42

**Section 11.09 Amendment and Modification; Waiver.** ................................................42

**Section 11.10 Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**....43

**Section 11.11 Counterparts.** ..........................................................................................43

**Section 11.12 Non-recourse.** ..........................................................................................44

EXHIBITS

Exhibit A       Allocation Schedule
Exhibit B       Bill of Sale
Exhibit C       Assignment and Assumption Agreement
Exhibit D       Deed

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of July 12, 2017 (the "**Effective Date**"),  is entered into among COCOA SERVICES, L.L.C., and MORGAN DRIVE ASSOCIATES, L.L.C., each a New Jersey limited liability company (individually, a "**Seller**" and collectively, "**Sellers**") and JB COCOA HOLDING, INC., a Delaware corporation ("**Buyer**").

## RECITALS

WHEREAS, Sellers are engaged in the business of processing cocoa products (the "**Business**"); and

WHEREAS, each Seller intends to file a voluntary petition for bankruptcy commencing a case (collectively, the "**Bankruptcy Case**") under chapter 11 of title 11 of the United States Code (such title, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"); and

WHEREAS, subject to the terms and conditions set forth herein, Sellers wish to sell and assign to Buyer, and Buyer wishes to purchase and assume from Sellers, the Purchased Assets, in a sale authorized by the Bankruptcy Court free and clear of all liens, claims and encumbrances pursuant to sections 105, 363 and 365 of the Bankruptcy Code; and

WHEREAS, the transactions contemplated by this Agreement will be subject to the approval of the Bankruptcy Court and will be consummated only pursuant to a Sale Order to be entered in the Bankruptcy Case and other applicable provisions of the Bankruptcy Code;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms have the meanings specified or referred to in this **Article I**:

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Allocation Schedule**" has the meaning set forth in **Section 2.06**.

6

"**Assigned Contracts**" has the meaning set forth in **Section 2.01(c)**.

"**Assignment and Assumption Agreement**" has the meaning set forth in **Section 3.03(a)(ii)**.

"**Assumed Liabilities**" has the meaning set forth in **Section 2.03**.

"**Auction**" means the auction conducted by Sellers pursuant to the Bidding Procedures Order.

"**Balance Sheet**" has the meaning set forth in **Section 4.04**.

"**Balance Sheet Date**" has the meaning set forth in **Section 4.04**.

"**Bankruptcy Case**" has the meaning set forth in the recitals.

"**Bankruptcy Code**" has the meaning set forth in the recitals.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Benefit Plan**" has the meaning set forth in **Section 4.14(a)**.

"**Bidding Procedures Order**" has the meaning set forth in **Section 9.01(a)**.

"**Bill of Sale**" has the meaning set forth in **Section 3.03(a)(i)**.

"**Books and Records**" has the meaning set forth in **Section 2.01(l)**.

"**Break-Up Fee**" has the meaning set forth in **Section 9.01(a)(ii)**.

"**Business**" has the meaning set forth in the recitals.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in New York are authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the preamble.

"**Buyer Benefit Plans**" has the meaning set forth in **Section 6.04(c)**.

"**Buyer Closing Certificate**" has the meaning set forth in **Section 7.03(d)**.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.

"**Closing**" has the meaning set forth in **Section 3.01**.

7

"**Closing Date**" has the meaning set forth in Section 3.01.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Competing Bid**" has the meaning set forth in **Section 9.02(a)**.

"**Confidentiality Agreement**" means the Confidentiality Agreement, dated as of March 20, 2017, between Buyer and Sellers.

"**Contracts**" means all legally binding written contracts, leases, mortgages, licenses, instruments, notes, commitments, undertakings, indentures and other agreements.

"**Cure Amount**" means all amounts, costs and expenses required to cure all defaults under the Assigned Contracts so that they may be sold and assigned to Buyer pursuant to section 365(b)(1) of the Bankruptcy Code.

"**Deed**" has the meaning set forth in **Section 3.03(a)(iii)**.

"**Deposit**" has the meaning set forth in **Section 2.05**.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Sellers to Buyer concurrently with the execution and delivery of this Agreement.

"**Division**" has the meaning set forth in **Section 6.09**.

"**Dollars or $**" means the lawful currency of the United States.

"**Drop Dead Date**" has the meaning set forth in Section 10.01(b)(i).

"**Effective Date**" has the meaning set forth in the preamble.

"**Employees**" means those Persons employed by either Seller who worked for the Business immediately prior to the Closing.

"**Encumbrance**" means any Lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, right-of-way, encroachment or other similar encumbrance.

"**Environmental Claim**" means any Governmental Order, action, suit, claim, notice, demand, investigation or other legal proceeding by any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

8

"**Environmental Law**" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): CERCLA; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; and the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.

"**Environmental Notice**" means any written or oral directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"**Environmental Permit**" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**Escrow Holder**" means Foundation Title.

"**Excluded Assets**" has the meaning set forth in **Section 2.02**.

"**Excluded Liabilities**" has the meaning set forth in **Section 2.04**.

"**Expense Reimbursement**" has the meaning set forth in **Section 9.01(a)(ii)**.

"**Financial Statements**" has the meaning set forth in **Section 4.04**.

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Hazardous Materials**" means: (a) any chemical, substance, material, or waste listed, defined, or classified as a "pollutant," "contaminant," "hazardous substance," "toxic substance," "solid waste," "hazardous waste," "hazardous material," or "special waste" under any applicable Environmental Law; (b) any substance regulated under any applicable Environmental Law; and (c) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls, or mold.

"**Hired Employees**" has the meaning set forth in **Section 6.04(b)**.

"**Intellectual Property**" means any and all of the following in any jurisdiction throughout the world: (a) trademarks and service marks, including all applications and registrations and the goodwill connected with the use of and symbolized by the foregoing; (b) copyrights, including all applications and registrations, and works of authorship, whether or not copyrightable; (c) trade secrets and confidential know-how; (d) patents and patent applications; (e) websites and internet domain name registrations; (f) software; and (g) all other intellectual property and industrial property rights and assets, and all rights, interests and protections that are associated with, similar to, or required for the exercise of, any of the foregoing.

"**Intellectual Property Agreements**" means all licenses, sublicenses and other agreements by or through which other Persons grant a Seller or a Seller grants any other Persons any exclusive or non-exclusive rights or interests in or to any Intellectual Property that is used in the operation of the Business.

"**Intellectual Property Assets**" means all Intellectual Property that is owned by a Seller and used in the operation of the Business, including the Intellectual Property Registrations set forth on **Section 4.10(a)** of the Disclosure Schedules.

"**Intellectual Property Registrations**" means all Intellectual Property Assets that are subject to any issuance, registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including registered trademarks, domain names, and copyrights, issued and reissued patents and pending applications for any of the foregoing.

"**Inventory**" has the meaning set forth in Section **2.01(g)**.

"**Knowledge of Sellers or Sellers' Knowledge**" or any other similar knowledge qualification, means the actual knowledge of those persons listed in **Section 1.01(a)** of the Disclosure Schedules, or such knowledge that each person listed in **Section 1.01(a)** of the Disclosure Schedules would have if he or she conducted a reasonable investigation regarding the accuracy of the representations and warranties made by him or her.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Liability**" means any liability, debt, obligation, deficiency, interest, tax, penalty, fine, claim, demand, judgment, cause of action or other loss (including, without limitation, loss of benefit, or relief), cost or expense of any kind or nature whatsoever, whether asserted or unasserted, absolute

or contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due and regardless of when asserted.

"**Lien**" means any charge against or interest in property to secure payment of a debt (as such term is defined in section 101(12) of the Bankruptcy Code) or performance of an obligation.

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is materially adverse to the business, results of operations, financial condition or assets of the Business, taken as a whole; *provided, however,* that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Business operates; (iii) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Buyer; (vi) any matter of which Buyer is aware on the date hereof; (vii) any changes in applicable Laws or accounting rules (including GAAP) or the enforcement, implementation or interpretation thereof; (viii) the announcement, pendency or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with the Sellers and the Business; (ix) any natural or man-made disaster or acts of God; (x) any failure by the Business to meet any internal or published projections, forecasts or revenue or earnings predictions (provided that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded); or (xi) the financial condition or operations of TCG or either Seller, or any of their Chapter 11 petitions and subsequent cases before the Bankruptcy Court.

"**Morgan Drive Facility**" has the meaning set forth in **Section 2.01(a)**.

"**Morgan Drive Title Policy**" has the meaning set forth in **Section 7.02(f)**.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations and consents required to be obtained from Governmental Authorities.

"**Permitted Encumbrances**" means (a) liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures; (b) mechanics', carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business for sums not yet delinquent; (c) easements, rights of way, zoning ordinances and other similar encumbrances affecting real property (including all items set forth in the Morgan Drive Title Policy); and (d) liens arising under equipment leases with third parties entered into in the ordinary course of business and set forth on Section **1.01(b)** of the Disclosure Schedules.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Purchase Price**" has the meaning set forth in **Section 2.05**.

11

"**Purchased Assets**" has the meaning set forth in Section 2.01.

"**Qualified Benefit Plan**" has the meaning set forth in Section 4.14(b).

"**Release**" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Sale Motion**" has the meaning set forth in **Section 9.01(a)**.

"**Sale Order**" has the meaning set forth in **Section 9.01(e)**.

"**Seller**" or "**Sellers**" has the meaning set forth in the preamble.

"**Seller Closing Certificate**" has the meaning set forth in Section 7.02(d).

"**Tangible Personal Property**" has the meaning set forth in Section 2.01(h).

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**TCG**" means Transmar Commodity Group Ltd., a New York corporation and the sole member of each Seller.

"**Transaction Documents**" means this Agreement, the Bill of Sale, the Assignment and Assumption Agreement, and the other agreements, instruments and documents expressly required by this Agreement to be delivered at the Closing.

"**Transaction Expenses**" has the meaning set forth in **Section 9.01(a)(ii)**.

"**Transferred Employee**" has the meaning set forth in Section 6.04(a).

"**Treasury Regulations**" means the regulations promulgated by the United States Department of the Treasury under the Code.

12

"**WARN Act**" has the meaning set forth in **Section 2.04(f)**.


# ARTICLE II
# PURCHASE AND SALE

**Section 2.01    Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, at the Closing, Sellers shall sell, assign, transfer, convey and deliver to Buyer free and clear of all Encumbrances other than Permitted Encumbrances, and Buyer shall purchase from Sellers, all of Sellers' right, title and interest in, to and under the following assets, properties and rights of Sellers, to the extent that such assets, properties and rights exist as of the Closing Date and relate to the Business (collectively, the "**Purchased Assets**"):

(a)    real property, buildings and improvements located at 400 Eagle Court, Swedesboro, New Jersey 08085 (the "**Morgan Drive Facility**");

(b)    all plans, reports, surveys and studies prepared, acquired or paid for regarding or benefitting the Morgan Drive Facility;

(c)    all Contracts set forth on **Section 2.01(c)** of the Disclosure Schedules and the Intellectual Property Agreements set forth on **Section 4.10(a)** of the Disclosure Schedules (collectively, the "**Assigned Contracts**");

(d)    to the extent transferable, assignable or saleable in accordance with the terms thereof and applicable Law, all Permits, including Environmental Permits, that are granted to, held or used by either Seller, whether or not such are actually utilized, in the operation of the Morgan Drive Facility, or any portion thereof, or relate primarily to the conduct of the Business, a list of which is set forth on **Section 4.12** of the Disclosure Schedules;

(e)    all Intellectual Property Assets, including the WinCC SCADA software system owned and used by Cocoa Services, L.L.C.;

(f)    all fixed assets, furniture, fixtures, equipment, supplies and other tangible personal property of the Business that are either (i) located at the Morgan Drive Facility or (ii) listed on **Section 2.01(f)** of the Disclosure Schedules, including, but not limited to, (a) one cake analyzer (incomplete), (b) one liquid sterilizer, (c) one U-shaped butter melter (3-5 mt capacity), (d) one ball mill (800k/hr capacity), and (e) one double-decker melter (the "**Tangible Personal Property**");

(g)    all inventory, finished goods, work in progress, packaging materials, spare parts, supplies, and other inventory ("**Inventory**") of the Business owned by Sellers as of the Closing Date;

(h)    all prepaid expenses, credits, advance payments, security, deposits, charges, sums and fees to the extent related to any Purchased Assets;

13

(i)    nineteen (19) sewer credits/units in connection with non-domestic wastewater discharge;

(j)    all of Sellers' claims or causes of action (whether liquidated or unliquidated, fixed or contingent) pursuant to any warranties, indemnities, representations, or guarantees made by suppliers, manufacturers, contractors, and other third parties in connection with products or services purchased by or furnished to either Seller and all similar rights against third parties to the extent related to any Purchased Assets, and all of Sellers' rights to rebates or credits or rights of setoff against third parties to the extent related to any Purchased Assets;

(k)    originals, or where not available, copies, of all books and records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records and internal financial statements, that relate to the Business or the Purchased Assets, other than books and records set forth in **Section 2.02(d)** ("**Books and Records**");

(l)    all goodwill associated with the Business; and

(m)    all insurance proceeds arising in connection with property damage to the Purchased Assets.

**Section 2.02    Excluded Assets.** Other than the Purchased Assets, Buyer expressly understands and agrees that it is not purchasing or acquiring, and Sellers are not selling or assigning, any other assets or properties of Sellers, and all such other assets and properties shall be excluded from the Purchased Assets (the "**Excluded Assets**"). Excluded Assets include the following assets and properties of Sellers:

(a)    all accounts or notes receivable of Sellers (provided, however, that Sellers shall not bring any action to collect any accounts receivable after the Closing Date without providing Buyer with at least ten (10) days prior written notice thereof, except as otherwise required by the Bankruptcy Code);

(b)    all cash and cash equivalents, bank accounts and securities of Sellers;

(c)    all Contracts that are not Assigned Contracts;

(d)    all Intellectual Property other than the Intellectual Property Assets;

(e)    all Inventory owned by customers of the Business, including any liens that Sellers may hold thereon;

(f)    the seals, organizational documents, minute books, Tax Returns, books of account or other records having to do with the legal organization of Sellers, all employee-related or employee benefit-related files or records, other than personnel files of Transferred

14

Employees, and any other books and records which Sellers are prohibited from disclosing or transferring to Buyer under applicable Law and is required by applicable Law to retain;

(g)     all insurance policies of Sellers and all rights to applicable claims and proceeds thereunder;

(h)     all Benefit Plans and trusts or other assets attributable thereto;

(i)     all Tax assets (including duty and Tax refunds and prepayments);

(j)     all rights to any action, suit or claim of any nature available to or being pursued by Sellers, whether arising by way of counterclaim or otherwise to the extent related to any Excluded Asset; and

(k)     the rights which accrue or will accrue to Sellers under the Transaction Documents.

**Section 2.03   Assumed Liabilities.** Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge when due the following Liabilities and no other Liabilities (collectively, the "**Assumed Liabilities**"):

(a)     all Liabilities arising under or relating to the Assigned Contracts, but only to the extent that such Liabilities arise out of or result from events occurring subsequent to the Closing;

(b)     all Liabilities of Buyer or its Affiliates relating to employee benefits, compensation or other arrangements with respect to any Hired Employee arising on or after the Closing;

(c)     all Liabilities for Taxes relating to the Business, the Purchased Assets or the Assumed Liabilities for any taxable period or portion thereof beginning after the Closing Date;

(d)     the Cure Amount; and

(e)     all other Liabilities arising out of or relating to Buyer's ownership or operation of the Business and the Purchased Assets on or after the Closing.

**Section 2.04   Excluded Liabilities.** Notwithstanding anything to the contrary contained in this Agreement, all Liabilities of Sellers, other than the Assumed Liabilities (collectively, the "**Excluded Liabilities**"), shall remain the sole responsibility of and shall be retained, paid, performed and discharged solely by Sellers, whether before or after the Closing, unless discharged by the Bankruptcy Court.  Without limiting the generality of the foregoing, the Excluded Liabilities shall include all, and Buyer will not assume any, of the following:

(a)     any Liabilities arising out of or relating to trade accounts payable owed to Sellers' Affiliates;

15

(b)       any Liabilities arising out of or relating to Sellers' ownership or operation of the Business and the Purchased Assets prior to the Closing Date;

(c)       any Liabilities relating to or arising out of the Excluded Assets;

(d)       any Liabilities for (i) Taxes relating to the Business, the Purchased Assets or the Assumed Liabilities for any taxable period or portion thereof ending on or prior to the Closing Date and (ii) any other Taxes of Sellers (other than Taxes allocated to Buyer under **Section 6.10**) for any taxable period;

(e)       any Liabilities of Sellers relating to or arising out of (i) the employment, or termination of employment, of any Employee prior to the Closing, or (ii) workers' compensation claims of any Employee which relate to events occurring prior to the Closing Date;

(f)       any Liabilities of Sellers arising out of Sellers' actions or omissions with respect to the Worker Adjustment and Retraining Notification Act of 1988 ("**WARN Act**") or any similar Law;

(g)       all Liabilities that are not related to the conduct of the Business or the Purchased Assets, whether arising prior to, on or after the Closing Date; and

(h)       any Liabilities of Sellers arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others.

**Section 2.05   Purchase Price.** The aggregate purchase price for the Purchased Assets shall be $8,000,000 (eight million U.S. dollars) (as further adjusted pursuant to **Section 3.02**, the "**Purchase Price**") plus the assumption of the Assumed Liabilities. The Cure Amount, if any, shall be paid from the Purchase Price (if not already paid by Sellers prior to the Closing).  Buyer shall pay an initial deposit of $800,000 (eight hundred thousand U.S. dollars) for the benefit of Sellers within three (3) business days of the execution of this Agreement (the "**Deposit**") by wire transfer of immediately available funds to Escrow Holder. The balance of the Purchase Price shall be paid at Closing by wire transfer of immediately available funds to an account designated in writing by Sellers to Buyer no later than two Business Days prior to the Closing Date.  For the avoidance of doubt, the Cure Amount, to the extent not paid by Sellers prior to the Closing Date, shall be paid directly to the counterparties of the Assigned Contracts on the Closing Date.

**Section 2.06   Allocation of Purchase Price.** Sellers and Buyer agree that the Purchase Price (including any Assumed Liabilities treated as consideration for the Purchased Assets for Tax purposes) shall be allocated among the Sellers for all purposes, and among the Purchased Assets of each Seller for Tax and financial accounting purposes, as shown on the allocation schedule attached hereto as **Exhibit A** (the "**Allocation Schedule**").  For the avoidance of doubt, with respect to Sellers, the amount of the Purchase Price allocated to Cocoa Services, L.L.C. shall be reduced on a dollar for dollar basis by the Cure Amount.  Buyer and Sellers shall file or cause to be filed all

16

relevant Tax Returns (including amended returns and claims for refund) and information reports (including IRS Forms 8594) in a manner consistent with the Allocation Schedule.

Section 2.07    Non-assignable Assets. Notwithstanding anything to the contrary in this Agreement, and subject to the provisions of this **Section 2.07**, to the extent that the sale, assignment, transfer, conveyance or delivery, or attempted sale, assignment, transfer, conveyance or delivery, to Buyer of any Purchased Asset would result in a violation of applicable Law, or would require the consent, authorization, approval or waiver of a Person who is not a party to this Agreement or an Affiliate of a party to this Agreement (including any Governmental Authority), and such consent, authorization, approval or waiver shall not have been obtained prior to the Closing, this Agreement shall not constitute a sale, assignment, transfer, conveyance or delivery, or an attempted sale, assignment, transfer, conveyance or delivery, thereof, and Buyer shall have the right to terminate this Agreement to the extent provided in Article X.

Section 2.08    Cure Payments. Not later than five (5) Business Days prior to the Closing Date, Sellers shall deliver to Buyer a detailed calculation of the Cure Amount.

## ARTICLE III
## ESCROW AND CLOSING

Section 3.01    Closing. Subject to the terms and conditions of this Agreement and the Escrow Holder's agreement to the time period for Closing set forth in this Section 3.01, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the Escrow Holder's office located at 214 Highway 18, 3rd Floor, East Brunswick, New Jersey 08816 on the date that is two (2) Business Days after all of the conditions to Closing set forth in Article VII are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or at such other time, date or place as Sellers and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**".

Section 3.02    Closing Adjustment. Sellers will pay all charges for the Morgan Drive Title Policy, transfer taxes, recording fees and one-half (1/2) of Escrow Holder's fee.  The real and personal property taxes, assessments, water and other utility charges and sewer fees assessed against or otherwise due and payable with respect to the Morgan Drive Facility shall be apportioned on a per diem basis as of the Closing Date between Sellers and Buyer.  All other charges associated with the Morgan Drive Facility shall be apportioned as is customary in the location of the Morgan Drive Facility.

Section 3.03    Closing Deliverables.

(a)    At the Closing, Sellers shall deliver to Buyer the following:

(i)    a bill of sale in the form of **Exhibit B** hereto (the "**Bill of Sale**") and duly executed by each Seller, transferring the tangible personal property included in the Purchased Assets to Buyer;

17

(ii)     an assignment and assumption agreement in the form of **Exhibit C** hereto (the "**Assignment and Assumption Agreement**") and duly executed by each Seller, effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities;

(iii)     with respect to the Morgan Drive Facility, a deed in the form of **Exhibit D** hereto (the "**Deed**") and duly executed and notarized by the relevant Seller;

(iv)     the Seller Closing Certificate;

(v)     a certificate pursuant to Treasury Regulations Section 1.1445-2(b) that TCG, the sole member of each Seller, is not a foreign person within the meaning of Section 1445 of the Code, duly executed by TCG;

(vi)     a copy of the Sale Order entered by the Bankruptcy Court;

(vii)     a discharge of each mortgage, security interest, or lien on the Purchased Assets, signed by the holder of each such Encumbrance, to the extent not provided in the Sale Order; and

(viii)    a certificate of occupancy for the Morgan Drive Facility (if required by applicable Law); and

(ix)     such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

(b)     At the Closing, Buyer shall deliver to Sellers the following:

(i)     the balance of the Purchase Price;

(ii)     the Bill of Sale, duly executed by Buyer;

(iii)     the Assignment and Assumption Agreement, duly executed by Buyer;

(iv)     the Buyer Closing Certificate; and

(v)     such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Sellers, as may be required to give effect to this Agreement.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby represent and warrant to Buyer as follows:

18

**Section 4.01    Organization and Qualification of Sellers.** Each Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of New Jersey and, subject to any necessary authority from the Bankruptcy Court, has all necessary power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted.  Each Seller is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of the Purchased Assets or the operation of the Business as currently conducted makes such licensing or qualification necessary.

**Section 4.02    Authority of Sellers.** Subject to any necessary authority from the Bankruptcy Court, each Seller has all necessary power and authority to enter into this Agreement and the other Transaction Documents to which such Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. Subject to the entry of the Sale Order, the execution and delivery by each Seller of this Agreement and any other Transaction Document to which such Seller is a party, the performance by each Seller of its obligations hereunder and thereunder and the consummation by each Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of each Seller. Subject to the entry of the Sale Order, this Agreement has been duly executed and delivered by each Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of each Seller, enforceable against such Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity). Subject to the entry of the Sale Order, when each other Transaction Document to which a Seller is or will be a party has been duly executed and delivered by such Seller (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of such Seller enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 4.03    No Conflicts; Consents.** Subject to the entry of the Sale Order, the execution, delivery and performance by each Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) result in a violation or breach of any provision of the articles of organization or operating agreement of such Seller; (b) result in a violation or breach of any provision of any Law or Governmental Order applicable to such Seller, the Business or the Purchased Assets; or (c) require the consent, notice or other action by any Person under any Assigned Contract; or (d) conflict with, result in a violation or breach of, constitute a default under or result in the acceleration of any Assigned Contract. Except as set forth in Section 4.03 of the Disclosure Schedules and subject to the entry of the Sale Order, no consent, approval, Permit, Governmental Order, declaration of, filing with or notice to any Governmental Authority is required by or with respect to either Seller in connection with the execution and delivery of this Agreement or any of the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

**Section 4.04    Financial Statements.** Copies of the unaudited financial statements consisting of the balance sheet of the Business as at December 31 in each of the years 2016, 2015

19

and 2014 and the related statements of income and retained earnings, members' equity and cash flow for the years then ended (the "**Financial Statements**") have been delivered or made available to Buyer. The Financial Statements have been prepared in accordance with Sellers' past practices applied on a consistent basis throughout the period involved, subject to all assumptions set forth in connection therewith. The Financial Statements fairly present in all material respects the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated, all in accordance with GAAP consistently applied. The balance sheet of the Business as of December 31, 2016 is referred to herein as the "**Balance Sheet**" and the date thereof as the "**Balance Sheet Date**".

    **Section 4.05   Absence of Certain Changes, Events and Conditions.** Except as expressly contemplated by this Agreement or as set forth on **Section 4.05** of the Disclosure Schedules, from the Balance Sheet Date until the date of this Agreement, Sellers have operated the Business in the ordinary course of business in all material respects and there has not been, with respect to the Business, any:

    (a)    event, occurrence or development that has had a Material Adverse Effect;

    (b)    incurrence of any indebtedness for borrowed money in connection with the Business in an aggregate amount exceeding $10,000.00 except unsecured current obligations and liabilities incurred in the ordinary course of business;

    (c)    sale or other disposition of any of the Purchased Assets shown or reflected in the Balance Sheet;

    (d)    entry into any material Contract outside the ordinary course of business (other than this Agreement or in furtherance of this Agreement) or amendment, modification or termination (partially or completely) granting any waiver under or giving any consent with respect to any material Contract or any Permit;

    (e)    violation, breach or default under, or taking or failure to take any action that (with or without notice or lapse of time or both) would constitute a violation, breach of, or default under, any term or provision of any Assigned Contract or any Permit, including, without limitation, any payment obligations thereunder;

    (f)    failure to keep in force insurance policies providing insurance coverage with respect to the assets, operations and activities of the Business;

    (g)    except to the extent required by applicable Law, with respect to terms of any Benefit Plan existing on the date hereof, (i) making or granting any change in compensation or benefits payable or to become payable to any Employee; (ii) granting any rights to severance or termination pay to, or entering into or amending any employment, consulting, severance, retention, change in control, termination pay, or other agreement with, any Employee, or (iii) taking any affirmative action to amend or waive any performance or vesting criteria or accelerated vesting, exercisability or funding under any Benefit Play with respect to any Employee;

20

(h)     cancellation of any debts or claims or amendment, termination or waiver of any rights constituting Purchased Assets, except in the ordinary course of business;

(i)     capital expenditures in an aggregate amount exceeding $10,000.00 which would constitute an Assumed Liability;

(j)     imposition of any Encumbrance upon any of the Purchased Assets, except for Permitted Encumbrances;

(k)     purchase or other acquisition of any property or asset that constitutes a Purchased Asset for an amount in excess of $10,000.00, except for purchases of supplies in the ordinary course of business; or

(l)     any agreement to do any of the foregoing, or any action or omission that would result in any of the foregoing.

**Section 4.06    Assigned Contracts.**  The Assigned Contracts are all of the Contracts necessary to the operation of the Business.  All of the Assigned Contracts are valid, binding and in full force and effect in accordance with their terms and conditions, and will be at the Closing Date. Except as set forth in **Section 4.06** of the Disclosure Schedules, Sellers are not in breach of, or in default under, any Assigned Contract.  A true, correct, and complete copy of each such written Assigned Contract has been delivered or made available to Buyer.

**Section 4.07    Title to Purchased Assets.** Sellers have good and valid title to, or a valid leasehold interest in, all Purchased Assets, free and clear of Encumbrances except for Permitted Encumbrances.

**Section 4.08    Sufficiency of Assets.** The Purchased Assets are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property and assets necessary to conduct the Business as currently conducted.

**Section 4.09    Real Property.**

(a)     Sellers do not own, lease, occupy or have any interest in any real property except for the Morgan Drive Facility.  Morgan Drive Associates, L.L.C. has fee simple title to the Morgan Drive Facility, free and clear of Encumbrances except for Permitted Encumbrances, and Sellers have sole and exclusive possession of the Morgan Drive Facility except on account of the Permitted Encumbrances.  Sellers have received all approvals of Governmental Entities (including licenses and permits) required in connection with the ownership of the Morgan Drive Facility and operation of the Business at the Morgan Drive Facility.

(b)     Sellers have not received any notice, whether written or oral, of existing (i) condemnation proceedings affecting the Morgan Drive Facility, or any portion thereof, or (ii) zoning, building code or other moratorium proceedings, or similar matters which would reasonably be expected to materially and adversely affect the ability to operate the Morgan

21

Drive Facility as currently operated. Neither the whole nor any material portion of the Morgan Drive Facility has been damaged or destroyed by fire or other casualty.

(c)    The plumbing, electrical, mechanical, HVAC, sewage, roofing, floor, and foundation systems at the Morgan Drive Facility are now, and shall be at Closing, materially in working order.

**Section 4.10    Intellectual Property.**

(a)    **Section 4.10(a)** of the Disclosure Schedules lists (i) all Intellectual Property Registrations and (ii) all Intellectual Property Agreements. Except as set forth in **Section 4.10(a)** of the Disclosure Schedules, or as would not have a Material Adverse Effect, Sellers own or have the right to use all Intellectual Property Assets and the Intellectual Property licensed to Sellers under the Intellectual Property Agreements.

(b)    The Intellectual Property Assets and the Intellectual Property Agreements constitute all of the Intellectual Property necessary to conduct the Business as currently conducted.

(c)    To Sellers' Knowledge: (i) the conduct of the Business as currently conducted does not infringe, misappropriate, dilute or otherwise violate the Intellectual Property of any Person; and (ii) no Person is infringing, misappropriating or otherwise violating any Intellectual Property Assets. Notwithstanding anything to the contrary in this Agreement, this **Section 4.10(b)** constitutes the sole representation and warranty of Sellers under this Agreement with respect to any actual or alleged infringement, misappropriation or other violation by Sellers of any Intellectual Property of any other Person.

**Section 4.11    Legal Proceedings; Governmental Orders.**

(a)    Except as set forth in **Section 4.11** of the Disclosure Schedules, there are no actions, suits, claims, investigations or other legal proceedings pending or, to Sellers' Knowledge, threatened against or by Sellers, at law or in equity, relating to or affecting the Business, the Purchased Assets or the Assumed Liabilities, which if determined adversely to Sellers would result in a Material Adverse Effect.

(b)    There are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against or affecting the Business or the Purchased Assets which would have a Material Adverse Effect.

**Section 4.12    Compliance With Laws; Permits.**

(a)    Sellers are in compliance with all Laws applicable to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets, except where the failure to be in compliance would not have a Material Adverse Effect.

(b)    **Section 4.12** of the Disclosure Schedules sets forth a list of all Permits, including Environmental Permits, issued to either Seller that relate to the operation of the

22

Morgan Drive Facility or the conduct of the Business, true and complete copies of which have been provided or made available to Buyer.  Except as set forth on Section 4.12 of the Disclosure Schedules, none of the Permits are freely assignable by Sellers to Buyer. All Permits required for Sellers to conduct the Business as currently conducted or for the ownership and use of the Purchased Assets have been obtained by Sellers and are valid and in full force and effect, except where the failure to obtain such Permits would not have a Material Adverse Effect.

(c)      None of the representations and warranties in **Section 4.12** shall be deemed to relate to environmental matters (which are governed by **Section 4.13**), employee benefits matters (which are governed by **Section 4.14**), employment matters (which are governed by **Section 4.15**) or tax matters (which are governed by **Section 4.16**).

**Section 4.13    Environmental Matters.**

(a)      To Sellers' Knowledge, the operations of Sellers with respect to the Business and the Purchased Assets are in material compliance with all Environmental Laws. Sellers have not received from any Person, with respect to the Business or the Purchased Assets, any: (i) Environmental Notice or Environmental Claim; or (ii) request for information from a Governmental Authority pursuant to Environmental Law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date.

(b)      To Sellers' Knowledge, Sellers have obtained and are in material compliance with all material Environmental Permits (each of which is disclosed in **Section 4.12** of the Disclosure Schedules) necessary for the conduct of the Business as currently conducted for the ownership, lease, operation or use of the Purchased Assets.

(c)      The Morgan Drive Facility is not listed on, nor has been proposed for listing on, the National Priorities List (or CERCLIS) under CERCLA, or any similar state list concerning a Release of Hazardous Materials in violation of Environmental Law.

(d)      Except as set forth in **Section 4.13(d)** of the Disclosure Schedules, to Sellers' Knowledge, there has been no Release of Hazardous Materials in contravention of Environmental Law with respect to the Business, the Purchased Assets or the Morgan Drive Facility, and Sellers have not received any Environmental Notice that the Business or any of the Purchased Assets or the Morgan Drive Facility has been contaminated with any Hazardous Material which would reasonably be expected to result in an Environmental Claim against, or a violation of Environmental Law or term of any Environmental Permit by, Sellers.

(e)      The representations and warranties set forth in this **Section 4.13** are the Sellers' sole and exclusive representations and warranties regarding environmental matters.

**Section 4.14    Employee Benefit Matters.**

(a)     **Section 4.14(a)** of the Disclosure Schedules contains a list of each material benefit, retirement, employment, consulting, compensation, incentive, bonus, phantom equity, change in control, severance, vacation, paid time off, welfare and fringe-benefit agreement, plan, policy and program in effect and covering one or more Employees, former employees of the Business, current or former directors of the Business or the beneficiaries or dependents of any such Persons, and is maintained, sponsored, contributed to, or required to be contributed to by Sellers, or under which Sellers have any material liability for premiums or benefits (as listed on **Section 4.14(a)** of the Disclosure Schedules, each, a "**Benefit Plan**").

(b)     Sellers have provided Buyer with a copy of all Benefit Plans.

(c)      To Sellers' Knowledge, each Benefit Plan and related trust complies in all material respects with all applicable Laws (including ERISA and the Code). Each Benefit Plan that is intended to be qualified under Section 401(a) of the Code (a "**Qualified Benefit Plan**") has received a favorable determination letter from the Internal Revenue Service, or with respect to a prototype or volume submitter plan, can rely on an opinion or advisory letter from the Internal Revenue Service to the prototype or volume submitter plan sponsor, to the effect that such Qualified Benefit Plan is so qualified and that the plan and the trust related thereto are exempt from federal income Taxes under Sections 401(a) and 501(a), respectively, of the Code, and, to Sellers' Knowledge, nothing has occurred that would reasonably be expected to cause the revocation of such determination letter from the Internal Revenue Service or the unavailability of reliance on such opinion or advisory letter from the Internal Revenue Service, as applicable. With respect to any Benefit Plan, to Sellers' Knowledge, no event has occurred or is reasonably expected to occur that has resulted in or would subject Sellers to a Tax under Section 4971 of the Code or the Purchased Assets to a lien under Section 430(k) of the Code.

(d)     No Benefit Plan: (i) is subject to the minimum funding standards of Section 302 of ERISA or Section 412 of the Code; (ii) is a "multi-employer plan" (as defined in Section 3(37) of ERISA); or (iii) is a "multiple employer plan" (within the meaning of Section 413(c) of the Code) or a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA). Sellers have not: (A) withdrawn from any pension plan under circumstances resulting (or expected to result) in liability; or (B) engaged in any transaction which would give rise to a liability under Section 4069 or Section 4212(c) of ERISA.

(e)     Other than as required under Section 601 et. seq. of ERISA or other applicable Law, no Benefit Plan provides benefits or coverage in the nature of health, life or disability insurance following retirement or other termination of employment (other than death benefits when termination occurs upon death).

(f)     No Benefit Plan exists that would: (i) result in the payment to any Employee, director or consultant of the Business of any money or other property; or (ii) accelerate the vesting of or provide any additional rights or benefits (including funding of compensation or benefits through a trust or otherwise) to any Employee, director or consultant of the Business, in each case, as a result of the execution of this Agreement. Neither the execution

24

of this Agreement nor the consummation of the transactions contemplated hereby will result in "excess parachute payments" within the meaning of Section 280G(b) of the Code.

**Section 4.15   Employment Matters.**

(a)      Neither Seller is a party to or bound by any collective bargaining or other agreement with a labor organization representing any of the Employees. Since June 1, 2011, to Sellers' Knowledge, there has not been any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar labor activity or dispute affecting Sellers or any of the Employees.

(b)      Sellers are in compliance with all applicable Laws pertaining to employment and employment practices, labor, immigrations, terms and conditions of employment, workers' compensation, wages, hours of work, independent contractor classifications and occupational safety and health to the extent they relate to the Employees, except to the extent non-compliance would not result in a Material Adverse Effect.

(c)      As of the Effective Date, there is no material unfair labor practice charge or complaint pending or, to Sellers' Knowledge, threatened against or otherwise affecting Sellers before the National Labor Relations Board or the Equal Employment Opportunity Commission or the Division of Labor Standards Enforcement or any similar federal or state agency.

(d)      No grievance or arbitration action arising out of any collective bargaining agreement or other grievance procedure relating to Sellers is pending or, to Sellers' Knowledge, threatened  that would reasonably be expected to have a Material Adverse Effect and no action in which Sellers are a party by or before any Governmental Authority brought by or on behalf of any Employee, prospective Employee, or former Employee, labor organization or other representative of the Employees is pending or, to Sellers' Knowledge, threatened against Sellers that would reasonably be expected to have a Material Adverse Effect.

(e)      Sellers have provided to Buyer a complete and accurate list, as of the Effective Date, of the names, rates of compensation, and current employment status (*e.g.*, full-time, part-time, etc.) of all Employees.

**Section 4.16   Taxes.**

(a)      Sellers have filed (taking into account any valid extensions) all material Tax Returns with respect to the Business required to be filed by Sellers and has paid all Taxes (whether or not shown on any Tax Return) as owing. Sellers are not currently the beneficiary of any extension of time within which to file any material Tax Return other than extensions of time to file Tax Returns obtained in the ordinary course of business.

(b)      No action, suit, proceeding, investigation, dispute, notice of deficiency, claim, or audit is pending against or, to Sellers' Knowledge, threatened with respect to Sellers regarding Taxes.

25

(c)    Sellers have not waived any statute of limitation in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(d)    Neither Seller is a party to any income Tax allocation or sharing agreement.

(e)    Each Seller is disregarded as an entity separate from its owner, within the meaning of Treasury Regulations Section 301.7701-2(c)(2) and pursuant to Treasury Regulations Section 301.7701-3(b)(1)(ii), for U.S. federal and state income Tax purposes. No election has ever been made to treat either Seller as a corporation for U.S. federal or state income Tax purposes.

(f)    Sellers are not and have never been a party to any "listed transaction" as defined in Code Section 6707A(c)(2) and Treasury Regulations Section 1.6011-4(b)(2).

(g)    Except for certain representations related to Taxes in **Section 4.14**, the representations and warranties set forth in this **Section 4.16** are Sellers' sole and exclusive representations and warranties regarding Tax matters.

**Section 4.17    Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Sellers.

**Section 4.18    No Other Representations and Warranties.** Except for the representations and warranties contained in this **Article IV** (including the related portions of the Disclosure Schedules), neither Sellers nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Sellers, including any representation or warranty as to the accuracy or completeness of any information regarding the Business and the Purchased Assets furnished or made available to Buyer and its Representatives, or as to the future revenue, profitability or success of the Business, or any representation or warranty arising from statute or otherwise in law.  Without limiting the foregoing, the Purchased Assets are conveyed "as is," "where is" and "with all faults," and, except as otherwise set forth in this Agreement, all warranties of merchantability or fitness for a particular purpose are expressly disclaimed.

# ARTICLE V
# REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers that the statements contained in this **Article V** are true and correct as of the date hereof.

**Section 5.01    Organization and Authority of Buyer.** Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware.

**Section 5.02    Authority of Buyer.** Buyer has all necessary corporate power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated

26

hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Sellers) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity). When each other Transaction Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 5.03    No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) result in a violation or breach of any provision of the governing documents of Buyer; (b) result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default under or result in the acceleration of any agreement to which Buyer is a party, except in the cases of clauses (b) and (c), where the violation, breach, conflict, default, acceleration or failure to give notice would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, except such consents, approvals, Permits, Governmental Orders, declarations, filings or notices which would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby and thereby.

**Section 5.04    Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

**Section 5.05    Sufficiency of Funds.** Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

**Section 5.06    Legal Proceedings.** There are no actions, suits, claims, investigations or other legal proceedings pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

27

Section 5.07    **Independent Investigation.** Buyer has conducted its own independent investigation, review and analysis of the Business and the Purchased Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Sellers for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Sellers set forth in this Agreement (including related portions of the Disclosure Schedules); and (b) neither Sellers nor any other Person has made any representation or warranty as to Sellers, the Business, the Purchased Assets or this Agreement, except as expressly set forth in this Agreement (including the related portions of the Disclosure Schedules).

<div align="center">

**ARTICLE VI**
**COVENANTS**

</div>

Section 6.01    **Conduct of Business Prior to the Closing.** From the date hereof until the Closing, except as otherwise provided in this Agreement or consented to in writing by Buyer (which consent shall not be unreasonably withheld or delayed), Sellers shall (a) conduct the Business in the ordinary course of business; and (b) use commercially reasonable efforts to maintain and preserve intact its current Business organization, operations and franchise and to preserve the rights, franchises, goodwill and relationships of its Employees, customers, lenders, suppliers, regulators and others having relationships with the Business. From the date hereof until the Closing Date, except as consented to in writing by Buyer (which consent shall not be unreasonably withheld or delayed), Sellers shall not take any action that would cause any of the changes, events or conditions described in **Section 4.05** to occur.

Section 6.02    **Access to Information.** From the date hereof until the Closing, Sellers shall (a) afford Buyer and its Representatives reasonable access to and the right to inspect the Morgan Drive Facility, properties, assets, premises, Books and Records, Assigned Contracts and other documents and data related to the Business; (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Business as Buyer or any of its Representatives may reasonably request; and (c) instruct the Representatives of Sellers to cooperate with Buyer in its investigation of the Business; *provided, however,* that any such investigation shall be conducted during normal business hours upon reasonable advance notice to Sellers, under the supervision of Sellers' personnel and in such a manner as not to interfere with the conduct of the Business or any other businesses of Sellers. Notwithstanding anything to the contrary in this Agreement, Sellers shall not be required to disclose any information to Buyer if such disclosure would, in Sellers' sole discretion: (x) intentionally omitted; (y) jeopardize any attorney-client or other privilege; or (z) contravene any applicable Law, fiduciary duty or binding agreement entered into prior to the date of this Agreement. Prior to the Closing, without the prior written consent of Sellers, which shall not be unreasonably withheld or delayed, Buyer shall not contact any suppliers to, or customers of, the Business and Buyer shall have no right to perform invasive or subsurface investigations of the Morgan Drive Facility. Buyer shall, and shall cause its Representatives to, abide by the terms of the Confidentiality Agreement with respect to any access or information provided pursuant to this **Section 6.02**.

<div align="center">28</div>

**Section 6.03   Supplement to Disclosure Schedules.** From time to time prior to the Closing, Sellers shall promptly supplement or amend the Disclosure Schedules hereto with respect to any matter hereafter arising or of which it becomes aware after the date hereof (each a "**Schedule Supplement**"). Any disclosure in any such Schedule Supplement shall not be deemed to have cured any inaccuracy in or breach of any representation or warranty contained in this Agreement, including for purposes of the indemnification or termination rights contained in this Agreement or of determining whether or not the conditions set forth in **Section 7.02(a)** have been satisfied; *provided, however,* that if Buyer has the right to, but does not elect to, terminate this Agreement within ten Business Days of its receipt of such Schedule Supplement, then Buyer shall be deemed to have irrevocably waived any right to terminate this Agreement with respect to such matter.

**Section 6.04   Employees and Employee Benefits.**

(a)      Sellers shall terminate all Employees immediately prior to Closing.

(b)      Buyer will consider in good faith offering employment to Employees subject in each case to Buyer's business plan; it being understood that Buyer will offer employment to such Employees as Buyer may select in its sole discretion upon terms and conditions, including compensation, vacation and benefits, comparable to those provided by Buyer from time to time to its similarly situated employees. No later than one (1) week prior to the Auction, Buyer shall provide to Sellers a list of all Employees to whom Buyer intends to offer employment as of the Closing Date or five (5) business days thereafter, as applicable. Employees who actually become employed by Buyer shall be referred to herein as the "**Hired Employees**."

(c)      Sellers shall cooperate with Buyer in its efforts to hire Employees. Sellers shall not make any representations or commitments to any Employees concerning the terms or conditions of possible employment with Buyer following the Closing Date without the prior written consent of Buyer. Buyer, in its sole discretion, may conduct individual interviews with Employees concerning possible employment with Buyer following the Closing Date.  Sellers shall be responsible for all severance obligations to Employees as a result of the termination of their employment with Sellers.

(d)      Buyer shall be responsible for any and all liabilities, obligations and claims of any kind arising out of employment (or termination of employment, whether actual or constructive) of the Hired Employees from and after the Closing Date.

(e)      Nothing in this **Section 6.04** or any other provision of this Agreement shall be interpreted to interfere with Sellers' rights to amend or terminate any of the its Benefit Plans that are sponsored by Sellers or their Affiliates, or interpreted as an amendment or other modification of any Benefit Plan.

(f)      **Worker's Compensation**.  Buyer shall not be responsible (and Sellers shall be responsible) for any health and accident claims and expenses that arise solely from Sellers' employment of any Employees prior to the Closing Date. Sellers shall not be responsible (and Buyer shall be responsible) for any health and accident claims and expenses with regard to Hired Employees that arise from and after the Closing Date.

29

(g)     **WARN Act**.  Buyer shall be responsible for compliance with, and any liability arising from, any applicable WARN Acts after the Closing.  Sellers shall be responsible for compliance with such WARN Acts before the Closing, including sole responsibility for any such obligation or liability to the extent caused by the termination of Employees pursuant to this **Section 6.04**.

(h)     **COBRA**.  Sellers and their Affiliates shall comply with the provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, as set forth in Section 4980B of the Code and Part 6 of Title I of ERISA ("**COBRA**") with respect to any employee, former employee or beneficiary of any such employee or former employee who is covered under any "group health plan" (as defined in Section 5001(b)(1) of the Code) maintained by Sellers and their Affiliates as of the Closing Date, whether pursuant to the provisions of COBRA or otherwise.

(i)     As soon as practicable after the Closing Date, Buyer shall take all reasonable steps to allow Hired Employees to effectuate a rollover (including a direct rollover, and including outstanding loans, as applicable) or other transfer of their account balance under a Qualified Benefit Plan of either Seller or an Affiliate of Sellers to a Buyer Benefit Plan that is a tax-qualified defined contribution plan, subject to the provisions of such Buyer Benefit Plan.

(j)     This **Section 6.04** shall be binding upon and inure solely to the benefit of each of the parties to this Agreement, and nothing in this **Section 6.04**, express or implied, shall confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this **Section 6.04** to the extent allowed by Law. The parties hereto acknowledge and agree that the terms set forth in this **Section 6.04** shall not create any right in any Employee or any other Person to any continued employment with Buyer or any of its Affiliates or compensation or benefits of any nature or kind whatsoever, nor shall anything herein interfere with the right of Buyer to terminate the employment of any Hired Employee at any time, with or without cause, or restrict Buyer in the exercise of its independent business judgment in modifying any of the terms and conditions of the employment of the Hired Employees, including amendment or termination of any benefit plans.

Section 6.05     **Confidentiality.** Buyer acknowledges and agrees that the Confidentiality Agreement remains in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to Buyer pursuant to this Agreement. If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement and the provisions of this **Section 6.05** shall nonetheless continue in full force and effect.

Section 6.06     **Governmental Approvals and Consents.**

(a)     Each party hereto shall, as promptly as possible, use its reasonable best efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement and the other Transaction Documents. Each party shall cooperate fully with the other party and its

30

Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals. The parties hereto shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

(b)    Sellers and Buyer shall use commercially reasonable efforts to give all notices to, and obtain all consents from, all third parties that are described in Section 4.03 of the Disclosure Schedules; *provided, however*, that no party shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested other than filing fees payable to Government Authorities (which fees shall be paid by the party legally responsible therefor).

**Section 6.07    Closing Conditions.** From the date hereof until the Closing, each party hereto shall use commercially reasonable efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in Article VII hereof.

**Section 6.08    Public Announcements.** Unless otherwise required by applicable Law or stock exchange requirements (based upon the reasonable advice of counsel), no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

**Section 6.09    Bulk Sales Law.** To the extent not waived by the Sale Order in accordance with Section 9.01(e) below, Buyer shall have the right to comply with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that are applicable with respect to the sale of any or all of the Purchased Assets to Buyer, and Seller shall reasonably and promptly upon the request of Buyer cooperate with Buyer in connection therewith.  If Buyer so elects to comply with the applicable provisions of New Jersey state Tax Law with respect to bulk sales, including N.J.S.A. 54:32B-22(c) and N.J.S.A. 54:50-38, Sellers may prepare and deliver to Buyer one or more completed Forms TTD, in which event Buyer shall submit such form(s) to the New Jersey Division of Taxation (the "**Division**") along with its own Form(s) C-9600.  If the Division requests that any amount that would otherwise be paid by Buyer pursuant to this Agreement instead be escrowed, Buyer shall, with the consent of Sellers, select an escrow agent for the purpose of holding such amount pursuant to an escrow agreement in a form reasonably acceptable to Buyer, Sellers and such agent.  If the Division subsequently requests that Buyer pay over to the Division all or any portion of the escrowed amount, then Buyer shall promptly provide a copy of such request to Sellers, and Sellers shall have the right to negotiate with the Division regarding any demand for payment of Taxes by or on behalf of a Seller out of the escrow.  If the Division notifies Buyer that Buyer has no further withholding obligation in respect of Sellers, then Buyer shall provide a copy of such notice to Sellers and the escrow agent, and such agent shall promptly release the balance of the escrow to Sellers.  Notwithstanding anything to the contrary in this Section 6.09, if any Tax for which the Division seeks payment in the manner described in this Section constitutes an Assumed Liability, then Buyer shall promptly pay Sellers that portion of the Tax that the escrow agent remits to the Division from the escrow.

31

**Section 6.10   Transfer Taxes.** Except as otherwise set forth below in this Section 6.10, all transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other Transaction Documents (including any real property transfer Tax and any other similar Tax) shall be borne and paid by Sellers when due. Sellers shall, at their own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

**Section 6.11   Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

# ARTICLE VII
# CONDITIONS TO CLOSING

**Section 7.01   Conditions to Obligations of All Parties.** The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)      No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(b)      The Bankruptcy Court shall have entered the Sale Order consistent with the requirements of **Section 9.01** which shall be in full force and effect on the Closing Date. On the Closing Date, there shall be no Governmental Order staying, reversing, modifying, vacating or amending the Sale Order and there shall be no preliminary or permanent injunction or other Governmental Order of any court or Government Authority declaring this Agreement invalid or unenforceable in any material respect or otherwise preventing the transactions contemplated herein from being consummated.

**Section 7.02   Conditions to Obligations of Buyer.** The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)      The representations and warranties of Sellers contained in **Section 4.01**, **Section 4.02**, **Section 4.03**, and **Section 4.07** shall be true and correct in all material respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date), and all other representations and warranties of Sellers in Article IV shall be true and correct as of the Closing Date with the same effect as though made at and as of such date (except those representations and

32

warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date), except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect.

(b)    Sellers shall have duly performed and complied in all respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c)    Sellers shall have delivered to Buyer duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in **Section 3.02(a)**.

(d)    Buyer shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of each Seller, that each of the conditions set forth in **Section 7.02(a)** and **Section 7.02(b)** have been satisfied (the "**Seller Closing Certificate**").

(e)    Buyer shall have received a certificate of a manager of each Seller certifying that attached thereto are true and complete copies of all resolutions adopted by the managers of such Seller and the board of directors of TCG authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(f)    Escrow Holder shall have issued to Buyer an ALTA Extended Coverage Owner's Policy of Title Insurance for the Morgan Drive Facility (the "**Morgan Drive Title Policy**") at regular rates from a title insurer licensed in the State of New Jersey upon the Closing, in a form reasonably acceptable to Buyer and subject only to the matters approved by Buyer, such approval not to be unreasonably denied.

(g)    Sellers shall have submitted an administrative amendment to the New Jersey Department of Environmental Protection, Division of Air Quality, for the transfer to Buyer of Cocoa Services, L.L.C.'s General Permit.

(h)    The Bankruptcy Court shall have approved the Bidding Procedures Order and Sale Order containing all the required provisions set forth in **Section 9.01(a)**, **Section 9.01(d)**, and **Section 9.01(e)**, respectively, *provided* that the failure of the Bankruptcy Court to approve the payment of the Break-Up Fee (but not, for the avoidance of doubt, the Expense Reimbursement) to the Buyer upon Buyer's termination of this Agreement pursuant to **Section 10.01(b)(i)**, **Section 10.01(b)(iii)** or **Section 10.01(b)(iv)** shall not constitute a failure to satisfy this condition.

**Section 7.03    Conditions to Obligations of Sellers.** The obligations of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Sellers' waiver, at or prior to the Closing, of each of the following conditions:

33

(a)    The representations and warranties of Buyer contained in **Section 5.01**, **Section 5.02**, and **Section 5.04** shall be true and correct in all material respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date), and all other representations and warranties of Buyer in Article V shall be true and correct as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date), except where the failure of such representations and warranties to be true and correct would not have a material adverse effect on Buyer's ability to consummate the transactiosns contemplated hereby.

(b)    Buyer shall have duly performed and complied in all respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c)    Buyer shall have delivered to Sellers the balance of the Purchase Price, duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in **Section 3.02(b)**.

(d)    Sellers shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in **Section 7.03(a)** and **Section 7.03(b)** have been satisfied (the "**Buyer Closing Certificate**").

(e)    Sellers shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying that attached thereto are true and complete copies of all resolutions adopted by the board of directors of Buyer authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(f)    Buyer shall, consistent with section 365(b)(1)(A) of the Bankruptcy Code, but subject to its rights otherwise provided under this Agreement, have paid and/or provided for a reservation of funds sufficient to pay the Cure Amount (for purposes of clarification, however, the Cure Amount shall be paid at Closing from the proceeds of the Purchase Price if not paid by Sellers prior to such time).

# ARTICLE VIII
# SURVIVAL

**Section 8.01    Survival.**  The representations and warranties contained herein shall not survive the Closing. None of the covenants or other agreements contained in this Agreement shall survive the Closing Date other than those which by their terms contemplate performance after the Closing Date, and each such surviving covenant and agreement shall survive the Closing for the

period contemplated by its terms. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of such survival period and such claims shall survive until finally resolved.

# ARTICLE IX
## BANKRUPTCY COURT MATTERS

**Section 9.01    Submission to Bankruptcy Court of Bid Protections and the Sale Order.**

(a)    In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof, as promptly as practicable following the execution of this Agreement, but no later than three (3) days after the "first day" hearing in the Bankruptcy Case , Sellers shall seek the approval from the Bankruptcy Court of a motion pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code (the "**Sale Motion**") seeking entry of an order of the Bankruptcy Court (the "**Bidding Procedures Order**"), which shall approve, among other things:

       (i)    the bid protections set forth in Section 9.01(d); and

       (ii)    Buyer's right to receive a break-up fee in an amount equal to $240,000 (the "**Break-Up Fee**"), plus expense reimbursement up to $100,000 (the "**Expense Reimbursement**" and, together with the Break-Up Fee, the "**Transaction Expenses**"), at the times set forth in Section 10.02.  The Bidding Procedures Order must provide that the Transaction Expenses constitute allowed superpriority administrative expenses under Sections 503(b) and 507(a)(1) of the Bankruptcy Code and are immediately payable if and when the Sellers' obligations to pay them to Buyer arise under this Agreement without further order of the Bankruptcy Court.

(b)    Sellers will e-mail draft copies of the Sale Motion, Bidding Procedures Order, and Sale Order to counsel to the Buyer for review no later than three (3) days prior to the filing of these documents with the Bankruptcy Court, such motion and orders to be reasonably acceptable to Buyer.

(c)    Sellers acknowledge and agree that (A) the approval of the Transaction Expenses are an integral part of the contemplated transactions, (B) in the absence of Sellers' obligations to pay the Transaction Expenses, Buyer would not have entered into this Agreement, (C) the entry of Buyer into this Agreement is beneficial to Sellers, and (D) the Transaction Expenses are reasonable in relation to Buyer's efforts and to the magnitude of the transactions contemplated hereby.

(d)    The Bidding Procedures Order shall include customary public auction terms and conditions reasonably acceptable to the parties with respect to any Competing Bid, including, without limitation:

(i)    the recognition of Buyer's status as a "stalking horse" bidder;

(ii)    approval of the payment of the Transaction Expenses without further order of the Court as allowed superpriority administrative expenses under Sections 503(b) and 507(a) of the Bankruptcy Code at the times and upon the satisfaction of the conditions set forth in this Agreement;

(iii)    relevant bidding procedures, including requirements for a proposed purchaser who makes an offer to be deemed a "Qualified Party" and appropriate overbid protections;

(iv)    a provision stating that any Deposit paid by Buyer shall be returned to Buyer within two (2) Business Days if this Agreement is terminated pursuant to **Section 10.01(a)**, **Section 10.01(b)**, **Section 10.01(c)(ii)** (but not also **Section 10.01(c)(i)**) or **Section 10.01(d)**; and

(v)    a provision stating that in order to be deemed a "Qualified Party," the bidder must provide a deposit of no less than ten (10%) percent of the total amount of its bid, and the amount of the bid of such Person must exceed the Purchase Price (or applicable portion thereof) by an amount equal to $50,000 plus the Transaction Expenses, and a provision stating that at the Auction (if any), bids must be made in minimum increments of at least $50,000 above the previous highest price.

(e)    The Sale Motion shall also seek the entry of a second order of the Bankruptcy Court (the "**Sale Order**"), which shall contain, among other terms reasonably acceptable to Buyer (assuming this Agreement is not terminated following the Auction) and Sellers, the following provisions:

(i)    that the terms and conditions of the sale of the Purchased Assets to Buyer as set forth herein are approved;

(ii)    that the sale of the Purchased Assets to Buyer is free and clear, pursuant to section 363(f) of the Bankruptcy Code , of any and all liabilities and liens of any type or nature whatsoever, other than for Assumed Liabilities, and that all claims of Encumbrances including the pre-petition and post-petition claims of any secured creditors of Seller or creditors of Seller whose claims could act as a Lien against the Purchased Assets, are transferred and shall attach to the proceeds of the sale;

(iii)    that Sellers have good and marketable title to the Purchased Assets and have the authority to transfer the Purchased Assets to Buyer;

(iv)    that the Purchase Price constitutes fair value for the Purchased Assets;

(v)    that Buyer acted in good faith in all respects and that Buyer and its assignees and designees are entitled to the protections of section 363(m) of the Bankruptcy Code;

36

(vi)     that notice of the transactions contemplated hereby was good and sufficient and was provided timely to all parties in interest in the Bankruptcy Case who are entitled or required to receive notice pursuant to the Bankruptcy Code, the Bankruptcy Rules, the local rules of the Bankruptcy Court, or other applicable law;

(vii)    that Sellers are authorized to assign to Buyer each of the Assigned Contracts pursuant to section 365 of the Bankruptcy Code *provided*, *however*, that Buyer shall have sole responsibility for paying the Cure Amount, if any, up to the amount of the Purchase Price;

(viii)   that Sellers are authorized and directed to consummate the transactions contemplated by this Agreement and to comply in all respects with the terms of this Agreement;

(ix)     that the Assigned Contracts are valid Contracts, enforceable on their terms, and Buyer shall have all of the rights of Sellers thereunder;

(x)      that no bulk sale or any similar law of any state, including but not limited to N.J.S.A. 54:32B-22(c) and N.J.S.A. 54:50-38, shall apply in any way to the sale and transfer of the Purchased Assets;

(xi)     that the sale process conducted by Sellers and/or their agent was non-collusive, fair and reasonable and was conducted in good faith;

(xii)    that Buyer and Sellers did not engage in any conduct that would allow the transactions contemplated by this Agreement to be set aside pursuant to section 363(n) of the Bankruptcy Code;

(xiii)   that Buyer is not a successor to, or otherwise liable for, the liabilities, debts or obligations of Sellers under any theory of law, other than as specifically set forth in this Agreement with respect to the Assumed Liabilities;

(xiv)    that the Sale Order is binding upon any successors to Sellers, including any chapter 7, 11 or liquidating trustee that may be appointed in the Bankruptcy Case; and

(xv)     a provision waiving the application of Federal Rule of Bankruptcy Procedure 6004(h).

(f)      Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Bidding Procedures Order and the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.  In the event the entry of the Bidding Procedures Order or the Sale Order shall be appealed, each party shall use their respective commercially reasonable efforts to defend against such appeal.

37

(g)      Sellers shall use their reasonable best efforts to obtain approval of the Bidding Procedures Order and the Sale Order as soon as practicable.

(h)      In the event that an appeal is taken, or a stay pending appeal or application for reconsideration is requested from the Bidding Procedures Order or the Sale Order, Sellers shall promptly notify Buyer of such appeal or stay request and shall provide Buyer within two (2) Business Days a copy of the relevant notice of appeal or order of stay or application for reconsideration.  Sellers shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders or application for reconsideration.

**Section 9.02   Competing Transaction.**

(a)      This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or otherwise better competing bids at the Auction (each a "**Competing Bid**").

(b)      Following the entry of the Bidding Procedures Order by the Bankruptcy Court and until the Bankruptcy Court's approval of the Sale Order approving this Agreement, Sellers are permitted to market and solicit other proposals or offers by any Person in connection with any sale or other disposition of all or any part of the Purchased Assets.  In addition, during such time period, Sellers have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Assets and perform any and all other acts related thereto that are required under the Bankruptcy Code or other applicable Law, including supplying information relating to the Business and the assets of Sellers to prospective purchasers.

**Section 9.03   Notice of Sale.** Sellers shall take such steps as are necessary to notify all Persons and parties in interest (including creditors) required to receive notice in accordance with applicable Law (including, to the extent applicable, Bankruptcy Rules 2002, 3016, 3017 and 6004 and any local rules or orders of the Bankruptcy Court) and any bidding procedures order on all Persons (including creditors) required to receive notice under applicable Law.

**ARTICLE X**
**TERMINATION**

**Section 10.01  Termination.** This Agreement may be terminated at any time prior to the Closing:

(a)      by the mutual written consent of Sellers and Buyer;

(b)      by Buyer by written notice to Sellers if:

(i)      Buyer is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Sellers pursuant to this Agreement that would give rise to the failure of any of the conditions specified in

38

Article VII and such breach, inaccuracy or failure cannot be cured by Sellers by the earlier of September 30, 2017 and the 16th day after the Bankruptcy Court enters the Sale Order approving and authorizing the sale of the Purchased Assets to Buyer (the "**Drop Dead Date**");

(ii)    any of the conditions set forth in **Section 7.01** or **Section 7.02** shall not have been fulfilled by the Drop Dead Date, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(iii)    the Bankruptcy Case is dismissed or converted into a case under chapter 7 of the Bankruptcy Code or a chapter 7 or chapter 11 trustee or an examiner with expanded powers is appointed for the Seller; or

(iv)    Sellers withdraw the Sale Motion or publicly announce their intention to withdraw the Sale Motion;

(c)    by Sellers by written notice to Buyer if:

(i)    Sellers are not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VII and such breach, inaccuracy or failure cannot be cured by Buyer by the Drop Dead Date; or

(ii)    any of the conditions set forth in **Section 7.01** or **Section 7.03** shall not have been fulfilled by the Drop Dead Date, unless such failure shall be due to the failure of Sellers to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(d)    by Buyer or Sellers in the event that:

(i)    there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited;

(ii)    any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable;

(iii)    the Sale Order ceases to be in full force and effect, or is revoked, rescinded, vacated, materially modified, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction; or

(iv)    Buyer is not the successful bidder for all of the Purchased Assets in the Auction.

39

**Section 10.02  Effect of Termination.** In the event of the termination of this Agreement in accordance with this Article, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except:

(a)      as set forth in this **ARTICLE X**, **Section 6.05** and **Article XI** hereof;

(b)      that in the event that the termination occurs pursuant to **Section 10.01(a)**, **Section 10.01(b)**, **Section 10.01(c)(ii)** (but not also **Section 10.01(c)(i)**) or **Section 10.01(d)**, Buyer shall be refunded the Deposit within the time provided in **Section 9.01(d)(iv)**;

(c)      that in the event that the termination occurs pursuant to **Section 10.01(b)(i)**, **Section 10.01(b)(iii)** or **Section 10.01(b)(iv)**, Sellers shall, subject to the approval of the Bankruptcy Court, pay Buyer the Transaction Expenses upon the earlier of (i) the closing of a transaction that is a Competing Bid and (ii) ten Business Days after the date of termination;

(d)      that in the event that the termination occurs pursuant to **Section 10.01(d)(iv)**, Sellers shall pay Buyer the Transaction Expenses upon the closing of a transaction that is a Competing Bid; and

(e)      that nothing herein shall relieve any party hereto from liability for any intentional breach of any provision hereof.

# ARTICLE XI
# MISCELLANEOUS

**Section 11.01  Expenses.** Except as otherwise expressly provided herein (including Section 3.02 and **Section 6.10** hereof), all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

**Section 11.02  Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 10.02**):

If to Sellers:                200 South Street, 4th Floor
                              Morristown, New Jersey 07960
                              Facsimile: 973-359-4058
                              E-mail: bfrezza@deloitte.com

40

|  | Attention:  Robert J. Frezza, Chief Restructuring Officer |
|---|---|

with a copy to:                    Riker Danzig Scherer Hyland & Perretti LLP
                                   One Speedwell Avenue
                                   Morristown, New Jersey 07962
                                   Facsimile: 973-451-8668
                                   E-mail: jnavarino@riker.com
                                   Attention: Jason D. Navarino, Esq.
                                           Joseph L. Schwartz, Esq.


If to Buyer:                       Mr. Tey How Keong (President)

                                   JB Cocoa Holding, Inc

                                   299 Park Avenue

                                   6th floor NY 10171

                                   Tel : 212 521 4342

                                   E-Mail:  hktey@jbcocoa.com



with a copy to:                    BAKER MANOCK & JENSEN, PC
                                   5260 North Palm, Suite 421
                                   Fresno, CA 93704
                                   Facsimile: (559) 432-5620
                                   E-mail: CRefuerzo@bakermanock.com
                                   Attention: Carl R. Refuerzo, Esq.


**Section 11.03 Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Whenever the masculine is used in this Agreement, the same shall include the feminine and whenever the feminine is used herein, the same shall include the masculine, where appropriate. Whenever the singular is used in this Agreement, the same shall include the plural, and whenever the plural is used herein, the same shall include the singular, where appropriate. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring

41

construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 11.04 Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 11.05 Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 11.06 Entire Agreement.** This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 11.07 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed, provided that a Seller may assign its rights and obligations hereunder to TCG without the consent of Buyer and Buyer may assign its rights and obligations hereunder to an Affiliate of Buyer without the consent of Seller. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 11.08 No Third Party Beneficiaries.** This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 11.09 Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto and approved by the Bankruptcy Court by way of the Sale Order or a modification thereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right,

remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

### Section 11.10  Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)    This Agreement shall be governed by and construed in accordance with the internal laws of the State of New Jersey without giving effect to any choice or conflict of law provision or rule (whether of the State of New Jersey or any other jurisdiction).

(b)    Any legal suit, action or proceeding arising out of or based upon this agreement, the other transaction documents or the transactions contemplated hereby or thereby shall be instituted in the Bankruptcy Court (or, if such court declines jurisdiction, the United States District Court for the Southern District of New York or the courts of the State of New Jersey), and each party irrevocably submits to the exclusive jurisdiction of such courts and any appellate court with jurisdiction over appeals taken therefrom in any such suit, action or proceeding. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(c)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.10(c).

### Section 11.11  Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

43

**Section 11.12 Non-recourse.** This Agreement may only be enforced against, and any claim, action, suit or other legal proceeding based upon, arising out of, or related to this Agreement, or the negotiation, execution or performance of this Agreement, may only be brought against the entities that are expressly named as parties hereto (and their permitted assigns hereunder) and then only with respect to the specific obligations set forth herein with respect to such party. Except for instances wherein Buyer can demonstrate actual fraud or intentional misconduct, no past, present or future director, officer, employee, incorporator, manager, member, partner, stockholder, Affiliate, agent, attorney or other Representative of any party hereto or of any Affiliate of any party hereto, or any of their successors or permitted assigns, shall have any liability for any obligations or liabilities of any party hereto under this Agreement or for any claim, action, suit or other legal proceeding based on, in respect of or by reason of the transactions contemplated hereby.

[SIGNATURE PAGE FOLLOWS]

44

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

COCOA SERVICES, L.L.C.

By: _____

Name: Bernd Herrmann

Title: Authorized Officer


MORGAN DRIVE ASSOCIATES, L.L.C.

By: _____

Name: Bernd Herrmann

Title: Authorized Officer


JB COCOA HOLDING, INC.


By: _____

Name: Tey How Keong

Title:  President

45

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

COCOA SERVICES, L.L.C.

By: _____
Name: Bernd Herrmann
Title: Authorized Officer

MORGAN DRIVE ASSOCIATES, L.L.C.

By: _____
Name: Bernd Herrmann
Title: Authorized Officer

JB COCOA HOLDING, INC.

By: _____
Name: Tey How Keong
Title:  President

45

**EXHIBIT A**

**Allocation Schedule**

<u>Cocoa Services</u>

Class V:                    $5,900,000

Classes VI-VII:             $100,000

TOTAL:                      $6,000,000

<u>Morgan Drive</u>

Class V:                    $2,000,000

TOTAL:                      $2,000,000

46

**EXHIBIT B**

**Bill of Sale**

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Cocoa Services, L.L.C. and Morgan Drive Associates, L.L.C., each a New Jersey limited liability company (collectively "**Sellers**"), do hereby grant, bargain, transfer, sell, assign, convey and deliver to JB Cocoa Holding, Inc., a Delaware corporation ("**Buyer**"), all of their right, title and interest in and to the Tangible Personal Property, as such term is defined in the Asset Purchase Agreement, dated as of July 12, 2017 (the "**Purchase Agreement**"), by and between Sellers and Buyer, to have and to hold the same forever.

Buyer acknowledges that Sellers make no representation or warranty with respect to the assets being conveyed hereby except as specifically set forth in the Purchase Agreement.

This Bill of Sale may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Bill of Sale delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Bill of Sale.

[*signature page follows*]

47

IN WITNESS WHEREOF, the parties have duly executed this Bill of Sale as of _____, 2017.

COCOA SERVICES, L.L.C.

By: _____
Name:
Title:

MORGAN DRIVE ASSOCIATES, L.L.C.

By: _____
Name:
Title:

JB COCOA HOLDING, INC.

By: _____
Name:
Title:

**EXHIBIT C**

**Assignment and Assumption Agreement**

This Assignment and Assumption Agreement (the "**Agreement**"), effective as of _____, 2017 (the "**Effective Date**"), is by and among Cocoa Services, L.L.C. and Morgan Drive Associates, L.L.C., each a New Jersey limited liability company (collectively, "**Sellers**"), and JB Cocoa Holding, Inc., a Delaware corporation ("**Buyer**").

WHEREAS, Sellers are each the debtor and debtor-in-possession in a Chapter 11 case now pending before the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"); and

WHEREAS, Sellers and Buyer have entered into a certain Asset Purchase Agreement, dated as of July 12, 2017 (the "**Purchase Agreement**"), pursuant to which, among other things, Sellers have agreed to assign all of their right, title and interest in and to the Purchased Assets (as defined in the Purchase Agreement), and Buyer has agreed to assume the Assumed Liabilities (as defined in the Purchase Agreement) of Sellers pursuant to Sections 363 and 365 of the United States Bankruptcy Code; and

WHEREAS, the Bankruptcy Court has entered an order (the "**Sale Order**") approving the assignment of the Purchased Assets and the assumption of the Assumed Liabilities on the terms and conditions set forth in the Purchase Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Definitions. All capitalized terms used in this Agreement but not otherwise defined herein are given the meanings set forth in the Purchase Agreement.

2.      Assignment and Assumption. Sellers hereby sell, assign, grant, convey and transfer to Buyer all of Sellers' right, title and interest in and to the Purchased Assets. Buyer hereby accepts such assignment and assumes all of Sellers' duties and obligations under the Assumed Liabilities of Sellers.

3.      Terms of the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements and indemnities relating to the Purchased Assets and Assumed Liabilities are incorporated herein by this reference. The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement or the Sale Order and the terms hereof, the terms of the Purchase Agreement or Sale Order shall govern.

49

4.      Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New Jersey without giving effect to any choice or conflict of law provision or rule (whether of the State of New Jersey or any other jurisdiction).

5.      Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.


IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the date first above written.


                                        COCOA SERVICES, L.L.C.


                                        By: _____
                                        Name:
                                        Title:


                                        MORGAN DRIVE ASSOCIATES, L.L.C.


                                        By: _____
                                        Name:
                                        Title:


                                        JB COCOA HOLDING, INC.


                                        By: _____
                                        Name:
                                        Title:

**EXHIBIT D**

**Deed**

<div style="border:1px solid;">Prepared By:

_____</div>

# DEED

**This Deed is made as of _____**

## BETWEEN:

Morgan Drive Associates, L.L.C., a New Jersey limited liability company, referred to as the **Grantor**,

## AND:

JB Cocoa Holding, Inc., a Delaware corporation,

whose post office address is 299 Park Avenue, 6th Floor, New York, NY 10171, referred to as the **Grantee**.

The words "Grantor" and "Grantee" shall mean all Grantors and all Grantees listed above.

**Transfer of Ownership.**  The Grantor grants and conveys (transfers ownership of) the property described below to the Grantee.  This transfer is made for the sum of **_____ AND 00/100 DOLLARS ($_____.00)**.

The Grantor acknowledges receipt of this money.

**Tax Map reference.**  (N.J.S.A. 46:15-1.1) Municipality - Township of Logan, County of Gloucester, State of New Jersey:

**Block No.** 1602 **Lot No.** 11

☐      No property tax identification number is available on the date of this Deed (check box if applicable).

**Property.**  The property consists of the land and all the buildings and structures on the land in the Township of Logan, County of Gloucester, State of New Jersey owned by Grantor.  The legal description is:

See **Exhibit "A"** attached hereto and made a part hereof.

[The property is subject to the exceptions described on **Exhibit "B"** attached hereto and made a part hereof.]

**Chain of Title.**  Being the same property conveyed to Grantor by 2 separate Deeds, fifty percent conveyed from Barry Callebaut U.S.A. LLC, dated October 19, 2011, recorded November 29, 2011, in the Gloucester County Clerk's Office in Deed Book 4919, Page 230, and fifty percent conveyed from 400 Eagle Court, LLC, dated April 16, 2014, recorded June 4, 2014, in the Gloucester County Clerk's Office in Deed Book 5196, Page 13.

**Promises by Grantor.**  The Grantor promises that the Grantor has done no act to encumber the property.  This promise is called a "covenant as to the grantor's acts" (N.J.S.A. 46:4-6).  This promise means that the Grantor has not allowed anyone else to obtain any legal rights which affect the property (such as by making a mortgage or allowing a judgment to be entered against the Grantor).

**Signatures.**  This Deed is signed and attested to by the Grantor's proper officers as of the date at the top of the first page.  Its seal is affixed.

ATTEST:

BY: _____          BY: _____

Name:                                                                 Name:

Title:                                                                    Title:

53

**STATE OF NEW JERSEY, COUNTY OF _____**          **SS.:**

I certify that on _____, 20___, _____ personally came before me and stated to my satisfaction that this person (or if more than one, each person):

(a) was the maker of the attached deed;

(b) was authorized to and did execute this deed as _____ of _____, the entity named in this deed; and

(c) this deed was made for $_____ as the full and actual consideration paid or to be paid for the transfer of title (Such consideration is defined in N.J.S.A. 46:15-5.)

_____
(print name and title below signature)

54

| | Dated _____, 20__ |
|---|---|
| **DEED** | |
| | **Record and Return To:** |

**Grantor**

**TO**

_____

**Grantee**

**EXHIBIT A**

**(TO DEED)**

LEGAL DESCRIPTION

### LEGAL DESCRIPTION

ALL that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in Township of Logan, in the County of Gloucester, State of NJ:

BEGINNING at a point, said point being the following 3 courses from the intersection of title line of High Hill Road (County Road 662) and the centerline of Eagle Court (60 feet wide); thence

a. Along the centerline of Eagle Court, North 81 degrees 49 minutes 43 seconds East, a distance of 132.94 feet to a point of tangency; thence
b. Continuing along same, along a curve, naming a radius of 300.00 feet, a length of 42.79 feet and a central angle of 08 degrees 10 minutes 17 seconds to a point of tangency; thence
c. East, a distance of 303.11 feet to the point of beginning; thence

1. Leaving the centerline of Eagle Court, North a distance of 418.88 feet to a point; thence
2. East, a distance of 669.85 feet to a point; thence
3. South 04 degrees 04 minutes 37 seconds West, a distance of 419.95 feet to a point; thence
4. West, a distance of 639.98 feet to the point of BEGINNING.

BEING Lot 1.05 on a certain map entitled "Lot 1.01 and 1.02, Block 41, High Hill Road, Logan Township, Gloucester County Subdivision Plan Center Square Real Estate Development Co., Inc." filed 9-13-1994 as Map Number 2673.

BEING FURTHER DESCRIBED AS FOLLOWS BASED ON A SURVEY MADE BY VARGO ASSOCIATES dated 6-21-2011

ALL that certain land in the Township of Logan, County of Gloucester and State of New Jersey described as follows :

BEGINNING at a point in the easterly terminus of Eagle Court (60' wide public road) at the division line between tax lots 11 and 21, block 1602, said point also being the centerline of Eagle Court and being the following courses and distances from the intersection of centerline of Eagle Court with the centerline of High Hill Road (County Route #662 - 70' wide):

a) South 81°59'06" West, along the centerline of Eagle Court, a distance of 144.22 feet to a point of curvature, thence
b) Westwardly curving to the right having a radius of 300.00 feet, an arc length of 42.79 feet to a point of tangency, thence
c) North 89°50'37" West, a distance of 423.57 feet to said point of BEGINNING; thence

1. North 00°08'48"East, along the Easterly line of Eagle Court, a distance of 40.00 feet to a point of curve in the westerly line of Eagle Court; thence,

2. Northwestwardly curving to the left, having a radius of 70.00 feet an arc length of 166.31 feet, a chord bearing of North 67°54'25"West, chord length of 129.87 feet to a point for a corner in the division line between tax lots 11 and 37, block 1602; thence,

3. North 00°09'23" East, along said division line and entering a 50' wide Colonial gas pipeline easement, a distance of 330.37 feet to a point for a corner in the division line between tax lots 11, 37 and 40, block 1602; thence,

4. South 89°50'38" East, along the division line between tax lots 11 and 40, and within the aforesaid gas pipeline easement, a distance of 669.85 feet to a point for a corner at the division line between tax lots 8, 11, and 40, block 1602; thence,

5. South 04°14'00" West, along the division line between tax lots 8 and 11, block 1602, and leaving a 50' wide Colonial gas pipeline easement, a distance of 419.95 feet to a point for a corner at the division line between tax lots 8, 11 and 21, block 1602; thence

6. North 89°50'37" West, along the division line between tax lots 11 and 21, block 1602, a distance of 519.52 feet to the point and place of BEGINNING.

FOR INFORMATION PURPOSES ONLY: BEING known as 400 Eagle Court, Tax Block 1602 Tax Lot 11, on the Official Tax Map of Township of Logan, NJ.

## Cocoa Services, L.L.C.

## APA Disclosure Schedules

### Section 1.01(a) – Sellers' Knowledge

1) Peter G. Johnson: President/Manager
2) Mary Johnson: Manager
3) Edgar Bittong: Plant Manager

_____

### Section 1.01(b) –Liens Arising Under Equipment Leases With Third Parties

Master Lease Agreement No. 8720688 dated February 27, 2012 by and between Cocoa Services LLC and NMHG Financial Services, Inc.; Schedule No. 001 dated February 27, 2012; Schedule No. 002 dated May 16, 2012; and Schedule No. 003 dated December 27, 2012.

_____

### Section 2.01(c) –Assigned Contracts

1) Master Lease Agreement No. 8720688 dated February 27, 2012 by and between Cocoa Services LLC and NMHG Financial Services, Inc.; Schedule No. 001 dated February 27, 2012; Schedule No. 002 dated May 16, 2012; and Schedule No. 003 dated December 27, 2012.
2) Master Services Agreement dated October 2011 by and between The Hershey Company and Cocoa Services LLC and Hershey Work Authorization Schedule dated October 2011.
3) Non-Domestic Wastewater Discharge Agreement effective as of January 1, 2015 by and between Cocoa Services Inc. and Logan Township Municipal Utilities Authority.
4) Eagle Food Registration Application/Contract between Eagle Food Registrations, Inc. and Cocoa Services, LLC dated August 5, 2014.
5) Recycling and Waste Master Services Provider Agreement dated July 15, 2016, between Cocoa Services, LLC and ERV, Inc. dba Complete Recycling.
6) Integrated Pest Management Service Agreement dated May 16, 2013 between Cocoa Services, LLC and RK Environmental Services, LLC.

7) Employee Staffing Service Agreement dated March 16, 2016 between Randstad USA and Cocoa Services, LLC.

8) Services Agreement dated February 3, 2015 between Aramark Uniform Servicers and Cocoa Services.

9) Contract dated February 22, 2017 between Excell Maintenance Services, Inc. and Cocoa Services, LLC.

10) Services Agreement Non-Hazardous Wastes dated September 5, 2014 between Waste Management and Cocoa Services LLC.

---

### Section 2.01(f) – Tangible Personal Property

See Appendix 1 (list of assets) and Appendix 2 (map depicting where the assets are located on premises) attached hereto.

In addition, all other Tangible Personal Property (as defined in the APA) located on the premises of Cocoa Services, L.L.C., located at 400 Eagle Court, Swedesboro, New Jersey. This pertains to all small tools as well as office equipment necessary for the ordinary course of business.

Excluded from the Purchased Assets is customers' raw material stored on the premises for processing purposes. A detailed list of this inventory is kept by the company.

---

### Section 4.03 – Consents

See Section 4.12. In addition, several of the Assigned Contracts contain language that would prevent their assignment to Buyer without the consent of the applicable counterparty.  Pursuant to section 365(f) of the Bankruptcy Code, however, those provisions are unenforceable on account of the Bankruptcy Case.

---

### Section 4.05 – Absence of Certain Events

None.

2010837v1 / 20532.0001                                2



_____

### Section 4.06 – Breach or Default Under Assigned Contracts

None.

_____

### Section 4.10(a) – Intellectual Property Registrations and Agreements

(a): Domain name "http://www.cocoaservicesllc.com" and corresponding e-mail domain "@cocoaservicesllc.com."

_____

### Section 4.11 – Legal Proceedings

Amir Hall v. Cocoa Services, L.L.C., filed in the United States District Court for the District of New Jersey, docket number 1:16-cv-03177-NLH-KMW. Parties have reached a settlement agreement, and Cocoa Services, L.L.C. has agreed to pay the amount of $16,500.

Cocoa Services, L.L.C. received a letter from Icestar B.V. ("Icestar") dated April 14, 2017 seeking compensation for certain lost inventory valued at $63,285.56 that Icestar claims was stored with Cocoa Services, L.L.C. and released to a third party without Icestar's consent. Icestar also alleged that certain inventory was damaged by Cocoa Services, L.L.C.

Sellers are affiliates of and wholly-owned subsidiaries of Transmar Commodity Group, Ltd. ("TCG"). TCG is currently a debtor in its own chapter 11 bankruptcy case, styled In re Transmar Commodity Group, Ltd., Case No. 16-13625.

_____

### Section 4.12 – Permits

| Permit | Issued By |
| --- | --- |

| Certificate of Occupancy<br>Permit No. 201200003<br>(nontransferable) | Logan Township Construction and Code Enforcement Office |
|---|---|
| Fire Safety Permits<br>Permit Nos. 16-0160, 16-0161, 16-0162<br>(nontransferable) | Logan Township Bureau of Fire Prevention |
| Certificate of Inspection<br>Reg No. 0809057274<br>(nontransferable) | Logan Township Bureau of Fire Prevention |
| Life Hazard Use Certificate of Registration<br>Reg. No. 0809057274<br>(nontransferable) | New Jersey Department of Community Affairs, Division of Fire Safety |
| License/Permit To Operate Food/Cosmetic Establishment and Sanitary Inspection Report<br>No. 0014133<br>(nontransferable) | New Jersey Department of Health |
| Preconstruction Permit and Certificate to Operate General Permit<br>ID No. GEN170001<br>(transferable upon permittee submitting an administrative amendment to the DEP) | New Jersey Department of Environmental Protection, Division of Air Quality. |
| Boiler Certificates of Inspection<br>(potentially transferable upon Buyer's completion and submission of Replacement Certificate Request Form, which may be used for changes in ownership) | New Jersey Department of Labor and Workforce Development, Division of Public Safety & Occupational Safety & Health. |

_____

## Section 4.13(d) – Environmental Matters

None.

_____

**Section 4.14(a) – Employee Benefit Matters**

Horizon Blue Cross/Blue Shield of New Jersey Small Group Health Plan

Transmar Commodity Group Ltd. 401(k) Deferred Compensation Plan

| Item # | Description | Location | Code |
|---|---|---|---|
| **Production Area** | | | |
| 1 | 2011 Schmidt (McCarter) 60-Ton Carbon Steel Un-Deodorized-Butter Storage Tank 1, CIL Tag # R011, Side Agitator, S/N 12421.01, ID# 8543 (UDT2021), Associated Equipment, Good Condition | Butter Tanks | BT |
| 2 | 2011 Schmidt (McCarter) 60-Ton Carbon Steel Un-Deodorized-Butter Storage Tank 2, CIL Tag # R012, Side Agitator, S/N 12270-003, ID# 8297 (UDT2011), Associated Equipment, Good Condition | Butter Tanks | BT |
| 3 | 2011 Schmidt (McCarter) 60-Ton Carbon Steel Un-Deodorized-Butter Storage Tank 3, CIL Tag # R013, Side Agitator, Viking Discharge Pump, Flow Valve,  S/N 12270-001, ID# 8295 (UDT2000),  Associated Equipment, Good Condition | Butter Tanks | BT |
| 4 | 2011 Schmidt (McCarter) Stainless Steel 64.5-Ton Deodorized-Butter Storage Tank 1, CIL Tag # R911, Steam Valve, S/N 12270-004, ID# 8298 (DBT 3001), Associated Equipment, Good Condition | Butter Tanks | BT |
| 5 | 2011 Schmidt (McCarter) Stainless Steel 64.5-Ton Deodorized-Butter Storage Tank 2, CIL Tag # R912, S/N 12498-001, ID# 8641 (DBT 3011), Associated Equipment, Good Condition | Butter Tanks | BT |
| 6 | 2011 Schmidt (McCarter) Stainless Steel 64.5-Ton Deodorized-Butter Storage Tank 3, CIL Tag # R913, S/N 12498-001, ID# 8641 (DBT 3021), Associated Equipment, Good Condition | Butter Tanks | BT |
| 7 | 2011 Schmidt (McCarter) Stainless Steel 64.5-Ton Deodorized-Butter Storage Tank 4, CIL Tag # R914, Steam Valve, S/N N/A, ID# N/A, Associated Equipment, Good Condition | Butter Tanks | BT |
| 8 | 2011 Schmidt (McCarter) Stainless Steel 64.5-Ton Deodorized-Butter Storage Tank 5, CIL Tag # R915, Steam Valve, S/N N/A, ID# N/A, Associated Equipment, Good Condition | Butter Tanks | BT |
| 9 | 2011 Schmidt (McCarter) Stainless Steel 64.5-Ton Deodorized-Butter Storage Tank 6, CIL Tag # R916, Steam Valve, S/N N/A, ID# N/A, Associated Equipment, Good Condition | Butter Tanks | BT |
| 10 | Geiger Discharge Pump, Micro Motion Mass Flow Meter, Viking Pump, Eriez Magnet, (2) Eaton Filters, Associated Equipment, Good Condition | Butter Tanks | BT |
| 11 | (8) Custom Square Carbon Steel Natural Cocoa Butter Storage Tanks, Approximately 20-Metric Ton Capacity, Bolted Construction, Complete w/ Insulated Panels, Geiger Discharge Pump, Micro Motion Mass Flow Meter, Viking Pump, Eriez Magnet, (2) Eaton Filters, Rosemont Meter, Bray Valves (4/4), Associated Equipment, Good Condition | Butter Tanks | BT |
| 12 | 2011 TMCI Chemtech Padovan Custom Designed & Fabricated Cocoa Butter Deodorizer System, Rated 10-Ton Hour Capacity, Complete w/ Control Panel HMI Box CC1105/HMI w/ Simatic Multipanel Controller, Frame, Staircases, Monitors, Computer Cabinet, (4) Siemens Servers, UPS, Networking Gear, Power Supply, S.S. Piping, | Deoderizer | Deso |
| | Stainless Steel Product Feed/Filter System, Complete w/ Various Pumps, (4) S.S. 50-Micron Filters, CIL Tag # P101, S.S Frame, SPX Johnson 60-HP Pump (Tag # P502), Product Regeneration & Heating/Cooling, Complete w/ (3) Small Enclosed Plate Heat Exchangers, Pumps, Filters, CIL Tag # E201, (2) Large Enclosed Plate Heat Exchangers #511, #512, | Deoderizer | Deso |
| | | Deoderizer | Deso |
| | TMCI Chemtech L-P/Padovan Pre-Stripper Vessel, CIL Tag # R301, w/ Insulated, Frame, Filter, Valve, Associated Equipment | Deoderizer | Deso |
| | Stripper Deodorizer Vessel Discharge Pump, CIL Tag # P302, 15-HP, | Deoderizer | Deso |
| | Electrical Trace Heating For Pipework, (Reader), | Deoderizer | Deso |
| | Live Stripping Steam Control, | Deoderizer | Deso |

| | | |
|---|---|---|
| 2011 L-P/Padovan FFA Scrubber, Complete w/ Various Pumps, Coolers, Piping, CIL Tag # R401, Insulated, Frame, Associated Equipment | Deoderizer | Deso |
| L-P/Padovan Secondary Scrubber/Main Water Condenser, Complete w/ Various Pumps, Piping, CIL Tag # R501, Frame, Associated Equipment | Deoderizer | Deso |
| S.S. Vertical Tube Heat Exchangers, | Deoderizer | Deso |
| 2011 Loch-Pye Water Cooler For Vacuum Pump, #E522, | Deoderizer | Deso |
| 2011 Loch-Pye Interstage Condenser & Ejector, #V524 & #V525 | Deoderizer | Deso |
| (4) Junction Boxes, Valves, S.S. Holding Vessels, | Deoderizer | Deso |
| Vacuum System, Complete w/ Various Pumps, Condenser, Piping, | Deoderizer | Deso |
| L-P/Padovan Main Augmenters, Complete w/ Various Pumps, Piping, | Deoderizer | Deso |
| L-P/Padovan Multi-Nozzle Augmenter, CIL Tag # V526, | Deoderizer | Deso |
| L-P/Padovan Multi-Nozzle Augmenter, CIL Tag # V527, | Deoderizer | Deso |
| L-P/Padovan Fatty Acid (FFA) Stainless Steel Waste Storage Tank, CIL Tag # R601, w/ SPX Valve Pump, Cone Bottom, Top Agitator, | Utility Room | UR |
| Combined CIP System/Florentine System/Hot Water System, Complete w/ Padovan Stainless Steel Multi-Compartment Holding Tank (Florentine, CIP & Hot Water) S/N CC1105 Tag # R821, Various Pumps, Piping, CIL Tag # 701, | Deoderizer | Deso |
| Garioni Naval Model NG C.2500, High Pressure 25-Bar G Horizontal Steam Boiler, S/N 373 11 A, CIL Tag # B212, (2) Pumps, Jacket, Control Panel, Riello Burner, | Utility Room | UR |
| PVI Turbopower Gas Water Heater, Model 750P150ATP, S/N 0212133787 (Hot Water Services), | Utility Room | UR |
| 2012 John Wood Company 5,000-Gallon Carbon Steel Storage Tank, Black Foam Insulated, (2) Ball & Gossett 10-HP Pumps, | Utility Room | UR |
| 2012 Harsco Model N2000-MFD, Gas Fired Boiler, S/N FY19-12-36261, | Utility Room | UR |
| 2011 Garioni Naval Model GMT-HP400, Low Pressure Vertical 15-Bar Steam Boiler, S/N 373.11.B, CIL Tag # B802, Control, Burner, Jacketed, 465-Kw, | Utility Room | UR |
| 2012 Powerex Model OTD1006C2, 10-HP Twin 3-Stage Horizontal Tank Air Compressor, S/N 5214063-143, Piping, Control, 4,442 & 6,451-Hrs, | Utility Room | UR |
| Zeks Heat Sink Model 50HSFA100, Air Dryer, S/N 528101, | Utility Room | UR |
| Chilled Water Supply System, Complete w/ Various Pumps, Pipes, 12-Fan Cooling Tower, Junction Box 5 (JB5) | Outside Deoderizer area | ODeso |
| 2011 Trane Model RTAC4504, Chiller Unit, Series R, S/N U11L02048, Glycol, CIL Tag # E811, (Located Outside) | Outside Deoderizer area | ODeso |
| Carbon Steel Vertical Effluent Storage Tank, Insulated, Heat Trace, (EST 5101), (Located Outside) | Outside Deoderizer area | ODeso |
| Stainless Steel Glycol Tank, CIL Tag # R816, (Located Outside) | Outside Deoderizer area | ODeso |
| 2011 Loch-Pye Second Stage Fatty Acid Cooler #E406, Order K5344, w/ Travaini Vac Pump, S/N DP996 #521, S.S Holding Tank, | Deoderizer | Deso |
| 2012 Grease Stopper S.S. Holding tanks, 100-Lbs., S/N 6000004333, w/ Secondary Holding Tank | Utility Room | UR |
| Water Treatment System, Complete w/ Noble Duplex Pump, Approximately 1,000-Gallon S.S. Holding Tank, (2) Fiberglass Filters, 2012 Euro Boiler Type BD500, Holding Tank, S/N 502.11, w/ Holding Tank, Poly Holding Tank Mixer Doser, | Utility Room | UR |
| Associated Equipment, Good Condition | Utility Room | UR |

| | | | |
|---|---|---|---|
| 13 | **Cocoa Butter Area, Complete w/** | Butter Melting | BM |
| | (3) 4,000-Lb Capacity Scissor Lift Tables, w/ (2) Controllers Each, | Butter Melting | BM |
| | (3) Deboxing Tables, | Butter Melting | BM |
| | (3) Debagging Tables, | Butter Melting | BM |
| | (3) 2012 Atlantic Coast Model FSM2424, Butter Flow Smasher Crushers, w/ (2) Nord Drive Units, (Tag Indicating Transmar PO #101012, 101011, N/A), | Butter Melting | BM |
| | (3) Custom Cocoa Butter Melters, Complete w/ Motor, Gearbox, Probes, (4) Load Cells Each, Valves, Magnet Filters, Falk Gear Box, Drive, Lomar Remote Control Enclosure, (2) Gieger 5-16-12 Butter Discharge Pumps, S/N A12014-6C1, N/A, w/ (2) Eaton Filters, Integrated Meters, Steam Valves, Mass Flow Sensor, Associated Equipment, Good Condition | Butter Melting | BM |

| | | | |
|---|---|---|---|
| 14 | **Cocoa Liquor Area, Complete w/ Control Panels,** | Liquor Melting | LM |
| | (3) 2,000-Lb Capacity Scissor Lift Tables | Liquor Melting | LM |
| | (3) S.S. Deboxing Tables, (3) Debagging Tables, | Liquor Melting | LM |

| | | | |
|---|---|---|---|
| | (3) Crushers Custom Butter Flow Smasher Crushers, S/N 5574, N/A, w/ Twin Drive Units, | Liquor Melting | LM |
| | Butter Dosing Tank, Approximately 200-Gallon | Liquor Melting | LM |
| | 1986 Cleaver Brooks Model NCB700-80, Natural Gas Boiler, S/N L-81432, 150-PSI, 3347000-BTU Hr., Complete w/ (2) Poly Chem Holding Tanks, BFS Feed Pack Model G31368X-30 Duplex, Boiler Feed/Condensate System w/ Elevated Receiver, S.O. No. 18-408-8, 326-Gallon, 10-GPM, (2) Filters, Tube Heat Exchanger, Associated Equipment, | Back Boiler Room | BBR |
| | Powerex Horizontal Tank Twin 3-Stage Air Compressor, 4377 & 5463 Hrs., w/ 2015 Niles NST Vertical Holding Tank, 150-PSI, Zeks Heat Sink Air Dryer | Back Boiler Room | BBR |
| | 1968 McCarter 27,000-Lbs. Capacity Cocoa Liquor Melter, S/N 2983F1, SO 2983, Complete w/ Drive Motor, Gearbox, Probes, (4) Load Cells Each, Valves, Magnet, Filter, Neptune Hose Pump, 2014 Kason 30" Single Deck Screener Model K30-1-SS, GEI S.S. Holding Tank Associated Equipment, (Tag Nestle Fulton, NY), (CST803) (Rebuilt-New Liner, Repainted) | Liquor Melting | LM |
| | (2) Custom Cocoa Liquor Melters, Complete w/ Motor, Gearbox, Probes, (4) Load Cells Each, Valves, Magnet Filter, Neptune Hose Pump, 2014 Kason 36 Single Deck Screener, GEI S.S. Holding Tank, Associated Equipment, (Rebuilt-New Liner, Repainted), (CST801, CST802), Associated Equipment, Good Condition | Liquor Melting | LM |
| 15 | (2) Carbon Steel Welded Construction Liquor Holding Tanks, 21-Metric Ton Capacity, Complete w/ Top Mounted, Agitator, 3-Legs w/ Load Cells, Pumps, Control (LAT1, LAT2), Good Condition | Liquor Melting | LM |
| 16 | (4) Stainless Steel Liquor Holding Tanks, Indicated 18-19-Metric Ton Capacity, (1-Creamery Package / 3-Cherry Burrell Model VC), S/N C5200-2550, 4500VC-61-352, 4500VC-61-381, 4500VC-61-383, Complete w/ Agitator, Tuthill Discharge Pump, Digital Meter, (LHT1, LHT2, LHT3, LHT4), Associated Equipment, Fair Condition | Liquor Melting | LM |
| 17 | Saferack 2-Position Truck Load System, S/N N/A, Complete w/ Self-Contained Cover, Platform, Associated Equipment, Good Condition | Truck Loading | TL |
| 18 | American Lincoln Model 505-286, Ride-On Floor Scrubber, S/N 683105, CIL Tag # 2005, (Not In Service), Fair Condition | Truck Loading | TL |
| 19 | (4) 6,000-Gallon Stainless Steel Liquor Load Tanks, Complete w/ Top Mounted Agitator, Waukesha Model 2200UL, Positive Displacement Pump, S/N 100002438472, Eriez Magnet, (LLT01, LLT02, LLT03, LLT04), 1981 Mueller Heat Transfer Surface Holding Tank S/N F3689-2, w/ 2014 Kason Model k60-1-SS 60" Single Deck Screener, Pump, (2) Magnets, Mass Flow Sensor, Valves, Associated Equipment, Good Condition | Liquor Melting | LM |
| 20 | Cherry Burrell Model 6000 CV, 6,000-Gallon Stianless Steel Holding Tanks, (Being Installed), w/ Top Agitated, Good Condition | Liquor Melting | LM |
| 21 | 2004 Feldmeier 16,300-Gallon Stainless Steel Vertical Holding Tank, 9,000-Lbs., S/N E477-04, ID# 11551L, w/ Mixer, 8-Legs, Associated Equipment, (Being Installed), Very Good Condition | Liquor Melting | LM |
| 22 | Digiweight Model DWP-102E Digital Platform Scale, w/ 4x4' Platform, Good Condition | Truck Loading | TL |
| 23 | Genie Model GS3232, 500-Lbs. Electric Scissor Lift, S/N N/A, Good Condition | Maintainance cage | MC |
| 24 | Yale Model OS030BB24SE095, Electric Picker, 3,000# Cap, S/N N595865, (Not In Service), Fair Condition | Maintainance cage | MC |
| 25 | Nissan Model 50 Optima CPJ02A25PM, 4,400-Lbs. LPG Forklift Truck, S/N CPJ02-9P6478, OROP, No-Mark Cushion Tires, Side Shift, Triple Mast, Good Condition | Maintainance cage | MC |
| 26 | Nissan Model 50 Optima KCPH02A25PV, LPG Forklift Truck, S/N KCPH02P900705, OROP, No-Mark Cushion Tires, Side Shift, Triple Mast, Fair Condition | Maintainance cage | MC |

| | | | |
|---|---|---|---|
| 27 | Miscellaneous Equipment Located In Maintenance Area Including But Not Limited To: 5-HP Portable Craftsman Air Compressor, Lincoln Weld Pack HD Code 10409 Welder, Fans, Battery Charger, Hydraulic Pallet Jacks, Hand Tools, Barrel Pump, IPC Gansow Portable Floor Scrubber, Power Tools Air Compressor, Double Ended Bench Grinder, Bench Vises, Shelves, Pneumatic Hand Tools, 12-Ton H-Frame Shop Press, Trinity SS Tool Cabinet, (4) Sections Pallet Racking w/ Decking, Creepers, Pipe Threader, Extension Ladder, Rigid Snake Drain Cleaner, Eastwood Model Versa-Cut 60 Plasma Cutter, Eastwood Model Tig 200, Welder, Portable Vacuum, Catch Basin, Storage Cage, Big Red 2-Ton Engine Hoist, Fork Extensions, Bar Clamps, Mix Paddles, Etc. | Maintainance cage | MC |
| 28 | Miscellaneous Equipment Located In Storage Including But Not Limited To: Southworth Scissor Lift, Used Scrap S.S. Baffling For Deodorizer Line, Tank Platform, Petzholdt-Heidenauer Ball Mill, McCarter Corporation Chocolate Melter, Unit # 3, S.S. Coil For Melter, Overhear Door, Donaldson Dust Collector, (ID # P1, P2), Etc. | Back storage | BS |
| 29 | Miscellaneous Production Support Equipment Including But Not Limited To: Fans, Pallet Jacks, Lincoln AC 225 Welder, Ladder, S.S. Sinks, Shovels, Brooms, Chairs, Etc. | Janitor/maintenance cage | JMC |

**Lab Equipment**

| | | Lab | Lab |
|---|---|---|---|
| 30 | Mettler Toledo Model T50M, Fully Automatic Titrator, S/N B214829791, w/ Mettler Toledo Model P25, Printer, Very Good Condition | Lab | Lab |
| 31 | Mettler Toledo (Karl Fischer) Model V20, Titrator Compact Volumetric, S/N B214826083, Very Good Condition | Lab | Lab |
| 32 | Mettler Toledo Model MS304S/03, Analytical Balance, (New Classic), S/N B213812767, w/ Enclosure, Very Good Condition | Lab | Lab |
| 33 | Mettler Toledo Model MS3002S/03, Precision Balance, (New Classic), S/N B21890686, Good Condition | Lab | Lab |
| 34 | Thermo Scientific Model Antaris II, FT-NIR Near Infrared Analyzer, S/N AHX1200836, w/ Dell Model Optiplex 990, PC, Good Condition | lab | Lab |
| 35 | VWR Model 82020-922, S.S. Glassware Washer, S/N 311926, Very Good Condition | Lab | Lab |
| 36 | (2) Binder Bench Top Hot Air Ovens, S/N N/A, Good Condition | Lab | Lab |
| 37 | Labconco 3' Laminar Flow Hood, S/N 48830, (Refurbished), Good Condition | Lab | Lab |
| 38 | Miscellaneous Lab Equipment Including But Not Limited To: Glassware, Stands, Phillips AED, VWR Model 1310 Sensory Room Oven, VWR Digital Heat Block, Glass Desiccator, Mettler Toledo Model FE20, pH Meter (Five Easy), Corning Model PC-420D, Stirrer/Hotplate, (2) 42 x 18 x 36 Chemical Safety Cabinets, Flammable Storage Cabinet, Dake H-Frame Shop Press, Lab Benches, Spectra Heater, Refrigerator, Wagner Heat Gun, Etc. | Lab | Lab |

**Office Areas**

| | | | |
|---|---|---|---|
| 39 | Miscellaneous Furniture, Fixtures & IT Equipment Including But Not Limited To: Chairs, (2) Wooden Desks, Conference Table, Folding Tables, Cabinets, (6) Modular Work Stations, 2-Drawer Lateral File Cabinets, Bookcases, PC's, Printers, Epson Model EX7210, Projector w/ Remote, Laminator, Shredder,  Tables, GE Microwave, Water Cooler, Keurig Coffeemaker, Sunbeam Microwave, Summit Refrigerator, Lockers, Networking Gear, ESI-200 Communications Server, Patch Panels, Brother MFC Copier/Fax Machine, Etc. | Office | Off |

**Leased Equipment**

| | | | |
|---|---|---|---|
| 40 | 2012 Hyster Model S60FT, 4,800-Lbs. Capacity LPG Forklift Truck, S/N F187V20683K, w/ 3-Stage Mast, Good Condition, **(Leased)** | Maintainance cage | MC |
| 41 | 2012 Hyster Model S60FT, 4,800-Lbs. Capacity LPG Forklift Truck, S/N F187V21271K, w/ 3-Stage Mast, Good Condition, **(Leased)** | Maintainance cage | MC |
| 42 | 2007 Yale Model GLC050VXNVSQ084, 4,450-Lbs. Capacity LPG Forklift Truck, S/N A910V08790E, w/ OROP, Solid Tires, 3-Stage Mast, Very Good Condition, **(Leased)** | Maintainance cage | MC |

# Exhibit B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
                                                          :
In re:                                                    :    Chapter 11
                                                          :
COCOA SERVICES, L.L.C., et al.,[1]                        :    Case No. 17-11936
                                                          :
                                    Debtors.              :    Joint Administration Pending
                                                          :
---------------------------------------------------------- x

**ORDER ESTABLISHING BIDDING PROCEDURES AND RELATED RELIEF**
**REGARDING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS**

Upon the motion (the "Motion")[2] of Cocoa Services, L.L.C. ("Cocoa Services") and

Morgan Drive Associates, L.L.C. ("Morgan Drive"), the debtors and debtors-in-possession (each

a "Debtor" and collectively, the "Debtors"), for an order (the "Bidding Procedures Order") (a)

establishing bidding procedures and bid protections, including an auction (the "Bidding

Procedures"), with respect to the Debtors' sale of their Assets, (b) approving the form and

manner of notices thereof (the "Bidding Procedures Notice"), (c) establishing JB Cocoa Holding,

Inc. ("JB Cocoa") as the stalking horse bidder for the Purchased Assets, (d) approving the form

of Asset Purchase Agreement by and among the Debtors and JB Cocoa (the "Stalking Horse

APA"), pursuant to which the Debtors propose to sell the Purchased Assets to JB Cocoa or a

third party that makes a higher and/or better offer for the Assets (the "Proposed Sale"), (e)

setting a hearing to consider approval of the Debtors' sale of the Assets (the "Sale Hearing"), and

(f) granting other relief; and it appearing that the Debtors have provided good and sufficient

notice to interested parties of the Motion, as evidenced by the proof of service filed on

---

[1] Debtors in these Bankruptcy Cases and the last four digits of their respective taxpayer identification number are as follows: Cocoa Services, L.L.C. (3769); Morgan Drive Associates, L.L.C. (2335). Debtors' principal office is located at 400 Eagle Court, Swedesboro, New Jersey 08085.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

_____; and it further appearing that this Court has jurisdiction to grant the requested relief

pursuant to 28 U.S.C. §§ 157 and 1334; and after considering all objections to the Motion, if any;

and the Court having conducted a hearing on August 10, 2017, at which time the Court

considered, among other things, the Bidding Procedures, any objections thereto and the oral

arguments of counsel; and it further appearing that the relief requested is reasonable and

necessary to protect the interests of the Debtors, their estates, and creditors; and after due

deliberation, sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT**:[3]

A.      The statutory and legal predicates for the relief requested in this Order are

sections 105, 363 and 365 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101

et seq. (the "Bankruptcy Code"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 6006-1 of the Local Rules for the

United States Bankruptcy Court for the Southern District of New York (the "Local Rules").

B.      The Debtors have provided good and sufficient notice of the relief granted by the

Bidding Procedures Order to all parties in interest.  The notice provided is appropriate and is

calculated to provide interested parties with timely and proper notice of the Bidding Procedures

and the Auction.  No further notice is required.  A reasonable opportunity to object or be heard

regarding the relief granted by this Order has been afforded to those parties entitled to notice

pursuant to Bankruptcy Rule 6004(a).

C.      The Debtors have engaged in a marketing process with respect to the Assets to

solicit and develop the highest and best offers for the Assets.

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law
pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the
extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the
extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

D.      The Bidding Procedures attached hereto as **Exhibit 1** are fair, reasonable, appropriate and are designed to maximize recovery to the Debtors' estates.

E.      The Debtors have demonstrated compelling and sound business justifications for entering into the Stalking Horse APA and incurring the obligations arising thereunder or in connection therewith, including the provisions related to the Transaction Expenses.

F.      JB Cocoa's role as a "stalking-horse" and the Stalking Horse APA as the "stalking-horse" sale agreement is in the best interest of the Debtors and the Debtors' estates, and it reflects a sound exercise of the Debtors' business judgment.   The Stalking Horse APA provides the Debtors with the opportunity to sell the Purchased Assets in order to maximize value.

G.      The Bid Protections, including, but not limited to, the Transaction Expenses, (i) have been negotiated by the Debtors and JB Cocoa at arms' length and in good faith, (ii) are a material inducement for, and consideration of, JB Cocoa's execution of the Stalking Horse APA, and (iii) are necessary to ensure that JB Cocoa will continue to pursue the Stalking Horse APA and the sale transaction contemplated thereby.   The Transaction Expenses, to the extent payable under the Stalking Horse APA, (x) are (i) an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code and (ii) shall be treated as an allowed superpriority administrative expense claim against the Debtors' estates, pursuant to sections 105(a), 503(b) and 507(a)(2) of the Bankruptcy Code, (y) are commensurate to the real and material benefits conferred upon the Debtors' estates, (z) are fair, reasonable and appropriate, particularly in light of the size and nature of the Proposed Sale to JB Cocoa and the efforts that have been and will be expended by JB Cocoa.

H.      The Debtors have demonstrated good and sufficient business reasons for the Court to approve (i) the Bidding Procedures, (ii) the Assumption and Assignment Procedures, (iii) the Bid Protections, including, but not limited to, the Transaction Expenses (to the extent payable under the Stalking Horse APA), and (iv) the form and manner of notice of the Auction and Sale Hearing.

I.      The Bidding Procedures comply with the requirements of Local Rule 6004-1 and the Sale Guidelines.  The Bidding Procedures were negotiated in good faith and at arms' length and are reasonably designed to promote participation and active bidding and ensure that the highest or best value is generated for the Assets.

J.      The Assumption and Assignment Procedures, including notice of proposed Cure Costs, are reasonable and appropriate and consistent with section 365 of the Bankruptcy Code and Bankruptcy Rule 6006. The Assumption and Assignment Procedures have been tailored to provide adequate opportunity for all Counterparties to the Cocoa Services' Contracts to raise objections, if any.

K.      The Bidding Procedures Notice is reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures, the Assumption and Assignment Procedures, the Auction, the Sale Hearing and the Proposed Sale, and the objection deadlines related thereto.

IT IS HEREBY ORDERED THAT:

<div align="center">**The Bidding Procedures/The Auction**</div>

1.      The Bidding Procedures, attached hereto as **Exhibit 1**, are hereby approved in all respects, are incorporated herein and shall apply with respect to any bids for the Assets.  The

Debtors are authorized to take all action necessary or appropriate to implement the Bidding Procedures.

2.        The deadline for submitting an Offer for the Assets shall be **August 25, 2017 at 5:00 p.m. (prevailing Eastern Time)** (the "Offer Deadline").  The Debtors shall provide copies of all bids to each of the Consultation Parties, in accordance with the Bidding Procedures.

3.        If the Debtors receive at least two (2) Qualified Bids for the Assets by the Offer Deadline, the Debtors shall conduct the Auction. The Auction shall take place at the offices of Riker, Danzig, Scherer, Hyland & Perretti LLP, Headquarters Plaza, One Speedwell Avenue, Morristown, New Jersey 07962 on **September 6, 2017 at 10:00 a.m. (prevailing Eastern Time)**, or at such other time and location as the Debtors, after consulting with the Consultation Parties and after providing notice to the Notice Parties, may determine in their reasonable business judgment. The Consultation Parties and/or their representatives shall be permitted to attend the Auction.

4.        The Auction shall be conducted openly and shall be transcribed or videotaped, at the Debtors' option after consultation with the Consultation Parties.

5.        Subject to the Bidding Procedures and this Order, the Debtors shall have the right, after consulting with the Consultation Parties, in their reasonable business judgment, to: (i) determine which bidders qualify as Qualified Parties; (ii) determine which bids qualify as Qualified Bids; (iii) determine which Qualified Bids qualify as Baseline Bids; (iv) determine the amount of each Minimum Overbid; (v) determine which Qualified Bids are the Winning Bids and the Backup Bids; (vi) reject any bid that is: (a) inadequate or insufficient; (b) not in conformity with the requirements of the Bidding Procedures, the Bankruptcy Code, the Bidding Procedures Order, or any other order of this Court; or (c) contrary to the best interests of the

Debtors and their estates; (vii) adjourn or cancel the Auction, after providing notice of such adjournment or cancellation in accordance with the Bidding Procedures; or (viii) modify the Bidding Procedures in a manner consistent with applicable law (subject to the prior consent of JB Cocoa, which consent shall not be unreasonably withheld).

6.      All bidders submitting a Qualified Bid are deemed to have submitted to the exclusive jurisdiction of this Court with respect to all matters related to the Auction and the terms and conditions of the sale or transfer of the Assets.

7.      Notwithstanding anything to the contrary set forth herein, JB Cocoa's bid, as reflected in the Stalking Horse APA, is deemed a Qualified Bid pursuant to the Bidding Procedures for all purposes.

### The Sale Hearing/Objection Deadline

8.      The Court shall conduct the Sale Hearing on **September 19, 2017 at __:00 _.m. (EST)**.  The Debtors may, after (a) consultation with JB Cocoa or the Winning Bidder (if JB Cocoa is not the Winning Bidder) and the Consultation Parties and (b) notice to the Notice Parties, seek an adjournment of the Sale Hearing as the Debtors deem appropriate in the exercise of their reasonable business judgment.

9.      Responses or objections (collectively, "Sale Objections") if any, to the relief requested in the Sale Motion (other than Cure Objections and Adequate Assurance Objections discussed below) shall be in writing, shall state the name of the objecting party, shall state with particularity the reasons and basis for the Sale Objection, and shall be (a) filed with the Court and (b) served upon (i) counsel for the Debtors (Attn: Joseph L. Schwartz, Esq. and Jason D. Navarino, Esq.), (ii) the Office of the U.S. Trustee (Attn: Serene Nakano, Esq.); (iii) Baker, Manock & Jenson, PC (Attn: Carl R. Refuerzo, Esq. and Courtney R. McKeever, Esq.) and

Trenk, DiPasquale, Della Fera & Sodono, P.C. (Attn: Adam D. Wolper, Esq. and Ross J. Switkes, Esq.), as counsel to JB Cocoa; (iv) the attorneys (if applicable) of any Winning Bidder(s); (v) the attorneys (if applicable) of any applicable Backup Bidder(s); (vi) Thompson & Knight, LLP, as counsel to Bank of the West (Attn: Anthony Pirraglia, Esq.) and (vii) counsel to the Committee, if any is appointed (collectively, the "Objection Recipients"), so as to be actually received by no later than **September 12, 2017 at 4:00 p.m.** (the "Sale Objection Deadline"). Any reply by the Debtors or other Objection Recipient shall be filed and served by no later than **September 15, 2017 at 6:00 p.m.**

<div align="center">**Notice Procedures**</div>

10.     The Bidding Procedures Notice, attached to the Motion as Exhibit D, provides adequate and sufficient notice to all interested parties of the Bidding Procedures, Auction, Motion, Sale Hearing, and the Proposed Sale pursuant to Bankruptcy Rules 2002 and 6004 and Local Rules 4001-1 and 6004-1, and is hereby approved.

11.     As soon as is reasonably practicable, but by no later than two (2) business days after entry of the Bidding Procedures Order, the Debtors shall serve a copy of this Order, with exhibit, and the Bidding Procedures Notice upon the following persons by first-class mail, postage prepaid: (i) the Office of the U.S. Trustee (Attn: Serene Nakano, Esq.); (ii) Baker, Manock & Jenson, PC (Attn: Carl R. Refuerzo, Esq. and Courtney R. McKeever, Esq.) and Trenk, DiPasquale, Della Fera & Sodono, P.C. (Attn: Adam D. Wolper, Esq. and Ross J. Switkes, Esq.), as counsel to JB Cocoa; (iii) all Counterparties to the Cocoa Services' Contracts; (iv) all parties who have made an offer on the Assets or expressed an interest in making an offer on the Assets; (v) Thompson & Knight, LLP, as counsel to Bank of the West (Attn: Anthony Pirraglia, Esq.); (vi) counsel to the Committee (if appointed); (vii) all taxing authorities that have

jurisdiction over the Assets; (viii) all known persons holding a lien on any of the Assets; and (ix) all entities who have requested notice under Bankruptcy Rule 2002 (collectively, the "Notice Parties").

### 12.    **The Assumption and Assignment Procedures**

13.    The Proposed Assumed Contracts Notice, attached to the Motion as Exhibit F, provides adequate and sufficient notice to any applicable Counterparty of any proposed assumption and/or assignment of any Cocoa Services' Contract, and is hereby approved.

14.    The Assumption and Assignment Procedures (as set forth in the Motion) are reasonable, fair, and appropriate, and contain the type of information required under Bankruptcy Rule 2002, Local Rule 2002-1, and comply in all respects with all other applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules, and are hereby approved.

15.    Within two (2) business days after entry of this Order, the Debtors shall file with the Court, serve on the Notice Parties, including each applicable Counterparty, and cause to be published on the Prime Clerk Website the Proposed Assumed Contracts Notice.

16.    Any and all objections to the Cure Amounts (any such objection, a "Cure Objection") shall be in writing, shall state with specificity the legal and factual bases thereof and include any appropriate supporting documentation, filed with the Court and shall be simultaneously served on the following Objection Recipients, so as to be actually received by the Objection Recipients by no later than **September 12, 2017 at 4:00 p.m.** (the "Cure Objection Deadline").  Any reply by the Debtors shall be filed and served by no later than **September 15, 2017 at 6:00 p.m.**

17.    The Debtors and any Counterparty that has filed a Cure Objection shall confer in good faith in an effort to resolve the Cure Objection without Court intervention, after

consultation with the Consultation Parties. If the parties are unable to consensually resolve the Cure Objection prior to the commencement of the Sale Hearing, the Court shall determine the amount to be paid or reserved with respect to such objection at the Sale Hearing; provided that, a Cure Objection (and only a Cure Objection) may, at the Debtors' discretion, after consulting with the Consultation Parties and the applicable Winning Bidder, be adjourned with the Court's consent (an "Adjourned Cure Objection") to a subsequent hearing.   An Adjourned Cure Objection may be resolved after the closing date of the applicable Proposed Sale (and therefore the contract of the Counterparty in question may be assumed and assigned at the closing), provided that the Debtors maintain a cash reserve equal to the Cure Costs the objecting Counterparty believes is required to cure the asserted monetary default under the implicated Cocoa Services' Contract.

18.     All other Sale Objections to the proposed assumption and assignment of the Debtors' right, title, and interest in, to, and under a Cocoa Services' Contract, if it is ultimately designated for assumption and assignment by the Winning Bidder(s), will be heard at the Sale Hearing.

19.     If a Counterparty fails to timely file with the Court and serve on the Objection Recipients a Cure Objection, the Counterparty shall be deemed to have consented to the assumption, assignment, and sale of the implicated Cocoa Services' Contract (unless such Counterparty has timely filed an Adequate Assurance Objection with respect to the implicated Forward Contract) to the applicable Winning Bidder and forever shall be barred from asserting any objection with regard to such assumption, assignment, and sale. The Cure Costs set forth in the Proposed Assumed Contracts Notice shall be controlling and will be the only amount necessary to cure outstanding monetary defaults under the implicated Cocoa Services' Contract

under 11 § U.S.C. 365(b), notwithstanding anything to the contrary in any Cocoa Services'

Contract, or any other document, and the Counterparty to the Cocoa Services' Contract shall be

deemed to have consented to the Cure Costs and shall forever be barred from asserting any other

claims related to such Cocoa Services' Contract against the Debtors or the Winning Bidders, or

the property of any of them.

20.     To the extent requested by a Counterparty, the Debtors shall provide, with respect

to JB Cocoa and each Qualified Party, information to demonstrate that JB Cocoa or such other

Qualified Party is able to fulfill all obligations in connection with satisfying adequate assurance

of future performance under any Cocoa Services' Contract ("Adequate Assurance Information").

In particular, the Debtors shall: (a) within 24 hours of receipt of an Offer from a Potential Bidder

(other than JB Cocoa) and (b) with respect to JB Cocoa, by no later than twenty (20) days before

the Sale Hearing, or by **August 30, 2017 at 5:00 p.m.** (the later of (a) and (b), the "Adequate

Assurance Deadline"), provide a copy of the Adequate Assurance Information to those

Counterparties (or their counsel) who have: (x) submitted a written request (e-mail to Debtors'

counsel is acceptable) for Adequate Assurance Information and (y) confirmed in writing to the

Debtors' counsel (e-mail is acceptable) their agreement to keep such Adequate Assurance

Information strictly confidential and use it solely for the purpose of evaluating whether a

Potential Bidder, including JB Cocoa, has provided adequate assurance of future performance

under the implicated Cocoa Services' Contracts.

21.     Any Counterparty to a Cocoa Services' Contract that has an objection to the

proposed assumption, assignment, and/or sale of the Cocoa Services' Contract, the subject of

which objection is a Winning Bidder's proposed form of adequate assurance of future

performance with respect to such contract (each, an "Adequate Assurance Objection"), shall file

with the Court and simultaneously serve on the Objection Recipients an Adequate Assurance Objection, which must state, with specificity, the legal and factual bases thereof, including submitting any appropriate supporting documentation, by no later than **September 12, 2017 at 4:00 p.m. (prevailing Eastern Time)** (the "Adequate Assurance Objection Deadline").  Replies, if any, to Adequate Assurance Objections shall be filed by **September 15, 2017 at 6:00 p.m. (prevailing Eastern Time)**.

22.    The Debtors, after consultation with the Consultation Parties, and any Counterparty that has filed an Adequate Assurance Objection shall confer in good faith in an effort to resolve the Adequate Assurance Objection without Court intervention. If the parties are unable to consensually resolve the Adequate Assurance Objection prior to the commencement of the Sale Hearing, the Court shall determine any issues of adequate assurance of future performance by the applicable Winning Bidder at the Sale Hearing.

23.    If a Counterparty fails to timely file with the Court and serve on the Objection Recipients an Adequate Assurance Objection, the Counterparty shall be deemed to have consented to the assumption, assignment, and/or sale of the implicated Cocoa Services' Contract (unless the Counterparty has filed a timely Cure Objection with respect to the Cocoa Services' Contract) to the applicable Winning Bidder and shall be forever barred from asserting any objection with regard to such assumption, assignment, and/or sale. Further, in the event no objections are filed and served, the applicable Winning Bidder shall be deemed to have provided adequate assurance of future performance with respect to the implicated Cocoa Services' Contract in accordance with 11 U.S.C. § 365(f)(2)(B), notwithstanding anything to the contrary in the Forward Contract, or any other document.

24.     Any Counterparty to a Cocoa Services' Contract that wishes to file a Sale Objection (other than a Cure Objection or an Adequate Assurance Objection) to the proposed assumption, assignment and sale of the Cocoa Services' Contract shall file with the Court and serve on the Objection Recipients its Sale Objection, which must state, with specificity, the legal and factual bases thereof, including any appropriate documentation in support thereof, by no later than the Sale Objection Deadline of **September 12, 2017, at 4:00 p.m. (prevailing Eastern Time).**  Replies, if any, to Sale Objections shall be filed by **September 15, 2017 at 6:00 p.m. (prevailing Eastern Time).**

25.     If a Counterparty fails to timely file with the Court and serve on the Objection Recipients a Sale Objection, the Counterparty shall be deemed to have consented to the assumption, assignment, and sale of the Cocoa Services' Contract (unless the Counterparty has filed a timely Cure Objection or Adequate Assurance Objection with respect to the Cocoa Services' Contract) to the applicable Winning Bidder and shall be forever barred from asserting any objection with regard to such assumption, assignment, and sale.

26.     The Debtors and JB Cocoa reserve all of their rights, claims, and causes of action with respect to each Cocoa Services' Contract or other document listed on the Proposed Assumed Contracts Notice. The Debtors' inclusion of any Cocoa Services' Contract on the Proposed Assumed Contracts Notice shall not be a covenant, promise, or guarantee that such contract ultimately will be assumed and assigned and sold.

## Debtors' Entry Into Stalking Horse APA

27.     The Debtors are authorized to perform all of their respective pre-closing obligations under the Stalking Horse APA; provided that, for the avoidance of doubt, consummation of the sale contemplated by the Stalking Horse APA shall be subject to entry of

the Sale Order and the satisfaction or waiver of the other conditions to closing set forth in the Stalking Horse APA.

28.    If the Stalking Horse APA is terminated pursuant to Section 10.01(a), (b), (d), or (c)(ii) (but not also (c)(i)), the Deposit shall be returned to JB Cocoa within two (2) business days of such termination.

## **Bid Protections**

29.    The Transaction Expenses, and the provisions of the Stalking Horse APA relating thereto, are hereby approved.

30.    The Transaction Expenses, to the extent payable under the Stalking Horse APA, shall constitute an allowed superpriority administrative expense claim against the Debtors' estate pursuant to sections 105(a), 503(b) and 507(a)(2) of the Bankruptcy Code.

31.    The Transaction Expenses shall not be deemed to be a default pursuant to paragraph __ of the Interim Order Pursuant to Sections 105, 361, 362, 363 and 507 of title 11 of the Bankruptcy Code, Rules 4001(b) and 9014 of the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York  Authorizing Debtors' Use of Cash Collateral and Providing Adequate Protection Thereof [Docket No.__].

## **Other Relief Granted**

32.    In the event there is a conflict between this Order and the Motion or the Stalking Horse APA, this Order shall control and govern.  Notwithstanding the immediately preceding sentence, the Debtors' exercise of any discretion granted to them under this Order shall not excuse the Debtors' compliance with the terms and provisions of the Stalking Horse APA.

33.    This Order shall become effective immediately upon its entry.

34.    The Court shall retain jurisdiction over any matter or dispute arising form or relating to the implementation of this Order.

Dated: New York, New York
        August ___ 2017

_____

UNITED STATES BANKRUPTCY JUDGE

## **Exhibit 1**

Bidding Procedures

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X
                                                              :
In re:                                                        :      Chapter 11
                                                              :
COCOA SERVICES, L.L.C., et al.,[4]                            :      Case No. 17-11936
                                                              :
                                    Debtors.                  :      Joint Administration Pending
                                                              :
-------------------------------------------------------------- x

## BIDDING PROCEDURES

Set forth below are the Bidding Procedures that will be employed in connection with a sale or disposition (the "Proposed Sale") of substantially all of the assets of Cocoa Services, L.L.C. ("Cocoa Services") and Morgan Drive Associates, L.L.C. ("Morgan Drive"), the debtors and debtors-in-possession (each a "Debtor" and collectively, the "Debtors") in the above captioned chapter 11 cases (the "Bankruptcy Cases").

### Key Dates and Deadlines

| | |
|---|---|
| August 10, 2017 at 2:00 p.m. | Hearing on Bidding Procedures Motion |
| August 14, 2017 | Deadline to Mail Bidding Procedures Notice and Sale Motion |
| August 25, 2017 | Offer Deadline |
| August 29, 2017 | Deadline for Debtors to notify Prospective Bidders of their status as Qualified Parties |
| September 6, 2017 | Auction |
| September 12, 2017 at 4:00 p.m. | Sale Objection Deadline, Cure Objection Deadline, and Adequate Assurance Objection Deadline |
| September 15, 2017 at 6:00 p.m. | Deadline for Debtors to file Replies to Sale Objections, Cure Objections, and Adequate Assurance Objections |
| September 19, 2017 at __:00 _.m. | Sale Hearing |

---

[4] Debtors in these Bankruptcy Cases and the last four digits of their respective taxpayer identification number are as follows: Cocoa Services, L.L.C. (3769); Morgan Drive Associates, L.L.C. (2335). Debtors' principal office is located at 400 Eagle Court, Swedesboro, New Jersey 08085.

### Description of the Assets

The Debtors are seeking to sell substantially all of their assets (the "<u>Assets</u>") free and clear of all liens, claims, interests, or other encumbrances.

### Consultation Parties

Throughout the sale process, as necessary or appropriate, the Debtors will consult with the following parties: (i) Bank of the West and (ii) the Committee (if any is appointed) (together, the "<u>Consultation Parties</u>").

### Bidder Qualifications

Not including JB Cocoa, each person or entity that desires to participate in the Auction (each, a "<u>Prospective Bidder</u>") must be determined by the Debtors, in consultation with the Consultation Parties, to satisfy the following eligibility requirements:

**A.    Due Diligence**

Any Prospective Bidder identified by the Debtors as reasonably likely to be a Qualified Party (defined below) that wishes to conduct due diligence on the Assets must execute a confidentiality agreement in form and on terms satisfactory to the Debtors in order to be granted access to all material information regarding the Assets.

The Debtors will work to accommodate all reasonable requests for additional information and due diligence access from Prospective Bidders. All due diligence requests shall be directed to (i) the Debtors, Cocoa Services, L.L.C. and Morgan Drive Associates, L.L.C., 400 Eagle Court, Swedesboro, New Jersey 08085 (Attn: Bernd Herrmann (berndherrmann@gmx.net)).

If the Debtors determine, after consultation with the Consultation Parties, that a Prospective Bidder does not qualify as a Qualified Party, such Prospective Bidder shall not be entitled to receive due diligence access or additional non-public information.

**B.    Offer Deadline**

Any Prospective Bidder interested in participating in the Auction (defined below) for the Assets shall make an offer (each, an "<u>Offer</u>") in writing and serve the Offer upon the Debtors (Attn: Joseph L. Schwartz, Esq. and Jason D. Navarino, Esq. of Riker Danzig Scherer Hyland & Perretti, LLP, Headquarters Plaza, One Speedwell Avenue, Morristown, NJ 07962); counsel to Bank of the West (Attn: Anthony F. Pirraglia, Esq., of Thompson & Knight LLP, 333 Clay St., Suite 3300, Houston, TX 77002), and counsel to any Official Committee of Unsecured Creditors appointed in the Bankruptcy Cases (the "<u>Committee</u>"), if any is appointed, by no later than **August 25, 2017 at 5:00 p.m.** prevailing Eastern Time (the "<u>Offer Deadline</u>").

The Debtors may, after consulting with the Consultation Parties and after providing notice to the Notice Parties (as defined herein), extend the Offer Deadline for any reason, in their reasonable business judgment. The Debtors shall promptly provide copies of all Offers received to the Consultation Parties; provided that the Debtors shall not be required to provide to any

Consultation Party any material, nonpublic information regarding bids for the Assets if such Consultation Party or any related entity to that Consultation Party submits a bid to purchase all or any portion of the Assets.  Further, the Debtors shall not be required to consult with any Consultation Party regarding a particular Offer if that Consultation Party is an active bidder for the Assets at the applicable time.

### C.    Qualified Bid Requirements

To qualify as a "Qualified Bid," the Offer must be in writing and the Debtors, in consultation with the Consultation Parties, must determine that the Offer satisfies the following requirements:

1.    Allocation Schedule.  Each Offer must include an allocation schedule of the proposed purchase price for the Assets to be assumed, assigned and sold to it in connection with the proposed transaction as Exhibit A to the Modified APA (defined below).

2.    Modified APA. Each written offer must include: (i) an executed copy of an asset purchase agreement which is not materially more burdensome than the Stalking Horse APA or inconsistent with these Bidding Procedures (the "Modified APA"); and (ii) a marked-up copy of the Modified APA reflecting the difference between the Modified APA and the Stalking Horse APA. The Debtors, in consultation with the Consultation Parties, shall determine whether any Modified APA that modifies the Stalking Horse APA in any respect beyond the identity of the purchaser, the purchase price under the agreement and the allocation of the Purchase Price is a Qualified Bid.

3.    Bidding Requirements. Any Offer by a Prospective Bidder for all of the Purchased Assets shall not be less than $8,390,000 ($8,000,000 plus Transaction Expenses (defined herein) plus $50,000 initial overbid).  If an Offer is only for the assets of Cocoa Services, such Offer shall not be less than $6,390,000 ($6,000,000 plus Transaction Expenses (defined herein) plus $50,000 initial overbid).   If an Offer is only for the assets of Morgan Drive, such Offer shall not be less than $2,390,000 ($2,000,000 plus Transaction Expenses (defined herein) plus $50,000 initial overbid).

4.    Identification of Bidder. A Qualified Bid must fully disclose the legal identity of each entity that will be bidding for the Assets otherwise participating in connection with such bid (including but not limited to any equity holder or other financial backer if the Prospective Bidder is an entity specifically formed for purposes of effectuating the Proposed Sale, and the complete terms of any such participation) and must also disclose any connections or agreements with the Debtors, any other known Prospective Bidder or Qualified Party, and/or any officer or director of the foregoing.

-18-

5.      Financial Information.  Any Prospective Bidder that wishes to make an Offer for the Assets must provide the Debtors with sufficient and adequate information to demonstrate, to the satisfaction of the Debtors, in consultation with the Consultation Parties, that its Offer: (i) is being made by an entity that has the financial wherewithal and ability to consummate the transaction, including evidence of adequate financing; and (ii) provides information to demonstrate that it is able to fulfill all obligations in connection with all Assigned Contracts (as defined below) so as to satisfy the requirement of providing adequate assurance of future performance, as contemplated by section 365 of the Bankruptcy Code (the "Adequate Assurance Information").

6.      Good Faith Deposit. All Qualified Bids must be accompanied by a good faith deposit in the amount of 10% of the Offer (a "Good Faith Deposit"), in the form of a certified or cashier's check, payable to "RIKER DANZIG SCHERER HYLAND & PERRETTI LLP TRUST ACCOUNT."  All such deposits shall be retained by the Debtors pending the hearing to consider the Sale Motion and shall be returned within ten (10) days after entry of a Sale Order, except that the Debtors shall transfer the deposit of the Winning Bidder (defined below) to Foundation Title, and apply such deposit(s) to the Purchase Price at closing, and hold the deposit of the Backup Bidder until the first business day following the closing of the Proposed Sale with the Winning Bidder.

7.      Other Requirements.  Each Offer shall:

        (i) state that the bid is formal, binding and unconditional, is not subject to further due diligence, and is irrevocable until the earlier to occur of: (x) the first business day following the closing of the Proposed Sale or (y) thirty (30) days following the last date of the Auction (as may be adjourned);

        (ii) not contain any financing contingencies of any kind;

        (iii) not contain any condition to closing the Proposed Sale on the receipt of any third party approvals that were not required by the Stalking Horse APA;

        (iv) state that the Prospective Bidder is ready, willing and able to perform its obligations under the Modified APA submitted with such Offer;

        (v) expressly state that the Prospective Bidder agrees to serve as a backup bidder (a "Backup Bidder") if such bidder's Qualified Bid is selected as the next highest or next best bid after the Winning Bid for the implicated Assets;

-19-

(vi) include contact information for the person(s) the Debtors should contact with questions about the Prospective Bidder's bid; and

(vii) be received by the Debtors and Consultation Parties by the Offer Deadline.

8.    For the avoidance of doubt, the bid of JB Cocoa has automatically been deemed to be a Qualified Bid.

### D.    Qualified Bidders

The Debtors shall, in consultation with the Consultation Parties, make a determination whether an Offer is a Qualified Bid and shall notify Prospective Bidders whether their Offers have qualified as Qualified Bids by not later than **August 29, 2017 at 5:00 p.m. (prevailing Eastern Time)**; provided that, if an Offer is made by the Offer Deadline that is not determined to be a Qualified Bid, the Debtors will promptly advise the Prospective Bidder of the deficiencies, if any, and allow such Prospective Bidder one (1) day to submit a revised offer.  In addition, if the Debtors, after consulting with the Consultation Parties and after providing notice to the Notice Parties, determine to extend the Offer Deadline, the Debtors shall be required to notify Prospective Bidders whether their bids have qualified as Qualified Bids by no later than two (2) business days after the newly-scheduled Offer Deadline. Any Prospective Bidder whose Offer that is deemed a Qualified Bid shall be designated a "Qualified Party."

JB Cocoa shall automatically be deemed a Qualified Party, and JB Cocoa's bid, as reflected in the Stalking Horse APA, shall be deemed a Qualified Bid.

### E.    Participants and Attendees

Each Qualified Party shall appear in person at the Auction or through a duly authorized representative. Only Qualified Parties shall be entitled to make any subsequent bids at the Auction. Each Qualified Party shall be required to confirm that (i) it has not engaged in any collusion with respect to the bidding or the Proposed Sale; and (ii) its Qualified Bid represents a binding, good faith, and bona fide offer to purchase the Assets identified if such bid is selected as the Winning Bidder.

The Debtors, in consultation with the Consultation Parties, shall, after the Offer Deadline and prior to the Auction, evaluate all Qualified Bids or combination of Qualified Bids received, and, in consultation with the Consultation Parties, determine which Qualified Bids or combination of Qualified Bids, as the case may be, reflect the highest or best offers for some or all of the Assets, whether in whole or in lots, at that time (the "Baseline Bid(s)").  The Debtors shall announce such determination at the commencement of the Auction.

## F.    **Auction Procedures**

The Auction shall be governed by the following procedures, subject to the Debtors' right, after consultation with the Consultation Parties, to modify such procedures in their reasonable business judgment:

    1.    <u>Minimum Overbid Procedures</u>. Any further bids made at the Auction for the Assets shall be in increments of at least $50,000 (the "<u>Overbid Procedures</u>").

    2.    <u>Highest or Best Offer</u>. After the first round of bidding and between each subsequent round of bidding, the Debtors, after consulting with the Consultation Parties, shall announce the bid that they determine in their business judgment to be the highest or otherwise best offer for the relevant Assets (the "<u>Leading Bid</u>"). Each round of bidding will conclude after each participating Qualified Party has had the opportunity to submit a subsequent bid with full knowledge of the Leading Bid.

    3.    <u>Modification of Procedure</u>. The Debtors may, after consulting with the Consultation Parties, announce at the Auction modified or additional procedures for conducting the Auction.

## G.    **Auction Results**

    1.    <u>Winning Bid</u>. Immediately prior to the conclusion of the Auction, the Debtors shall, in consultation with the Consultation Parties, (i) determine, consistent with these Bidding Procedures, which bid constitutes the Winning Bid for the implicated Assets; and (ii) notify all Qualified Parties at the Auction for the implicated Assets of the identity of the bidder that submitted the Winning Bid (each such bidder, the "<u>Winning Bidder</u>") and the amount of the purchase price and other material terms of the Winning Bid.

    The Auction may include open bidding in the presence of all other Qualified Parties. All Qualified Parties shall have the right to submit additional bids at the Auction to improve their bids. The Debtors may, in their reasonable business judgment, negotiate with any and all Qualified Parties participating in the Auction.

    The Debtors shall have the right, after consulting with the Consultation Parties, to determine, in their reasonable business judgment, without liability, which bid is the highest or otherwise best bid and reject at any time, any bid that the Debtors deems to be inadequate or insufficient, not in conformity with the requirements of the Bankruptcy Code, Bankruptcy Rules, or the Local Rules, these Bidding Procedures, any order of the Bankruptcy Court, or the best interests of the Debtors and their estates.

At least one (1) day prior to the Sale Hearing, the Winning Bidder shall be required to supplement its Good Faith Deposit by the difference between its Qualified Bid and the Winning Bid.

2.   Backup Bid.   Immediately prior to the conclusion of the Auction, the Debtors shall, in consultation with the Consultation Parties, (i) determine, consistent with these Bidding Procedures, which Qualified Bid is the next highest or otherwise best Qualified Bid for the relevant Assets after the Winning Bid (each such Qualified Bid, a "Backup Bid"); and (ii) notify all Qualified Parties at the Auction for the implicated Assets of the identity of the Backup Bidder and the amount of the purchase price and other material terms of the Backup Bid. Backup Bids shall be open and irrevocable until the earlier of (x) the first business day following closing of the Proposed Sale or (y) thirty (30) days following the last date of the Auction (as may be adjourned). If the Winning Bidder for the implicated Forward Contract fails to consummate a Proposed Sale, the Backup Bidder shall be deemed the new Winning Bidder, and the Debtors will be authorized, but not required, to consummate a Proposed Sale for the applicable Assets with the Backup Bidder.

Subject to the terms and conditions set forth in the Stalking Horse APA or Modified APA, in the event that a Winning Bidder fails to consummate the proposed transaction by the Closing Date, such bidder's deposit shall be forfeited to the Debtors (but not as liquidated damages, the Debtors reserving the right to pursue all remedies that may be available to it) and the Debtors shall be free to consummate the proposed transaction with the Backup Bidder at the final price bid by such bidder at the Auction (or, if that bidder is unable to consummate the transaction at that price, the Debtors may consummate the transaction with the next higher bidder, and so forth) without the need for an additional hearing or order of the Court. If JB Cocoa is not the Winning Bidder, it shall be the Backup Bidder if it has made the second best offer, but shall nonetheless be entitled to receive the Transaction Expenses if the Purchased Assets are sold to the Winning Bidder.

3.   Auction Results: Within one (1) business day following the Auction, the Debtors will cause the results of the Auction to be filed with the Court, docketed on the Court's electronic case filing ("ECF") system, and published on the website of the Debtors' Court-approved claims agent, Prime Clerk, LLC at (http://cases.primeclerk.com/cocoaservices) (the "Prime Clerk Website"), which filing will include a list of the Cocoa Services' Contracts to be sold and assigned to the Winning Bidder(s), subject to revision prior to Closing, as further set forth below.

4.   Bankruptcy Court Approval: All bids for the purchase of the Assets shall be subject to approval of the Court and conditioned upon entry of a Sale Order.

4862678v4

**Exhibit C**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
                                      :

In re:                         :    Chapter 11
                                     :
                                     :

COCOA SERVICES, L.L.C., et al.,[1]  :    Case No. 17-11936
                                     :
                                     :

                 Debtors.    :    Joint Administration Pending
------------------------------------------------------------ :

**ORDER (A) APPROVING THE SALE AND ASSIGNMENT OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES PURSUANT TO 11 U.S.C. § 363, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS PURSUANT TO 11 U.S.C. § 365, AND (C) GRANTING RELATED RELIEF PURSUANT TO BANKRUPTCY CODE § 105**

Upon the motion (the "Sale Motion")[2] of Cocoa Services, L.L.C. ("Cocoa Services") and Morgan Drive Associates, L.L.C. ("Morgan Drive"), the debtors and debtors-in-possession (each a "Debtor" and collectively, the "Debtors"), for an order (the "Order"), *inter alia,* pursuant to Sections 105, 363 and 365 of the United States Bankruptcy Code (the "Bankruptcy Code") and Bankruptcy Rules 2002, 6004 and 6006 authorizing and approving the sale of the Purchased Assets free and clear of liens, claims and encumbrances, described in and pursuant to the terms and conditions of an executed Asset Purchase Agreement, dated as of July 12, 2017 (the "APA"), by and among the Debtors, as sellers, and JB Cocoa Holding, Inc., as buyer (the "JB Cocoa"), and (b) granting related relief; and the Court having conducted a hearing on the Sale Motion on September 19, 2017 (the "Sale Hearing") and the Court having considered the Sale Motion, all

---

[1] The Debtors in these Bankruptcy Cases and the last four digits of their respective taxpayer identification number are as follows: Cocoa Services, L.L.C. (3769); Morgan Drive Associates, L.L.C. (2335). The Debtors' principal office is located at 400 Eagle Ct., Swedesboro, NJ 08085.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Sale Motion.

responses filed thereto, if any, as well as any evidence presented at the Sale Hearing; and the

Court having jurisdiction to consider and determine the Sale Motion in accordance with 28

U.S.C. §§ 157 and 1334; and due notice of the Sale Motion having been provided, and it

appearing that no other or further notice need be provided; and after due deliberation and

sufficient cause appearing therefor; the Court hereby finds and determines the following:

## General

A.      The Court has jurisdiction to consider the Sale Motion and the relief requested

therein under 28 U.S.C. §§ 157 and 1334. The Sale Motion is a core proceeding under 28 U.S.C.

§ 157(b)(2). Venue is proper in the Court under 28 U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief sought in the Sale Motion are 11 U.S.C. §§

105, 363 and 365 and Fed. R. Bankr. P. 2002, 6004 and 6006.

C.      On August __, 2017, the Court entered the Order Establishing Bidding Procedures

and Related Relief Regarding the Sale of Substantially all of the Debtors' Assets (the "Bidding

Procedures Order") [Docket No. ___], establishing, among other things: (a) Bidding Procedures

(as defined in the Sale Motion), including manner and form of notice to be applied during a sale

of certain assets of the Debtors and assumption and assignment of related contracts, (b) a date for

an auction (the "Auction"), and (c) a date for the Sale Hearing to consider approval of the

Auction results.

D.      As evidenced by the certificates of service filed with the Court, and based on the

representations of counsel at the Sale Hearing, (i) proper, timely, and sufficient notice of the Sale

Motion, the transactions contemplated therein (including the assumption and assignment of the

Assigned Contracts), the Bidding Procedures Order, the Bidding Procedures, the Auction and the

Sale Hearing has been timely provided to all parties in interest in accordance with Sections 105,

363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006; (ii) such

notice was good and sufficient under the particular circumstances; and (iii) no other or further notice of the Sale Motion, the transactions contemplated therein (including the assumption and assignment of the Assigned Contracts), the Bidding Procedures Order, the Bidding Procedures, the Auction, the Sale Hearing or the entry of this Order is required.

E.    A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities, including, but not limited to: (i) the Office of the U.S. Trustee (Attn: Serene Nakano, Esq.); (ii) Baker, Manock & Jenson, PC (Attn: Carl R. Refuerzo, Esq. and Courtney R. McKeever, Esq.) and Trenk, DiPasquale, Della Fera & Sodono, P.C. (Attn: Adam D. Wolper, Esq. and Ross J. Switkes, Esq.), as counsel to JB Cocoa; (iii) all Counterparties to the Cocoa Services' Contracts; (iv) all parties who have made an offer on the Assets or expressed an interest in making an offer on the Assets; (v) Thompson & Knight, LLP, as counsel to Bank of the West (Attn: Anthony Pirraglia, Esq.); (vi) counsel to the Committee (if appointed); (vii) all taxing authorities that have jurisdiction over the Assets; (viii) all known persons holding a lien on any of the Assets; and (ix) all entities who have requested notice under Bankruptcy Rule 2002.  Counsel for the Debtors has filed with the Court affidavits of service of Notice of the Bidding Procedures Order, detailing the manners of service of, and the persons served with, the Bidding Procedure Order.

### The Bankruptcy Cases

F.    On July 14, 2017, the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.  The Debtors continue to operate their business and manage their assets as a debtors-in-possession under 11 U.S.C. §§ 1107(a) and 1108.

### The Marketing Process

G.    Between February and May 2017, the Debtors embarked on a process of actively marketing substantially all of their assets (the "Assets") for sale.  In connection with this

marketing process, in February 2017, the Debtors established a due diligence data room for potential bidders, all of which were required to execute confidentiality agreements in order to participate. In connection with this process, the Debtors initially contacted at least 14 separate potential strategic and/or financial bidders, and to date have provided detailed information regarding the Assets to at least 11 different potential bidders, each of which has executed a confidentiality agreement, and which were provided access to the Debtors' electronic data room.

H.      As a result of these marketing efforts, the Debtors received two (2) bids for the Assets.

I.      The Debtors, after due consideration, in their business judgment determined that the bid presented by one of those two (2) bidders, JB Cocoa, was the superior bid of the two and determined in their business judgment to designate JB Cocoa's bid as the stalking horse bid for the Assets forth in the APA (the "Purchased Assets").  The Purchased Assets include, without limitation, the real property known as Block 1602, Lot 11, on the Tax Map of the Township of Logan, County of Gloucester, State of New Jersey.

J.      On July 12, 2017, the Debtors and JB Cocoa entered into the APA, whereby JB Cocoa would, subject to the approval of the Court: (i) purchase the Purchased Assets for a purchase price of $8,000,000, less the Cure Amount and certain other adjustments, and subject to higher or otherwise better offers and (ii) assume the Assumed Liabilities, including the obligation to pay the Cure Amount relating to the Assigned Contracts.

K.      The Debtors provided notice to all parties as required under the Bidding Procedures Order.

L.      At the Auction, the Debtors determined that JB Cocoa submitted the highest and best offer for the Purchased Assets.

M.      The Bidding Procedures afforded a full, fair and reasonable opportunity for any entity to make a higher or better offer to purchase the Purchased Assets.

N.      The Debtors and JB Cocoa have complied with the Bidding Procedures Order in all respects.

### The Sale of the Purchased Assets to JB Cocoa

O.      The transactions effectuating, and the terms and conditions governing, the sale of the Purchased Assets to JB Cocoa are embodied in the APA, which is attached to the Motion as **Exhibit A**.

P.      The APA provides that the sale of the Purchased Assets shall be free and clear of all liens, claims, interests, and other encumbrances within the meaning of 11 U.S.C. § 363(f).

Q.      JB Cocoa's obligation to consummate the transactions contemplated in the APA is subject to the satisfaction of specific conditions outlined in the APA, including the condition of Court approval.  As of the date of entry of this Order, there has been no failure to satisfy any condition under the APA to JB Cocoa's obligation to consummate the Sale that by its nature should have been satisfied prior to the date hereof.

R.      The APA was negotiated, proposed, and entered into by and among JB Cocoa and the Debtors without collusion, in good faith, and from arm's length bargaining positions.  The sale process conducted by the Debtors and their agents was non-collusive, fair and reasonable and was conducted in good faith.  Neither the Debtors nor JB Cocoa has engaged in any conduct that would cause or permit the application of 11 U.S.C. § 363(n) to the sale, including having the APA voided.

S.      JB Cocoa is a good faith purchaser in accordance with 11 U.S.C. § 363(m) and, as such, JB Cocoa and its assignees and designees are entitled to all of the protections afforded thereby.  Absent a stay of the effectiveness of this Order, if any, JB Cocoa will be acting in good

faith within the meaning of 11 U.S.C. § 363(m) in closing the transaction under the APA, including the assumption and assignment of the Assigned Contracts, upon the entry of this Order.

T.      The Assigned Contracts to be assumed and assigned to JB Cocoa are valid and binding, in full force and effect, and enforceable in accordance with their terms and are property of the Cocoa Services' estates pursuant to Section 541(a) of the Bankruptcy Code, and JB Cocoa shall have all of the rights of the Debtors thereunder.

U.      The terms and conditions of the APA to be complied with by JB Cocoa under the APA (i) are fair and reasonable; (ii) are valid, binding and enforceable; (iii) constitute the highest and best offer for the Purchased Assets; (iv) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative; and (v) constitute reasonably equivalent value and fair consideration for the Purchased Assets.

V.      The transactions contemplated by the APA will, upon consummation thereof (the "Closing"), (i) be a legal, valid, and effective transfer of the Purchased Assets to JB Cocoa with no further action required on the part of the Debtors and (ii) vest JB Cocoa with good title to the Purchased Assets free and clear of all liens, claims and encumbrances within the meaning of 11 U.S.C. § 363(f).

W.      The relief sought in the Sale Motion, including approval of the APA and consummation of the transactions contemplated therein is in the best interests of the Debtors, their bankruptcy estates, creditors, and all parties in interest.  The Proposed Sale must be approved and consummated promptly in order to maximize the value of the Debtors' estates.

X.      Upon entry of this Order, the Debtors have good and marketable title to the Purchased Assets and all the corporate or organizational power and authority necessary to consummate the transactions contemplated by the APA.

Y.      The Debtors have demonstrated good, sound and sufficient business purpose and justification, and it is a reasonable exercise of their business judgment, to (i) sell the Purchased Assets on the terms and conditions set forth in the APA; (ii) assume and assign the Assigned Contracts to JB Cocoa; and (iii) consummate all transactions contemplated by the APA, and the sale, assumption and assignment of the Purchased Assets is in the best interests of the Debtors, their estates and their creditors.

Z.      The provisions of Sections 363 and 365 of the Bankruptcy Code have been complied with and are applicable to the sale of the Purchased Assets.

AA.     The Debtors may consummate the transactions and transfer the Purchased Assets free and clear of all liens, claims, interests, and encumbrances because one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) have been satisfied.   All liens, claims or encumbrances against the Purchased Assets shall attach to the proceeds of the transactions with the same validity, enforceability, priority, force and effect that they now have as against the Purchased Assets.

BB.     The Debtors have (i) cured, or have provided adequate assurance of cure for all defaults under the Assigned Contracts, if any, existing before the date of this Order, within the meaning of Section 365(b)(1)(A) of the Bankruptcy Code and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default before the date of this Order under the Assigned Contracts, if any, within the meaning of Section 365(b)(1)(B) of the Bankruptcy Code, and JB Cocoa has provided adequate assurance of its future performance of and under the Assigned Contracts, within the meaning of Section 365(b)(1)(C) of the Bankruptcy Code.

**ACCORDINGLY, THE COURT HEREBY ORDERS THAT:**

**General Provisions**

1.      The findings of fact entered above and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, made applicable to this proceeding pursuant to Fed. R. Bankr. P. 9014. To the extent that any finding of fact shall later be determined to be a conclusion of law, it shall be so deemed, and to the extent that any conclusion of law shall later be determined to be a finding of fact, it shall be so deemed.

2.      The Sale Motion, to the extent not previously granted in the Bidding Procedures Order, is granted in its entirety on the terms and conditions set forth herein.

3.      All parties in interest have had the opportunity to object to the relief requested by the Debtors in the Sale Motion, and to the extent that objections to the Sale Motion have not been withdrawn, waived or settled, such objections and all reservations of rights included therein are overruled on the merits.  The parties who did not object, or who withdrew their objections, to the Sale Motion, are deemed to have consented to the relief set forth therein.

**Approval of the APA**

4.      The APA and all of the terms and conditions contained therein are approved in their entirety.  The APA is fully enforceable by the parties thereto in accordance with and subject to its terms and conditions.   The Debtors are hereby authorized to perform each of their covenants and undertakings and to take such actions as may be necessary to effectuate the terms of this Order and as provided in the APA.

5.      The sale of the Purchased Assets and the terms and conditions contemplated by the APA, including, without limitation, the closing of the transactions contemplated by the APA, are hereby approved pursuant to 11 U.S.C. §§ 105(a), 363 and 365.

6.      The Debtors and JB Cocoa are authorized and directed, pursuant to 11 U.S.C. §§ 105(a), 363(b) and 365, to perform all of their obligations pursuant to the APA and to execute such other documents and take such other actions as are reasonably necessary to effectuate the transactions contemplated by the APA.

**Transfer of the Purchased Assets to JB Cocoa**

7.      Except as expressly provided in the APA, pursuant to 11 U.S.C. §§ 105(a), 363(f) and 365, upon the Closing, the Purchased Assets shall be sold, transferred or otherwise assigned to Purchaser free and clear of all liens, claims and encumbrances, with all such liens, claims and encumbrances to attach to the proceeds of sale in the order of their priority, and with the same validity, priority, force and effect that they now have as against the Purchased Assets.

8.      Upon Closing, Cocoa Services shall pay over to Bank of the West such portion of the sale proceeds allocable to Cocoa Services as is necessary to satisfy its obligations to Bank of the West.

9.      The sale of the Purchased Assets is exempt from any applicable transfer taxes pursuant to N.J.S.A. 46:15-19(g).

10.     No bulk sale or any similar law of any state, including but not limited to N.J.S.A. 54:32B-22(c) and N.J.S.A. 54:50-38, apply in any way to the sale and transfer of the Purchased Assets hereunder.

**Assumption and Assignment of the Assigned Contracts**

11.     The Debtors are authorized pursuant to 11 U.S.C. § 365(a) to assume and assign the Assigned Contracts set forth on Section 2.01(c) of the Disclosure Schedules delivered in connection with the APA.

12.     Pursuant to 11 U.S.C. §§ 105(a) and 365, the Debtors' assumption and assignment of the Assigned Contracts to JB Cocoa, on the terms contained in the APA, is approved, and the

requirements of 11 U.S.C. § 365(b)(1) with respect thereto are deemed satisfied. The assignment

by the Debtors of the Assigned Contracts to JB Cocoa pursuant to 11 U.S.C. § 365(f) is binding

on the Counterparties to those contracts.

13.     Upon Closing pursuant to the APA, the Assigned Contracts shall be assigned and

transferred to, and remain in full force and effect for the benefit of, JB Cocoa in accordance with

their terms, notwithstanding any provision in the Assigned Contracts (including, without

limitation, those described in Sections 365(b)(2) and (1) of the Bankruptcy Code) that prohibits,

restricts, or conditions such assignment or transfer and, pursuant to 11 U.S.C. § 365(k), the

Debtors are hereby relieved from any further obligation or liability for any breach of the

Assigned Contracts.

14.     The Cure Amount as set forth in (i) any relevant Cure Notice or (ii) any

stipulation entered into between the Debtors and the Counterparty to an Assigned Contract, as

applicable, shall be controlling notwithstanding anything to the contrary in any Assigned

Contract or other document, and the Counterparty to each Assigned Contract shall be forever

barred from asserting any other claim arising prior to the date of entry of this Order against either

the Debtors or JB Cocoa.

15.     The failure of the Debtors or JB Cocoa to enforce any term or condition of any

Assumed Contract shall not constitute a waiver of such term or condition or of the Debtors' or

JB Cocoa's rights to enforce every term and condition of the Assigned Contracts.

**Miscellaneous Provisions**

16.     The consideration to be paid by JB Cocoa for the Purchased Assets under the

APA is fair and reasonable and may not be avoided under 11 U.S.C. § 363(n).

17.     This Order (a) is and shall be effective as a determination that, upon the Closing,

except as expressly provided in the APA, all liens, claims and encumbrances existing as to the

Purchased Assets prior to the date of entry of this Order have been unconditionally released, discharged and terminated in each case as to the Purchased Assets and (b) is and shall be binding upon and shall govern acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of fees, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities, who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that JB Cocoa is the assignee of the Purchased Assets free and clear of liens, claims and encumbrances.  In addition, upon the Closing, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions to release its liens, claims or encumbrances in or on the Purchased Assets as may have been recorded or may otherwise exist.

18.    Except as otherwise provided in the APA or in this Order, consummation of the transactions in the APA will not subject JB Cocoa to any debts, liabilities, obligations, commitments, responsibilities or claims of any kind or nature whatsoever, by reason of sale, transfer or assignment of the Purchased Assets (including the Assigned Contracts), including, without limitation, based on any theory of successor or transferee liability. JB Cocoa and its affiliates and their respective successors, assigns, members, partners, principals, and shareholders (or equivalent) are not and shall not be deemed a "successor" in any respect to the Debtors or their estates as a result of the consummation of the transactions contemplated by the APA or any other event occurring in the Debtors' bankruptcy cases under any theory of law or equity.

19.     The APA and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties in accordance with the terms thereof without further order of the Court after consultation with the Consultation Parties; provided, however, that any such modification, amendment or supplement is neither material nor changes the economic substance of the transactions contemplated hereby.

20.     JB Cocoa, as a purchaser in good faith, and its assignees and designees shall be entitled to the protections of 11 U.S.C. § 363(m).

21.     The provisions of this Order are self-executing and each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

22.     The Court shall retain exclusive jurisdiction (a) to enforce and implement the terms and provisions of the APA and each of the agreements, documents and instruments executed therewith; (b) to resolve any disputes, controversies or claims arising out of or relating to the APA; and (c) to interpret, implement and enforce the provisions of this Order.

23.     The terms of this Order and the APA shall be binding on and inure to the benefit of the Debtors, JB Cocoa and all other parties in interest, and any successors of the Debtors, JB Cocoa and the Debtors' creditors, including any trustee or examiner appointed in this or any subsequent case.

24.     The failure to include any particular provision of the APA in this Order shall not diminish or impair the effectiveness of that provision, it being the intent of the Court and the parties that the APA be authorized in its entirety.

25.     Any conflict between the terms and provisions of this Order and the APA shall be resolved in favor of this Order.

26.     Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure (as made applicable by Bankruptcy Rule 7054), this Order shall be effective immediately upon entry and Debtors are authorized to close the sale immediately upon entry of this Order.

27.     Notwithstanding the possible applicability of Fed. R. Bankr. P. 6004(h), 6006(d), 7062 and 9014, the terms and conditions of this Order shall be effective immediately and enforceable upon its entry, and no automatic stay of execution shall apply to this Order.  The Debtors and JB Cocoa are authorized to close immediately upon entry of this Order.

Dated:      New York, New York
            August __, 2017


                                        _____
                                        United States Bankruptcy Judge


4862679v3

**Exhibit D**

KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP
Tracy L. Klestadt
Joseph C. Corneau
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245

-and-

RIKER DANZIG SCHERER HYLAND & PERRETTI LLP
Joseph L. Schwartz (*pro hac vice* admission pending)
Tara J. Schellhorn
Rachel F. Gillen (*pro hac vice* admission pending)
Headquarters Plaza, One Speedwell Avenue
Morristown, New Jersey 07960
Telephone: (973) 538-0800
Facsimile: (973) 538-1984

Attorneys for the Debtors and Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                                                              :
In re                                                         :    Chapter 11
                                                              :
COCOA SERVICES, L.L.C., et al.,[1]                            :
                                                              :    Case No. 17-11936
                Debtors.                                      :
                                                              :    Jointly Administered
                                                              :
                                                              :
------------------------------------------------------------- x

**NOTICE OF SALE AND ASSIGNMENT OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS, AND
BIDDING PROCEDURES AND AUCTION RELATED THERETO**

    **PLEASE TAKE NOTICE** that, on August ___, 2017, the United States Bankruptcy

Court for the Southern District of New York (the "Court") entered an Order (the "Bidding

---

[1] Debtors in these Bankruptcy Cases and the last four digits of their respective taxpayer identification number are as
follows: Cocoa Services, L.L.C. (3769); Morgan Drive Associates, L.L.C. (2335). Debtors' principal office is
located at 400 Eagle Court, Swedesboro, New Jersey 08085.

-1-

Procedures Order") (a) establishing bidding procedures and bid protections, including an auction, as set forth herein (the "Bidding Procedures"), with respect to the Debtors' sale and assignment of substantially all of their assets, (b) approving the form and manner of notices thereof (the "Bidding Procedures Notice"), (c) establishing JB Cocoa Holding, Inc. ("JB Cocoa") as the stalking horse bidder for substantially all of the Debtors' assets, (d) approving the form of Asset Purchase Agreement by and among the Debtors and JB Cocoa (the "Stalking Horse APA")[2], pursuant to which the Debtors propose to sell substantially all of their assets to JB Cocoa, or a third party that makes a higher and/or better offer for those assets (the "Proposed Sale"), and (e) setting a hearing to consider approval of the Proposed Sale (the "Sale Hearing");

Pursuant to the Bidding Procedures Order, an auction for the Forward Book will take place on **September 6, 2017** at the law offices of Riker Danzig Scherer Hyland & Peretti LLP, Headquarters Plaza, One Speedwell Avenue, Morristown, NJ 07962, or at such alternative location as the Debtor may determine or the Court may direct, **commencing at 10:00 a.m. (EST)**;

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures Order, the following procedures (the "Bid Procedures") shall govern the sale of the Forward Book, including third party offers received for some or all of the Forward Book (each, an "Offer"):

(1)   Offer Deadline: Any person or entity interested in participating in the Auction (defined below) (each, a "Prospective Bidder") shall make an Offer in writing and serve the Offer upon the

---

[2] A copy of the Stalking Horse APA is attached as Exhibit A to the Debtors' Motion for Orders Pursuant to 11 U.S.C. §§ 105, 363 and 365, and Bankruptcy Rules 2002, 6004 and 6006: (A) Fixing the Time, Date and Place for Hearing to Consider Bidding Procedures in Connection with the Debtors' Sale of Substantially All of Their Assets; (B)(i) Establishing Bidding Procedures and Bid Protections; (ii) Approving the Form and Manner of Notices; (iii) Establishing JB Cocoa Holding, Inc. as Stalking Horse; (iv) Approving Asset Purchase Agreement for Stalking Horse Transaction; (v) Setting Hearing Date for the Hearing on Sale of Substantially All of the Debtors' Assets; and (C)(i) Approving the Sale and Assignment of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (ii) Granting Related Relief (the "Sale Motion").

Debtors (Attn: Joseph L. Schwartz, Esq. and Jason D. Navarino, Esq. of Riker Danzig Scherer Hyland & Perretti, LLP, Headquarters Plaza, One Speedwell Avenue, Morristown, NJ 07962); counsel to Bank of the West (Attn: Anthony F. Pirraglia, Esq., of Thompson & Knight LLP, 333 Clay St., Suite 3300, Houston, TX 77002); and counsel to any Official Committee of Unsecured Creditors appointed in the Bankruptcy Cases (the "Committee"), if any is appointed, by no later than **August 25, 2017 at 5:00 p.m.** prevailing Eastern Time (the "Offer Deadline").[3]  The Debtors shall promptly provide copies of all Offers received to the Consultation Parties; provided that the Debtors shall not be required to provide to any Consultation Party any material, nonpublic information regarding bids for the Assets if such Consultation Party or any related entity to that Consultation Party submits a bid to purchase all or any portion of the Assets.  Further, the Debtors shall not be required to consult with any Consultation Party regarding a particular Offer if that Consultation Party is an active bidder for the Assets at the applicable time.

(2)   Diligence:  To be eligible to participate in the Auction, each Prospective Bidder must execute a confidentiality agreement in form and on terms satisfactory to the Debtors.  Any Prospective Bidder identified by the Debtors as reasonably likely to be a Qualified Party that wishes to conduct due diligence on the Assets may be granted access to all material information regarding them.

(3)   Qualified Bid Requirements: To qualify as a "Qualified Bid," a Prospective Bidder must submit a written Offer by the Offer Deadline, and the Debtors, in consultation with the Consultation Parties, must determine that the Offer satisfies the following requirements:

(a)   Allocation Schedule.  Each Offer must include an allocation schedule of the proposed purchase price for the Assets to be assumed, assigned and sold to it in connection with the proposed transaction as Exhibit A to the Modified APA (defined below).

(b)   Modified APA. Each written offer must include: (i) an executed copy of an asset purchase agreement which is not materially more burdensome than the Stalking Horse APA or inconsistent with these Bidding Procedures (the

---

[3] Throughout the sale process, as necessary or appropriate, the Debtors will consult with counsel to BOW and counsel to the Committee, if any is appointed (together, the "Consultation Parties").

"Modified APA"); and (ii) a marked-up copy of the Modified APA reflecting the difference between the Modified APA and the Stalking Horse APA. The Debtors, in consultation with the Consultation Parties, shall determine whether any Modified APA that modifies the Stalking Horse APA in any respect beyond the identity of the purchaser, the purchase price under the agreement and the allocation of the Purchase Price is a Qualified Bid.

(c)    <u>Bidding Requirements</u>. Any Offer by a Prospective Bidder for all of the Purchased Assets shall not be less than $8,390,000 ($8,000,000 plus Transaction Expenses (defined herein) plus $50,000 initial overbid). If an Offer is only for the assets of Cocoa Services, such Offer shall not be less than $6,390,000 ($6,000,000 plus Transaction Expenses (defined herein) plus $50,000 initial overbid). If an Offer is only for the assets of Morgan Drive, such Offer shall not be less than $2,390,000 ($2,000,000 plus Transaction Expenses (defined herein) plus $50,000 initial overbid).

(d)    <u>Identification of Bidder</u>. A Qualified Bid must fully disclose the legal identity of each entity that will be bidding for the Assets otherwise participating in connection with such bid (including but not limited to any equity holder or other financial backer if the Prospective Bidder is an entity specifically formed for purposes of effectuating the Proposed Sale, and the complete terms of any such participation) and must also disclose any connections or agreements with the Debtors, any other known Prospective Bidder or Qualified Party, and/or any officer or director of the foregoing.

(e)    <u>Financial Information</u>. Any Prospective Bidder that wishes to make an Offer for the Assets must provide the Debtors with sufficient and adequate information to demonstrate, to the satisfaction of the Debtors, in consultation with the Consultation Parties, that its Offer: (i) is being made by an entity that has the financial wherewithal and ability to consummate the transaction, including evidence of adequate financing; and (ii) provides information to demonstrate that it is able to fulfill all obligations in connection with all Assigned Contracts (as defined below) so as to satisfy the requirement of providing adequate assurance of future performance, as contemplated by section 365 of the Bankruptcy Code (the "<u>Adequate Assurance Information</u>").

(f)    <u>Other Requirements</u>.  Each Offer shall: (i) state that the bid is formal, binding and unconditional, is not subject to further due diligence, and is irrevocable until the earlier to occur of: (x) the first business day following the closing of the Proposed Sale or (y) thirty (30) days following the last date of the Auction (as may be adjourned); (ii) not contain any financing contingencies of any kind; (iii) not contain any condition to closing the Proposed Sale on the receipt of any third party approvals that were not required by the Stalking Horse APA; (iv) state that the Prospective Bidder is ready, willing and able to perform its obligations under the Modified APA submitted with such Offer; (v) expressly state that the Prospective Bidder agrees to serve as a backup bidder (a "<u>Backup Bidder</u>") if such bidder's Qualified Bid is selected as the next highest or next best bid after the Winning Bid for the implicated Assets; (vi) include contact information for the person(s) the Debtors should contact with questions about the Prospective Bidder's bid; and (vii) be received by the Debtors and Consultation Parties by the Offer Deadline.

(g)    <u>Good Faith Deposit</u>.  All Qualified Bids must be accompanied by a good faith deposit in the amount of 10% of the Offer (a "<u>Good Faith Deposit</u>"), in the form of a certified or cashier's check, payable to "RIKER DANZIG SCHERER HYLAND & PERRETTI LLP TRUST ACCOUNT."  All such deposits shall be retained by the Debtors pending the hearing to consider the Sale Motion and shall be returned within ten (10) days after entry of a Sale Order, except that the Debtors shall transfer the deposit of the Winning Bidder (defined below) to Foundation Title, and apply such deposit(s) to the Purchase Price at closing, and hold the deposit of the Backup Bidder, until the first business day following the closing of the Proposed Sale with the Winning Bidder.

(h)    For the avoidance of doubt, the bid of JB Cocoa has automatically been deemed to be a Qualified Bid.

(4)    <u>Selecting Qualified Parties</u>.  The Debtors shall, in consultation with the Consultation Parties, make a determination whether an Offer is a Qualified Bid and shall notify Prospective Bidders whether their Offers have qualified as Qualified Bids by not later than **August 29, 2017 at 5:00 p.m.** (prevailing Eastern Time); <u>provided</u> that, if an Offer is made by the Offer Deadline that is not determined to be a Qualified Bid, the Debtors will promptly advise the Prospective Bidder of the deficiencies, if any, and allow such Prospective Bidder one (1) day to submit a revised

offer. In addition, if the Debtors, after consulting with the Consultation Parties and after providing notice to the Notice Parties, determine to extend the Offer Deadline, the Debtors shall be required to notify Prospective Bidders whether their bids have qualified as Qualified Bids by no later than two (2) days after the newly-scheduled Offer Deadline. Any Prospective Bidder whose Offer that is deemed a Qualified Bid shall be Assigned  as a "Qualified Party."

JB Cocoa shall automatically be deemed a Qualified Party, and JB Cocoa's bid, as reflected in the Stalking Horse APA, shall be deemed a Qualified Bid.

(5)    Bid Protections: In the event that the Stalking Horse APA is terminated because the Court approves a sale of any of the Assets to a party or parties other than JB Cocoa, or if JB Cocoa is determined to be the Winning Bidder, and the Proposed Sale failed to close for any reason, the Debtors shall pay JB Cocoa a fee of $240,000 (the "Break-Up Fee"), plus reimbursement of expenses, including professional fees and expenses incurred in pursuit of its bid and preparation of the Stalking Horse APA and related documents, not to exceed $100,000 ("Expense Reimbursement," and together with the Break-Up Fee, the "Transaction Expenses"), to compensate JB Cocoa for its efforts in connection with it being the "stalking horse" bidder for the Assets, including the costs of the JB Cocoa incurred in performing due diligence, negotiating and documenting the terms of the Stalking Horse APA and representing its interests with respect to the Proposed Sale.  The Transaction Expenses shall also be payable to JB Cocoa in the event that it terminates the Stalking Horse APA pursuant to Section 10.01(b)(i), Section 10.01(b)(iii), or Section 10.01(b)(iv) thereof.  The Transaction Expenses shall constitute allowed superpriority administrative expenses of the Debtors pursuant to Section 503(b) and shall be paid upon closing in connection with the Assets and without further order or application to the Court.

(6)    The Auction:  If the Debtors receive at least two (2) Qualified Bids, the Debtors shall conduct an Auction (the "Auction").[4] The Auction, if required, shall be held at the offices of Riker Danzig Scherer Hyland & Perretti LLP, Headquarters Plaza, One Speedwell Avenue, Morristown, NJ 07962, or at such alternative location as the Debtors may determine, after consultation with the Consultation Parties, and after providing notice to the Notice

---

[4] In the event the Debtors fail to receive at least two (2) Qualified Bids, the Debtors shall file with the Court and docket on the Court's ECF system a notice of cancellation of the Auction by no later two (2) business days prior to the Auction.

Parties. The Auction shall commence on **September 6, 2017 at 10:00 a.m. (EST)**. The Consultation Parties and/or their representatives will be permitted to attend the Auction.

(a)    Each Qualified Party shall appear in person at the Auction or through a duly authorized representative. Only Qualified Parties shall be entitled to make any subsequent bids at the Auction. Each Qualified Party shall be required to confirm that (i) it has not engaged in any collusion with respect to the bidding or the Proposed Sale; and (ii) its Qualified Bid represents a binding, good faith, and bona fide offer to purchase the Assets identified if such bid if selected as the Winning Bidder.

The Debtors, in consultation with the Consultation Parties, shall, after the Offer Deadline and prior to the Auction, evaluate all Qualified Bids or combination of Qualified Bids received, and, in consultation with the Consultation Parties, determine which Qualified Bids or combination of Qualified Bids, as the case may be, reflect the highest or best offers for some or all of the Assets, whether in whole or in lots, at that time (the "<u>Baseline Bid(s)</u>"). The Debtors shall announce such determination at the commencement of the Auction.

(b)    <u>Minimum Overbid Procedures</u>. Any further bids made at the Auction for the Assets shall be in increments of at least $50,000 (the "<u>Overbid Procedures</u>").

(c)    <u>Highest or Best Offer</u>. After the first round of bidding and between each subsequent round of bidding, the Debtors, after consulting with the Consultation Parties, shall announce the bid that it determines in its business judgment to be the highest or otherwise best offer for the relevant Assets (the "<u>Leading Bid</u>"). Each round of bidding will conclude after each participating Qualified Party has had the opportunity to submit a subsequent bid with full knowledge of the Leading Bid.

(d)    <u>Winning Bid</u>. Immediately prior to the conclusion of the Auction, the Debtors shall, in consultation with the Consultation Parties, (i) determine, consistent with these Bidding Procedures, which bid constitutes the Winning Bid for the implicated Assets; and (ii) notify all Qualified Parties at the Auction for the implicated Assets of the identity of the bidder that submitted the Winning Bid (each such bidder, the "<u>Winning Bidder</u>") and the amount of the purchase price and other material terms of the Winning Bid.

The Auction may include open bidding in the presence of all other Qualified Parties. All Qualified Parties shall have the right to submit additional bids at the Auction to improve their bids. The Debtors may, in their reasonable business judgment, negotiate with any and all Qualified Parties participating in the Auction.

The Debtors shall have the right, after consulting with the Consultation Parties, to determine, in its reasonable business judgment, without liability, which bid is the highest or otherwise best bid and reject at any time, any bid that the Debtors deems to be inadequate or insufficient, not in conformity with the requirements of the Bankruptcy Code, Bankruptcy Rules, or the Local Rules, these Bidding Procedures, any order of the Bankruptcy Court, or the best interests of the Debtors and their estates.

At least one (1) day prior to the Sale Hearing, the Winning Bidder shall be required to supplement its Good Faith Deposit by the difference between its Qualified Bid and the Winning Bid.

(e)     Backup Bid. Immediately prior to the conclusion of the Auction, the Debtors shall, in consultation with the Consultation Parties, (i) determine, consistent with these Bidding Procedures, which Qualified Bid is the next highest or otherwise best Qualified Bid for the relevant Assets after the Winning Bid (each such Qualified Bid, a "Backup Bid"); and (ii) notify all Qualified Parties at the Auction for the implicated Assets of the identity of the Backup Bidder and the amount of the purchase price and other material terms of the Backup Bid. Backup Bids shall be open and irrevocable until the earlier of (x) the first business day following closing of the Proposed Sale or (y) thirty (30) days following the last date of the Auction (as may be adjourned). If the Winning Bidder for the implicated Forward Contract fails to consummate a Proposed Sale, the Backup Bidder shall be deemed the new Winning Bidder, and the Debtors will be authorized, but not required, to consummate a Proposed Sale for the applicable Assets with the Backup Bidder.

Subject to the terms and conditions set forth in the Stalking Horse APA or Modified APA, in the event that a Winning Bidder fails to consummate the proposed transaction by the Closing Date, such bidder's deposit shall be forfeited to the Debtors (but not as liquidated damages, the Debtors reserving the right to pursue all remedies that may be available to it) and the Debtors shall be free to consummate

the proposed transaction with the Backup Bidder at the final price bid by such bidder at the Auction (or, if that bidder is unable to consummate the transaction at that price, the Debtors may consummate the transaction with the next higher bidder, and so forth) without the need for an additional hearing or order of the Court.

If JB Cocoa is not the Winning Bidder, it shall be the Backup Bidder if it has made the second best offer, but shall nonetheless be entitled to receive the Transaction Expenses if the Purchased Assets are sold to the Winning Bidder.

(f)     Modification of Procedure. The Debtors may, after consulting with the Consultation Parties, announce at the Auction modified or additional procedures for conducting the Auction.

(g)     Auction Results: Within one (1) business day following the Auction, the Debtors will cause the results of the Auction to be filed with the Court, docketed on the Court's electronic case filing ("ECF") system, and published on the website of the Debtors' Court-approved claims agent, Prime Clerk, LLC at (http://cases.primeclerk.com/cocoaservices) (the "Prime Clerk Website"), which filing will include a list of the Cocoa Services' Contracts to be sold and assigned to the Winning Bidder(s), subject to revision prior to Closing, as further set forth below.

(7)     Bankruptcy Court Approval: All bids for the purchase of some or all of the Assets shall be subject to approval of the Court and conditioned upon entry of a Sale Order.

(8)     Sale Objection: Objections to the Proposed Sale (each, a "Sale Objection"), including any objection to the sale of the Assets free and clear of liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code and entry of any Sale Order (other than Adequate Assurance Objections and Cure Objections (as hereinafter defined)), must (i) be in writing and specify the nature of such objection; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules; and (iii) be filed with the Court and served on: (a)  counsel for the Debtors (Attn: Joseph L. Schwartz, Esq.,), (b) the Office of the U.S. Trustee (Attn: Serene Nakano, Esq.); (c) Baker, Manock & Jenson, PC (Attn: Carl R. Refuerzo, Esq. and Courtney R. McKeever, Esq.) and Trenk, DiPasquale, Della Fera & Sodono, P.C. (Attn: Adam D. Wolper, Esq. and Ross J. Switkes, Esq.), as counsel to JB Cocoa; (d) the attorneys (if applicable) of any

Winning Bidder(s); (e) the attorneys (if applicable) of any applicable Backup Bidder(s); (f) Thompson & Knight, LLP, as counsel to Bank of the West (Attn: Anthony Pirraglia, Esq.) and (e) as counsel to the Committee, if any is appointed) (the foregoing parties, the "Objection Recipients") by **September 12, 2017, at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline").  Any reply by the Debtors or the Other Objection Recipients shall be filed and served by no later than **September 15, 2017 at 6:00 p.m.**

All Sale Objections not otherwise resolved by the parties prior thereto shall be heard at the Sale Hearing. The failure of any party to timely file with the Court and serve on the Objection Recipients a Sale Objection by the Sale Objection Deadline forever shall be barred from asserting, at the Sale Hearing or thereafter, any objection to the relief requested in the Sale Motion, or to the consummation and performance of the applicable Proposed Sale(s) contemplated by an applicable asset purchase agreement with a Winning Bidder, including the transfer of the Assets to the applicable Winning Bidder(s), free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code.

[Remainder of Page Intentionally Left Blank]

**PLEASE TAKE FURTHER NOTICE** that copies of the Sale Motion, the Bidding Procedures Order and the form of APA can be obtained, free of charge, from the website maintained by the Debtors' designated claims and noticing agent (http://cases.primeclerk.com/cocoaservices) or from the Bankruptcy Court docket for this case.

Dated: July 21, 2017

New York, New York

Respectfully submitted,

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP


By: */s/ Tracy Klestadt*
     Tracy Klestadt

Tracy L. Klestadt
Joseph C. Corneau
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Fax: (212) 972-2245
Email: tklestadt@klestadt.com
      jcorneau@klestadt.com

    - and -

RIKER DANZIG SCHERER HYLAND &
PERRETTI LLP
Joseph L. Schwartz (*pro hac vice* admission pending)
Tara J. Schellhorn
Rachel F. Gillen (*pro hac vice* admission pending)
Headquarters Plaza, One Speedwell Avenue
Morristown, New Jersey 07960
Telephone: (973) 538-0800
Facsimile: (973) 538-1984
Email: jschwartz@riker.com
      tschellhorn@riker.com
      rgillen@riker.com
Attorneys for the Debtors and
Debtors-in-Possession

4865238v2

-11-

**<u>Exhibit E</u>**

KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP
Tracy L. Klestadt
Joseph C. Corneau
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245

-and-

RIKER DANZIG SCHERER HYLAND & PERRETTI LLP
Joseph L. Schwartz (*pro hac vice* admission pending)
Tara J. Schellhorn
Rachel F. Gillen (*pro hac vice* admission pending)
Headquarters Plaza, One Speedwell Avenue
Morristown, New Jersey 07960
Telephone: (973) 538-0800
Facsimile: (973) 538-1984

Proposed Attorneys for the Debtors and Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                           :

In re                         :     Chapter 11
                           :

COCOA SERVICES, L.L.C., et al.,[1]   :     Case No. 17-11936
                           :

           Debtors.          :     Jointly Administered
                           :
------------------------------------------------------------- x

# DECLARATION OF ROBERT J. FREZZA IN SUPPORT OF DEBTORS' MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365, AND BANKRUPTCY RULES 2002, 6004 AND 6006: (A) FIXING THE TIME, DATE AND PLACE FOR HEARING TO CONSIDER BIDDING PROCEDURES IN CONNECTION WITH THE DEBTORS' SALE OF SUBSTANTIALLY ALL OF THEIR ASSETS; (B)(i) ESTABLISHING BIDDING PROCEDURES AND BID PROTECTIONS; (ii) APPROVING THE FORM AND MANNER OF NOTICES; (iii) ESTABLISHING JB COCOA HOLDING, INC. AS STALKING HORSE; (iv) APPROVING

---

[1] Debtors in these Bankruptcy Cases and the last four digits of their respective taxpayer identification number are as follows: Cocoa Services, L.L.C. (3769); Morgan Drive Associates, L.L.C. (2335). Debtors' principal office is located at 400 Eagle Court, Swedesboro, New Jersey 08085.

**ASSET PURCHASE AGREEMENT FOR STALKING HORSE TRANSACTION; (v) SETTING HEARING DATE FOR THE HEARING ON SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; AND (C)(i) APPROVING THE SALE AND ASSIGNMENT OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES AND (ii) GRANTING RELATED RELIEF**

I, Robert J. Frezza, declare, pursuant to section 1746 of title 28 of the United States Code, that:

1.    I am a Managing Director with Deloite CRG ("Deloitte").  I have more than 30 years of experience providing financial advisory services to clients across numerous industries in the United States and Europe.

2.    I was engaged to serve as Chief Restructuring Officer by Cocoa Services, L.L.C. ("Cocoa Services") and Morgan Drive Associates, L.L.C. ("Morgan Drive"), the debtors and debtors-in-possession (each a "Debtor" and collectively, the "Debtors") shortly before the Debtors' bankruptcy filing.  In performing the duties of Chief Restructuring Officer, I have become familiar with the Debtors' business history, their corporate and capital structures, their business operations and financial affairs and their books and records.

3.    I submit the Declaration in support of the Debtors' motion for entry of orders pursuant to 11 U.S.C. §§ 105, 363, and 365, and Rules 2002, 6004 and 6006: (a) fixing the time, date and place for a hearing to consider bidding procedures in connection with the Debtors' sale and assignment of substantially all of their assets (the "Proposed Sale"); (b)(i) establishing bidding procedures and bid protections, (ii) approving the form and manner of notices, (iii) establishing JB Cocoa Holding, Inc. ("JB Cocoa") as the "stalking horse" bidder for substantially all of the Debtors' assets, (iv) approving the Asset Purchase Agreement (the "Stalking Horse APA") by and among the Debtors and JB Cocoa, (v) setting a hearing date for the hearing on the Proposed Sale;

and (c)(i) approving the sale and assignment of substantially all of the Debtors' assets free and clear of liens, claims, interests and encumbrances and (ii) granting related relief (the "Sale Motion").

## THE PRE-PETITION MARKETING OF THE ASSETS

4.      Between February and May 2017, the Debtors embarked on a process to actively market substantially all of their assets for sale (collectively, the "Assets").[2]  In connection with this marketing process, in February 2017, the Debtors established a due diligence data room for potential bidders, all of which were required to execute confidentiality agreements in order to participate. In connection with this process, the Debtors initially contacted at least 14 separate potential strategic and/or financial bidders, and to date have provided detailed information regarding the Assets to at least 11 different potential bidders, each of which has executed a confidentiality agreement, and which were provided access to the Debtors' electronic data room.

5.      As a result of these marketing efforts, in May 2017, the Debtors received two (2) bids for the Assets.

6.      The Debtors, after due consideration, in their business judgement determined that the bid presented by one of those two (2) bidders, JB Cocoa, was the superior bid of the two and determined in their business judgment to designate JB Cocoa's bid as the stalking horse bid for the Purchased Assets.   The Purchased Assets include, without limitation, the real property known as Block 1602, Lot 11, on the Tax Map of the Township of Logan, County of Gloucester, State of New Jersey.

---

[2] As further discussed herein, the Debtors and JB Cocoa recently executed the Stalking Horse APA for JB Cocoa's potential purchase of the "Purchased Assets," which are more specifically identified in Section 2.01 of the Stalking Horse APA.

## <u>NEED FOR A TIMELY SALE PROCESS</u>

7.      The need for a prompt sale process is driven by the liquidity crisis facing the Debtors, which resulted, in large part, from Cocoa Services' loss of its largest customer, Transmar Commodity Group Ltd. (the Debtors' parent company), earlier this year.

8.      As part of the Stalking Horse APA, JB Cocoa has required that the Proposed Sale shall be consummated by no later than September 30, 2017 (the "<u>Drop Dead Date</u>").

9.      Cognizant of their precarious financial condition and the tight timeline that would govern upon the commencement of the Bankruptcy Cases, the Debtors accomplished as much as possible with respect to the sale process prior to the Petition Date.

10.      Absent the Proposed Sale contemplated by the Sale Motion, the Debtors believe they will be unable to realize the maximum value of their Assets for the benefit of all stakeholders.  The Debtors' declining revenues are insufficient to support the continued operation of the business in light of the unsustainable and insurmountable costs of the Debtors' business as a whole.  Thus, a prompt sale is necessary to ensure that such assets are sold at their going concern values.

[Remainder of page intentionally left blank]

I hereby certify, under penalty of perjury, that the foregoing factual statements made by me are true.

Executed on July 21, 2017

_/s/ Robert J. Frezza_

Robert J. Frezza, Chief Restructuring Officer
Cocoa Services, L.L.C.
Morgan Drive Associates, L.L.C.

4864509v2

**Exhibit F**

KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP
Tracy L. Klestadt
Joseph C. Corneau
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245

-and-

RIKER DANZIG SCHERER HYLAND & PERRETTI LLP
Joseph L. Schwartz (*pro hac vice* admission pending)
Tara J. Schellhorn
Rachel F. Gillen (*pro hac vice* admission pending)
Headquarters Plaza, One Speedwell Avenue
Morristown, New Jersey 07960
Telephone: (973) 538-0800
Facsimile: (973) 538-1984

Attorneys for the Debtors and Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x
                         :
In re                        :     Chapter 11
                        :
COCOA SERVICES, L.L.C., et al.,[1]  :
                        :
      Debtors.          :     Case No. 17-11936
                        :
                        :     Jointly Administered
                        :
--------------------------------------------------------------- x

## NOTICE OF POTENTIAL ASSUMPTION
## AND ASSIGNMENT OF EXECUTORY CONTRACTS IN CONNECTION WITH THE
## <u>SALE AND ASSIGNMENT OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS</u>

---

[1] Debtors in these Bankruptcy Cases and the last four digits of their respective taxpayer identification number are as follows: Cocoa Services, L.L.C. (3769); Morgan Drive Associates, L.L.C. (2335). Debtors' principal office is located at 400 Eagle Court, Swedesboro, New Jersey 08085.

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      On July 21, 2017, Transmar Commodity Group Ltd. the debtor in the above-captioned case (the "<u>**Debtor**</u>") filed with the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") a motion (the "<u>Sale Motion</u>") for the entry of (i) an order (the "<u>Bidding Procedures Order</u>")[2] (a) authorizing and approving bidding procedures (the "<u>Bidding Procedures</u>") with respect to the Debtors' sale and assignment of substantially all of their assets (as defined in the Motion) to JB Cocoa Holding, Inc. ("<u>JB Cocoa</u>") or a third party that makes a higher and/or better offer (the "<u>Proposed Sale</u>"), (b) approving the form and manner of notices thereof, (c) establishing JB Cocoa as the "staking horse" bidder for substantially all of the Debtors' assets, (d) approving the Asset Purchase Agreement by and among the Debtors and JB Cocoa, and (e) setting a hearing to consider approval of the Proposed Sale (the "<u>Sale Hearing</u>"); (ii) entry of an order approving the sale and assignment of substantially all of the Debtors' assets free and clear of liens, claims, interests and encumbrances and (iii) granting related relief.

2.      On August ___, 2017, the Bankruptcy Court entered the Bidding Procedures Order [Doc. No. _____] approving the relief requested in the Motion.

3.      The Sale Hearing will take place on **September 19, 2017 at __:00 _.m.** before the Honorable James L. Garrity, Jr., United States Bankruptcy Judge, in the Bankruptcy Court, located at One Bowling Green, New York, NY 10004.  The Debtors will have accepted the terms of the Winning Bidder only when such bid has been approved by the Bankruptcy Court pursuant to a Sale Order.

4.      In connection with the Proposed Sale, and in accordance with the Assumption and Assignment Procedures set forth in the Sale Motion and the Bidding Procedures Order, the Debtors will seek to assume and assign the Cocoa Services' Contracts (as defined in the Sale Motion) and execute and deliver to any Winning Bidder such documents or other instruments as may be necessary to assign and transfer the Cocoa Services' Contracts.  Each of the Contracts are identified on the Contracts Schedule attached hereto as **Schedule 1** (the "<u>Proposed Assumed Contracts Notice</u>").  The cure costs (the "<u>Cure Costs</u>") under the Contracts, if any, that the Debtors believe is required to be paid to the applicable counterparty (the "<u>Counterparty</u>") to each of the Contracts to cure any monetary defaults under such Contracts pursuant to 11 U.S.C. §§ 365(b)(1)(A) and (B) is set forth on the Proposed Assumed Contracts Notice.

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Bidding Procedures and the Bidding Procedures Order, as applicable. Any summary of the Bidding Procedures or the Bidding Procedures Order contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.

5.      Cure Objections.

a)   Cure Objection Deadline.  Any Counterparty to a Cocoa Services' Contract that wishes to object to the proposed assumption, assignment, and sale of the Contract, the subject of which objection is the Debtors' proposed Cure Costs to cure any outstanding monetary defaults then existing under such contract (each, a "Cure Objection") shall file with the Court and serve its Cure Objection on (i) counsel for the Debtors (Attn: Joseph L. Schwartz, Esq.,), (ii) the Office of the U.S. Trustee (Attn: Serene Nakano, Esq.); (iii) Baker, Manock & Jenson, PC (Attn: Carl R. Refuerzo, Esq. and Courtney R. McKeever, Esq.) and Trenk, DiPasquale, Della Fera & Sodono, P.C. (Attn: Adam D. Wolper, Esq. and Ross J. Switkes, Esq.), as counsel to JB Cocoa; (iv) the attorneys (if applicable) of any Winning Bidder(s); (v) the attorneys (if applicable) of any applicable Backup Bidder(s); (vi) Thompson & Knight, LLP, as counsel to Bank of the West (Attn: Anthony Pirraglia, Esq.) and (vii) as counsel to the Committee, if any is appointed) (the foregoing parties, the "Objection Recipients") by **September 12, 2017 at 4:00 p.m. (prevailing Eastern Time)** (the "Cure Objection Deadline").  Replies, if any, to Cure Objections shall be filed by **September 15, 2017 at 6:00 p.m. (prevailing Eastern Time)**.  Cure Objections must state, with specificity, the legal and factual bases thereof, including any appropriate documentation in support thereof.

b)   Resolution of Cure Objections.  The Bidding Procedures Order requires that the Debtors and a Counterparty that has filed a Cure Objection first confer in good faith to attempt to resolve the Cure Objection without Court intervention. If the parties are unable to consensually resolve the Cure Objection prior to the commencement of the Sale Hearing, the amount to be paid or reserved with respect to such objection shall be determined by the Court at the Sale Hearing. The Court shall make all necessary determinations relating to the applicable Cure Costs and Cure Objection at a hearing scheduled pursuant to the following paragraph.[3]

c)   Adjournment of Cure Objections.  If a timely Cure Objection cannot otherwise be resolved by the parties, such objection shall be heard at the Sale Hearing; provided that, a Cure Objection (and only a Cure Objection) may, at the Debtors' discretion, after consulting with the Consultation Parties[4] and the Winning Bidder, be adjourned (an "Adjourned Cure Objection") to a subsequent hearing. An Adjourned Cure Objection may be resolved after the closing date of the applicable Proposed Sale (and therefore the contract of the Counterparty in question may be assumed and assigned at Closing), provided that, the Debtors maintain a cash reserve equal to the Cure Costs the objecting Counterparty believes is required to cure the asserted monetary default under the implicated Cocoa Services' Contract.

---

[3] All other Sale Objections to the proposed assumption and assignment of the Debtors' right, title, and interest in, to, and under a Cocoa Services' Contract, if it is ultimately designated as a contract to be assumed or assigned by a Winning Bidder, will be heard at the Sale Hearing.

[4] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Sale Motion.

d) **Failure to File Timely Cure Objection. If a Counterparty fails to timely file with the Court and serve on the Objection Recipients a Cure Objection, the Counterparty shall be deemed to have consented to the assumption, assignment, and sale of the Cocoa Services' Contract (unless such Counterparty has timely filed an Adequate Assurance Objection (as hereinafter defined) with respect to the Cocoa Services' Contract) to the applicable Winning Bidder and shall be forever barred from asserting any objection with regard to such assumption, assignment, and sale. Further, in the event no objections are timely filed and served, the Cure Costs set forth in the Assumption and Assignment Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the Cocoa Services' Contract under Bankruptcy Code section 365(b), notwithstanding anything to the contrary in any Cocoa Services' Contract, or any other document, and the Counterparty to the Cocoa Services' Contract shall be deemed to have consented to the Cure Costs and shall be forever barred from asserting any other claims related to such Cocoa Services' Contract against the Debtors or any Winning Bidder(s), or the property of any of them.**

6.  <u>Adequate Assurance.</u>

e)  <u>Adequate Assurance Information</u>. The Debtors shall provide, with respect to JB Cocoa and each Qualified Party, such information, as is reasonably requested by a Counterparty, to demonstrate that JB Cocoa or such other Qualified Party is able to fulfill all obligations in connection with satisfying adequate assurance of future performance under any Cocoa Services' Contract ("<u>Adequate Assurance Information</u>"). The Debtors shall: (a) **within 24 hours of receipt of an Offer from a Potential Bidder (other than JB Cocoa) and (b) with respect to JB Cocoa, by no later than twenty (20) days before the Sale Hearing, or by August 30, 2017 at 5:00 p.m.** (the later of (a) and (b), the "<u>Adequate Assurance Deadline</u>"), provide a copy of the Adequate Assurance Information to those Counterparties (or their counsel) who have (x) submitted a written request (e-mail to Debtors' counsel is acceptable) for Adequate Assurance Information and (y) confirmed in writing to the Debtors' counsel (e-mail is acceptable) their agreement to keep such Adequate Assurance Information strictly confidential and use it solely for the purpose of evaluating whether a Potential Bidder, including JB Cocoa, has provided adequate assurance of future performance under the implicated Cocoa Services' Contract.

f)  <u>Adequate Assurance Objection Deadline</u>. Any Counterparty to a Cocoa Services' Contract that wishes to object to the proposed assumption, assignment, and sale of the Cocoa Services' Contract, the subject of which objection is a Winning Bidder's proposed form of adequate assurance of future performance with respect to such contract (each, an "<u>Adequate Assurance Objection</u>") shall file with the Court and serve on the Objection Recipients an Adequate Assurance Objection, which must state, with specificity, the legal and factual bases thereof, including submitting any appropriate documentation in support thereof, by **September 12, 2017 at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Adequate Assurance Objection Deadline</u>").

Replies, if any, to Adequate Assurance Objections shall be filed by **September 15, 2017 at 6:00 p.m. (prevailing Eastern Time)**.

g) <u>Resolution of Adequate Assurance Objections</u>.   The Bidding Procedures Order requires that the Debtors and a Counterparty that has filed an Adequate Assurance Objection first confer in good faith to attempt to resolve the Adequate Assurance Objection without Court intervention. If the parties are unable to consensually resolve the Adequate Assurance Objection prior to the commencement of the Sale Hearing, such objection and all issues of adequate assurance of future performance by the applicable Winning Bidder shall be determined by the Court at the Sale Hearing.

h) **<u>Failure to File Timely Adequate Assurance Objection</u>. If a Counterparty fails to timely file with the Court and serve on the Objection Recipients an Adequate Assurance Objection, the Counterparty shall be deemed to have consented to the assumption, assignment, and sale of the Cocoa Services' Contract (unless the Counterparty has filed a timely Cure Objection with respect to the Cocoa Services' Contract) to the applicable Winning Bidder and shall be forever barred from asserting any objection with regard to such assumption, assignment, and sale. Further, in the event no objections are filed and served, the applicable Winning Bidder shall be deemed to have provided adequate assurance of future performance with respect to the implicated Cocoa Services' Contract in accordance with section 365(f)(2)(B) of the Bankruptcy Code, notwithstanding anything to the contrary in the Cocoa Services' Contract, or any other document.**

7.   <u>Sale Objections by Counterparties</u>.

a) <u>Sale Objection Deadline</u>. Any Counterparty to a Cocoa Services' Contract that wishes to file a Sale Objection (other than a Cure Objection or an Adequate Assurance Objection) to the proposed assumption, assignment and sale of the Cocoa Services' Contract shall file with the Court and serve on the Objection Recipients its Sale Objection, which must state, with specificity, the legal and factual bases thereof, including any appropriate documentation in support thereof, by no later than **September 12, 2017 at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Sale Objection Deadline</u>").   Replies, if any, to Sale Objections shall be filed by **September 15, 2017 at 6:00 p.m. (prevailing Eastern Time).**

b) **<u>Failure of Counterparties to File Timely Sale Objection</u>. If a Counterparty fails to timely file with the Court and serve on the Objection Recipients a Sale Objection, the Counterparty shall be deemed to have consented to the assumption, assignment, and sale of the Cocoa Services' Contract (unless the Counterparty has filed a timely Cure Objection or Adequate Assurance Objection with respect to the Cocoa Services' Contract) to the applicable Winning Bidder and shall be forever barred from asserting any objection with regard to such assumption, assignment, and sale.**

8.      The inclusion of a Cocoa Services' Contract or Cure Costs on the Proposed Assumed Contracts Notice shall not constitute or be deemed a determination or admission by the Debtors, the Winning Bidder(s), or any other party in interest that such contract or other document is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code or that the stated Cure Costs are due (all rights with respect thereto being expressly reserved). The Debtors and JB Cocoa reserve all of their rights, claims, and causes of action with respect to each Cocoa Services' Contract or other document listed on the Proposed Assumed Contracts Notice.   The Presumed Assumed Contracts Notice shall be without prejudice to each Winning Bidder's rights, if any, under the applicable asset purchase agreement, to subsequently exclude any Cocoa Services' Contract from the assumption or assignment prior to the closing of an applicable Proposed Sale.

9.      The Debtors' assumption and/or assignment of a Cocoa Services' Contract is subject to approval by the Bankruptcy Court and consummation of the Proposed Sale. Absent consummation of the Proposed Sale and entry of a Sale Order approving the assumption and assignment of the Cocoa Services' Contract, the Cocoa Services' Contract shall be deemed neither assumed nor assigned, and shall in all respects be subject to subsequent assumption or rejection by the Debtor.

10.      Copies of the Motion, the Bidding Procedures Order, and the Bidding Procedures may be obtained free of charge at the website dedicated to the Debtors' chapter 11 cases maintained by their claims and noticing agent and administrative advisor, Prime Clerk LLC (https://cases.primeclerk.com/cocoaservices/).  Copies of these documents also are available for inspection during regular business hours at the Office of the Clerk of the Bankruptcy Court, located at One Bowling Green, New York, NY 10004, and may be viewed for a fee on the internet at the Bankruptcy Court's website (http://www.nysb.uscourts.gov/) by following the directions for accessing the ECF system on such website.

[Remainder of page intentionally left blank]

Dated: July 21, 2017

New York, New York

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP


By:_____/s/ Tracy Klestadt_____
      Tracy Klestadt

Tracy L. Klestadt
Joseph C. Corneau
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Fax: (212) 972-2245
Email: tklestadt@klestadt.com
       jcorneau@klestadt.com

    - and -

RIKER DANZIG SCHERER HYLAND &
PERRETTI LLP
Joseph L. Schwartz (*pro hac vice* admission
pending)
Tara J. Schellhorn
Rachel F. Gillen (*pro hac vice* admission
pending)
Headquarters Plaza, One Speedwell Avenue
Morristown, New Jersey 07960
Telephone: (973) 538-0800
Facsimile: (973) 538-1984
Email:  jschwartz@riker.com
       tschellhorn@riker.com
       rgillen@riker.com
Attorneys for the Debtor and
Debtor-in-Possession

4865035v2